**MASSACHUSETTS MUTUAL LIFE
INSURANCE COMPANY,
Plaintiff,**

**v.**

**UNITED STATES, Defendant.**

**No. 07–648T.**

United States Court of Federal Claims.

Jan. 30, 2012.

B. John Williams, Jr., Skadden, Arps, Slate, Meagher & Flom LLP, Washington, D.C. With him were Alan J.J. Swirski and Melissa L. Galetto, Skadden, Arps, Slate, Meagher & Flom LLP, of counsel.

Robert Stoddart, Trial Attorney, Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, D.C., for the defendant. With him were G. Robson Stewart, Assistant Chief, Court of Federal Claims Section, United States Department of Justice, David I. Pincus, Chief, Court of Federal Claims Section and John A. DiCicco, Principal Deputy Assistant Attorney General, Tax Division.

## OPINION

HORN, Judge.

"While in some cases, 'timing is everything,' here timing is the only thing...."[1]

### FINDINGS OF FACT

The plaintiff, Massachusetts Mutual Life Insurance Company (MassMutual), on behalf of itself, and as successor to Connecticut Mutual Life Insurance Company (ConnMutual), brought this claim to recover funds allegedly overpaid to the Internal Revenue Service (IRS) for the tax years 1995, 1996 and 1997,[2] when the IRS disallowed certain policyholder dividend deductions made pursuant to Board Resolutions in December 1995, 1996, and 1997, respectively. These Resolutions established a minimum amount of dividends that would be paid out to certain policyholders the following year (the Dividend Guarantees). As noted by the plaintiff, and

---

1. *Vulcan Basement Waterproofing of Illinois, Inc. v. NLRB*, 219 F.3d 677, 688 (7th Cir.2000) (quoting *N.L.R.B. v. Joy Recovery Tech. Corp.*, 134 F.3d 1307, 1314 (7th Cir.1998)).

2. The plaintiff's original complaint alleged additional grounds for recovery of federal income tax overpayment for additional tax years. The plaintiff, however, ultimately indicated it would not proceed on a number of the issues alleged in the complaint, specifically the claims raised regarding plaintiff's tax years from 1988 through 1994. The parties subsequently filed a stipulation for partial dismissal for plaintiff's claims regarding tax years 1988 through 1994, which have been dismissed.

not objected to by the defendant, "[p]laintiff is entitled to policyholder dividend deductions; the only issue is when." Plaintiff continued, "[i]t is undisputed that the dividends are deductible. The parties disagree solely about timing."

A trial was held and post-trial briefings on the legal and factual issues raised in this case were filed by both parties. After a review of the trial transcripts, the testimony, the exhibits entered into the record, and the submissions filed by the parties, the court makes the following findings of facts. MassMutual is a mutual life insurance company with its principle place of business in Springfield, Massachusetts. For the tax years 1995, 1996, and 1997, MassMutual was an accrual basis taxpayer, and timely filed its federal income tax return for each tax year at issue. In the fall of 1995, the Boards of Directors of MassMutual and ConnMutual approved a merger of the two companies. The merger was effective February 29, 1996, with MassMutual emerging as the surviving entity and succeeding to all of ConnMutual's rights and liabilities. Prior to the merger, ConnMutual was a mutual life insurance company with its principal place of business in Hartford, Connecticut. In 1995, ConnMutual was an accrual basis taxpayer, which also had timely filed its federal income tax return for the 1995 tax year.[3]

According to the Joint Stipulations of Fact, mutual life insurance companies, such as MassMutual and ConnMutual, operate for the benefit of their policyholders. Mutual life insurance companies typically issue two types of insurance policies, participating policies and non-participating policies. A participating policy is an insurance policy that is eligible to receive a share of any annual distribution of surplus, as declared by the Board of Directors of a mutual life insurance company. A non-participating policy does not receive a share of the annual distribution of surplus. Each year, mutual life insurance companies calculate their surplus, i.e., assets less reserves[4] and other liabilities. The mutual life insurance company's Board of Directors then approves the amount of surplus, known as the divisible surplus, to be returned to holders for participating policies, or participating policyholders. A sample MassMutual participating policy, included as a Joint Exhibit, stated: "Each year we determine how much money can be paid as dividends. This is called divisible surplus. We then determine how much of this divisible surplus is to be allocated to this [participating] policy."[5] A mutual life insurance company's divisible surplus is distributed to participating policyholders, consistent with the dividend scale developed by the company's management, and approved by the Board of Directors.

Mutual life insurance companies typically declare policyholder dividends at the end of each year. Dividends are then payable to participating policyholders whose policies are in force as of the anniversary date of their policy. An insurance policy is in force if the premiums for the policy are paid through its anniversary date. A policy that is not in force has lapsed. A lapse rate, usually expressed as a percentage, is the number of life insurance policies that lapsed within a given period, divided by the number of policies in force at the beginning of that period. Participating policyholders may choose to have their policyholder dividends applied to the following year's premium or purchase additional insurance instead of receiving the dividend.

---

**3.** The court's reference to plaintiff refers to the post-merger entity. When the court identifies MassMutual or ConnMutual, the court is referring only to the specifically identified entity.

**4.** As defined by Black's Law Dictionary, a reserve is "[f]unds set aside to cover future expenses, losses, claims, or liabilities. Sums of money an insurer is required to set aside as a fund for the liquidation of future unaccrued and contingent claims, and claims accrued, but contingent and indefinite as to amount." Black's Law Dictionary 1307–08 (6th ed. 1990).

**5.** The parties stipulated that "the language relating to policyholder dividends in Joint Exhibit 3 does not differ in any material respect from the language relating to policyholder dividends in all MassMutual policies outstanding in 1996, 1997, or 1998 that are at issue in this case." A sample ConnMutual participating policy also was included as a Joint Exhibit, and the parties similarly stipulated that "language relating to policyholder dividends in Joint Exhibit 2 does not differ in any material respect from the language relating to policyholder dividends in all ConnMutual policies outstanding in 1996 that are at issue in this case."

Policyholder dividends are generally not taxable to the policyholder until the aggregate dividends paid to a policyholder exceed the aggregate premiums paid by the policyholder. The point at which the aggregate dividends paid to a policyholder exceed the aggregate premiums paid by the policyholder is known as the cross-over point.

**1995 Tax Year**

*1995 MassMutual Dividend Guarantee*

On October 9, 1995, the Board of Directors of MassMutual approved the 1996 dividend scale recommended by MassMutual's Dividend Policy Committee. The 1996 dividend scale resulted in the apportionment of $517.3 million to all MassMutual's participating policies. In order to determine the amount of dividends to be guaranteed, MassMutual first calculated the dividends it expected to pay policyholders of post–1983 policies, pursuant to its 1996 dividend scale, $217.3 million, and then set the guaranteed amount at 85% of that amount, or $184.7 million. The final guaranteed amount was rounded up to $185.0 million.

MassMutual, and as described below, ConnMutual chose to apply the Dividend Guarantees only to policies issued after December 31, 1983 because of unfavorable tax consequences that would have resulted from also applying the Dividend Guarantees to the policies issued before January 1, 1984. Under Section 216(b)(1) of the Deficit Reduction Act of 1984, Pub.L. 98–369, 98 Stat. 758 (1984), life insurance companies were allowed a fresh start for then-existing policies as a benefit for the change in tax treatment in the deduction of policyholder dividends from a reserve basis to an accrual basis.[6] "The 'fresh start' for the change in policyholder dividend accounting was intended to mitigate the detriment caused taxpayers by the statutory change in such accounting; to the extent the detriment caused by the statutory change is mitigated in fact by a company's own change in business practices, the 'fresh start' was not intended to give a company additional tax benefits." Staff of the Joint Comm. on Taxation, 98th Cong., General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 611 (Comm. Print 1984). Therefore, pursuant to 26 U.S.C. § 808(f),[7]

6. Section 216(b)(1) states: "Except as provided in paragraph (2), in the case of any insurance company, any change in the method of accounting (and any change in the method of computing reserves) between such company's first taxable year beginning after December 31, 1983, and the preceding taxable year which is required solely by the amendments made by this subtitle shall be treated as not being a change in the method of accounting (or change in the method of computing reserves) for purposes of the Internal Revenue Code of 1954." Although Section 216(b)(1) of the Deficit Reduction Act of 1984 is not codified in the Tax Code, reference to Section 216(b)(1) appears at 26 U.S.C. § 801, note (2006). Moreover, 26 U.S.C. § 808(f), discussed below, specifically addresses the impact of the fresh start adjustment on policyholder dividends. *See* 26 U.S.C. § 808(f) (2006). Subsection (f) is titled: "Coordination of 1984 fresh-start adjustment with acceleration of policyholder dividends deduction through change in business practice." *Id.*

7. 26 U.S.C. § 808(f) states:
Coordination of 1984 fresh-start adjustment with acceleration of policyholder dividends deduction through change in business practice.
(1) In general.—The amount determined under paragraph (1) of subsection (c) for the year of change shall (before any reduction under paragraph (2) of subsection (c)) be reduced by so much of the accelerated policyholder dividends

deduction for such year as does not exceed the 1984 fresh-start adjustment for policyholder dividends (to the extent such adjustment was not previously taken into account under this subsection).
(2) Year of change.—For purposes of this subsection, the term "year of change" means the taxable year in which the change in business practices which results in the accelerated policyholder dividends deduction takes effect.
(3) Accelerated policyholder dividends deduction defined.—For purposes of this subsection, the term "accelerated policyholder dividends deduction" means the amount which (but for this subsection) would be determined for the taxable year under paragraph (1) of subsection (c) but which would have been determined (under such paragraph) for a later taxable year under the business practices of the taxpayer as in effect at the close of the preceding taxable year.
(4) 1984 fresh-start adjustment for policyholder dividends.—For purposes of this subsection, the term "1984 fresh-start adjustment for policyholder dividends" means the amounts held as of December 31, 1983, by the taxpayer as reserves for dividends to policyholders under section 811(b) (as in effect on the day before the date of the enactment of the Tax Reform Act of 1984) other than for dividends which accrued before January 1, 1984. Such amounts shall be properly reduced to reflect

acceleration of pre–1984 policyholder dividends, could result in the recapture of the fresh start benefit the life insurance company received for the pre–1984 policies. To avoid the recapture of the "fresh start" benefit, MassMutual and ConnMutual limited the Dividend Guarantees to only post–1983 policyholders. In explaining why the Dividend Guarantees only applied to post–1983 policies, Margaret Sperry, the former chief compliance officer of MassMutual, testified at trial: "If a company changed its practices with regard to dividends in order to accelerate the tax deduction of dividends on that pre–[19]84 population, the population that got the fresh start, then there would be an adjustment and the company would ... have to pay additional tax."

Ms. Sperry testified that, prior to 1995, MassMutual "was very aware of the difference between book and tax accounting on dividends...." She further stated that MassMutual "wanted to align the economics of what was going on, which was reflected in our financial reporting, align the tax accounting with that financial reporting...." In 1995, Ms. Sperry stated she consulted with the accounting firm KPMG and their tax counsel at the time, Steptoe & Johnson LLP, about a dividend guarantee. According to Ms. Sperry:

> what the guarantee did was it aligned a portion of our [MassMutual] dividends with the economics of what's going on where the board would have declared the amounts of divisible surplus reflective of the earnings of the company in 1995 and prior years, and by accruing that amount

of dividends associated with the guarantee in 1995, you have alignment mapping of the tax accounting, financial reporting, where the liability was firmly established, and the economics of what was going on.

In November 1995, MassMutual representatives met with representatives from the Massachusetts Division of Insurance, including the Insurance Commissioner, Linda Ruthardt and Assistant Commissioner, Kevin McAdoo. MassMutual explained to the Massachusetts Division of Insurance representatives that it intended to implement a dividend guarantee for MassMutual's post–1983 policyholders. MassMutual further explained that the reason MassMutual had informed the Massachusetts Division of Insurance was to ensure that the Massachusetts Division of Insurance did not have any objections to the dividend guarantee. The parties agree, at that meeting the Division of Insurance did not raise any objections to the dividend guarantee. Subsequent to the November 1995, meeting, on December 7, 1995, MassMutual sent a letter to the Massachusetts Division of Insurance informing the Massachusetts Division of Insurance of MassMutual's intention to adopt the dividend guarantee. The letter stated in part that MassMutual

> intends to guarantee absolutely and irrevocably that it will pay a specified amount of the total annual dividend apportionment determined as of December 31, 1995, for the period beginning January 1, 1996 and ending December 31, 1996.

> The purpose of this letter is to inform you of this anticipated guarantee so that you

the amount of previously nondeductible policyholder dividends (as determined under section 809(f) as in effect on the day before the date of the enactment of the Tax Reform Act of 1984).

(5) Separate application with respect to lines of business.—This subsection shall be applied separately with respect to each line of business of the taxpayer.

(6) Subsection not to apply to mere change in dividend amount.—This subsection shall not apply to a mere change in the amount of policyholder dividends.

(7) Subsection not to apply to policies issued after December 31, 1983.—

 (A) In general.—This subsection shall not apply to any policyholder dividend paid or accrued with respect to a policy issued after December 31, 1983.

 (B) Exchanges of substantially similar policies.—For purposes of subparagraph (A), any policy issued after December 31, 1983, in exchange for a substantially similar policy issued on or before such date shall be treated as issued before January 1, 1984. A similar rule shall apply in the case of a series of exchanges.

(8) Subsection to apply to policies provided under employee benefit plans.—This subsection shall not apply to any policyholder dividend paid or accrued with respect to a group policy issued in connection with a plan to provide welfare benefits to employees (within the meaning of section 419(e)(2)).

26 U.S.C. § 808(f).

will be fully informed concerning Mass Mutual's dividend practices.

Attached to the letter was a draft copy of the 1995 Mass Mutual Dividend Guarantee.

On December 8, 1995, Assistant Commissioner McAdoo of the Massachusetts Division of Insurance responded to MassMutual's December 7, 1995, letter, stating in part, "[t]hank you for informing the Division of Massachusetts Mutual Life Insurance Company's ('MassMutual') intention to guarantee absolutely and irrevocably the payment of a specified amount of the total annual dividend apportionment determined as of December 31, 1995, for the period beginning January 1, 1996 and ending December 31, 1996." Mr. McAdoo also stated, "[i]t is our understanding that you will monitor the payment of annual dividends during 1996 to assure that the guaranteed aggregate amount is paid in accordance with the 'Terms of the Annual Dividend Guarantee.' We intend to instruct the examiners who perform MassMutual's Examination to verify that the guaranteed aggregate amount is paid in accordance with the 'Terms of the Annual Dividend Guarantee.'" Consequently, MassMutual concluded that no Massachusetts state regulator, in his or her official capacity, objected to the legality of the 1995 MassMutual Dividend Guarantee.

At the December 13, 1995, MassMutual Board of Directors meeting, the Board of Directors stated it was guaranteeing a minimum amount of $185.0 million in policyholder dividends to be paid to post–1983 policyholders in the following year. The MassMutual Board of Directors voted:

> That the Company hereby absolutely and irrevocably commits and guarantees that, of the total apportionment from its surplus funds for the period beginning January 1, 1996 and ending December 31, 1996, said apportionment having previously been established by vote of this Board of Directors at its meeting held on October 9, 1995, it will pay or cause to be applied during 1996, in all events, annual dividends for participating individual life and annuity policies issued after December 31, 1983, in an amount of not less than $185 million; and that the Executive Vice President,

Corporate Financial Operations be, and he hereby is, made responsible for monitoring the payment of annual dividends during 1996 to assure that such guaranteed amount is so paid or applied.

The 1995 MassMutual Dividend Guarantee stated, in part:

4.1. During each year for which the Company has adopted an Annual Dividend Guarantee, the Company shall pay or apply annual policyholder dividends to its policyholders in accordance with its usual practices and procedures. The Company's adoption of an Annual Dividend Guarantee for any year shall not affect any individual policyholder's right to receive, or the Company's obligation to pay or apply, the annual policyholder dividend otherwise due to that individual policyholder on the applicable anniversary date.

4.2. Prior to December 31st of each year for which the Company has adopted an Annual Dividend Guarantee, the Company shall determine whether it actually has paid or applied annual policyholder dividends with respect to post–1983 policies in an amount at least equal to the specified amount of Guaranteed Dividends.

4.3. If the Company determines that it actually has paid or applied annual policyholder dividends with respect to post–1983 policies in an amount at least equal to the amount of Guaranteed Dividends specified, then the Company's Executive Vice President—Corporate Financial Operations shall certify that the Company has satisfied its obligations imposed under the Annual Dividend Guarantee.

4.4. If the amount of Guaranteed Dividends specified exceeds the amount of annual policyholder dividends that the Company actually has paid or applied during the year (plus the amount that the Company determines will be paid or applied through December 31st of the year) with respect to post–1983 policies, then the Company shall be obligated to pay or apply an additional amount of policyholder dividends, equal to such excess, with respect to post–1983 policies.

4.5 Such excess shall be apportioned among the post–1983 policies still in force

in proportion to the annual policyholder dividends otherwise paid or applied with respect to such policies during the year.

4.6 Such excess shall be paid or applied with respect to post–1983 policies during the year in accordance with the apportionment made pursuant to the preceding paragraph.

4.7 The Company's Executive Vice President—Corporate Financial Operations shall certify that such payments or applications have been made and that the Annual Dividend Guarantee has been properly implemented.

For the 1995 tax year, the guaranteed amount of dividends to be paid was 85% of the dividends MassMutual expected to pay to its post–1983 policyholders with policies still in force pursuant to its 1996 dividend scale. The 85% figure was set at a level that Mass-Mutual believed was virtually certain to be paid. At trial, Isadore Jermyn,[8] the Senior Vice President and Chief Actuary of Mass-Mutual, explained, "the intent was to choose an amount where the probability or the possibility that in fact a second amount of dividends would have to be paid in order to bring the total dividends up to the guarantee would be extremely remote." According to plaintiff's expert, Louis Lombardi, a second round of payments would have required a "total breakdown of our financial system," or some "unforeseeable cataclysmic event." In order for a second round of payments to be triggered, plaintiff's expert Lombardi testified that, based on his analysis, a 16% policy lapse rate would be required.

According to Mass Mutual's Chief Actuary, Mr. Jermyn, MassMutual's lapse rate was in the 5 to 6 percent range during the mid to late 1990s and the lapse rate was fairly stable. Mr. Jermyn added that "[i]t would be very unusual for those lapse rates to get up above 10 percent." Mr. Jermyn testified, however, that he believed the lapse rate would have to "be of the order of 50 percent" in order for a second round of payments to occur, and not just the 15% lapse rate assumed by Mr. Lombardi. Mr. Jermyn explained that for policies that lapse, typically one third of the policies lapse prior to their policy anniversary and two thirds of the policies lapse after the policy anniversary. Mr. Jermyn also stated that the majority of policies lapse after the policy anniversary because the policyholder still receives the full dividend even if the policy lapses after the policy anniversary date. Therefore, Mr. Jermyn reasoned, "you're going to need a 15 percent [of policies] to lapse before the anniversary, you need at least three times that to lapse in aggregate, so at least 45 percent, and I've sort of said roughly 50 percent need to lapse in order to result in less than 85 percent of the normal dividend being paid."

As of December 31, 1995, at least some of the MassMutual's post–1983 policies were paid through their anniversary date in the following year, including 78,569 post–1983 policies with anniversary dates of January, February, or March. Between January 1, 1996 and September 15, 1996, MassMutual paid $118,975,383.00 in policyholder dividends to its post–1983 policyholders. During 1996, MassMutual monitored the payment of post–

---

**8.** Mr. Jermyn testified at trial both as an employee of the plaintiff and as an expert witness. When asked about Mr. Jermyn's credibility to testify both as an employee and an expert, counsel for the defendant indicated if Mr. Jermyn stated "something is a fact I wouldn't question him if he has knowledge to know that it's a fact ... he [Mr. Jermyn] would be like any other fact witness, and to the extent he's being an expert all experts can have their conclusions questioned, and they're persuasive only to the extent that the logic is good." The court notes that simply because an expert witness is an employee of a party "does not disqualify his testimony, but would merely be a factor to be taken into consideration by the jury in weighing the credibility of his testimony." *Megarry Bros., Inc. v. United States,* 404 F.2d 479, 487 (8th Cir.1968); *see also Den*

*Norske Bank AS v. First Nat'l Bank of Boston,* 75 F.3d 49, 58 (1st Cir.1996); *Scheidt v. Klein,* 956 F.2d 963, 968 n. 4 (10th Cir.1992); *Dunn v. Sears, Roebuck & Co.,* 639 F.2d 1171, 1174 (5th Cir.), *modified on other grounds,* 645 F.2d 511 (5th Cir.1981). The United States Court of Appeals for the Federal Circuit has stated that "a witness's pecuniary interest in the outcome of a case goes to the probative weight of testimony, not its admissibility," and cited the holding of *Den Norske Bank AS v. First Nat'l Bank of Boston* that "interests of expert witnesses who were employees of plaintiff affected the weight of their testimony, not its admissibility." *Ethicon, Inc. v. U.S. Surgical Corp.,* 135 F.3d 1456, 1465 (Fed. Cir.), *reh'g denied, en banc suggestion declined* (Fed.Cir.), *cert. denied,* 525 U.S. 923, 119 S.Ct. 278, 142 L.Ed.2d 229 (1998).

1983 policyholder dividends, and on December 12, 1996, MassMutual determined that the $185.0 million had been satisfied with post–1983 policyholder dividends paid through November 30, 1996. Under the 1996 dividend scales, MassMutual and ConnMutual paid a total of $319.8 million in dividends to post–1983 policyholders, which exceeded the combined amount of the 1995 ConnMutual Dividend Guarantee and the 1995 MassMutual Dividend Guarantee by $37.8 million. No second round of payments was required for the 1995 MassMutual Dividend Guarantee.

*1995 ConnMutual Dividend Guarantee*

Similar to MassMutual, ConnMutual adopted a dividend guarantee in 1995. In a November 6, 1995, letter to the Connecticut Department of Insurance, J. Brinke Marcuccilli, ConnMutual's Senior Vice President and Chief Financial Officer, indicated that ConnMutual intended to adopt the dividend guarantee in a measure to provide further assurance to ConnMutual's policyholders "regarding the financial strength and strategic benefits generated by the merger...." In that same letter, ConnMutual informed the Connecticut Insurance Department of ConnMutual's intent to adopt a dividend guarantee and disclose the guarantee in its 1995 Annual Statement. The relevant portion of the letter stated:

> As a measure to provide further assurance to our respective policyholders regarding the financial strength and strategic benefits generated by the merger, both CML [ConnMutual] and MM [MassMutual] will be supplementing its 1996 dividend scale action with an unconditional guarantee as to a portion of its current dividend provisions. In our year end balance sheets, we will segregate the applicable portion of our dividend liability, and include appropriate footnote disclosure explaining the scope and nature of the guarantee.

No state regulator, including any Connecticut state regulator, in his or her official capacity, objected to the legality of the 1995 ConnMutual Dividend Guarantee.

On November 27, 1995, the ConnMutual Board of Directors voted to approve the 1996 dividend scale. The 1996 dividend scale resulted in the apportionment of $302.5 million to all ConnMutual's participating policies. On December 8, 1995, the ConnMutual Board of Directors stated it was guaranteeing a minimum amount of $97.0 million in policyholder dividends to post–1983 policyholders the following year. At the December 8, 1995, meeting, the ConnMutual Board of Directors voted that:

> Supplementing the 1996 Dividend Scale vote was taken at the November 27, 1995, meeting of this Board, the Company hereby absolutely and irrevocably commits and guarantees that, of the total apportionment for the period beginning January 1, 1996 and ending December 31, 1996, it will pay or cause to be applied in all events, annual dividends in 1996, for participating individual life and annuity policies issued after December 31, 1983, in the amount of at least $97 million; and
>
> That the Chief Financial Officer is hereby charged with monitoring the payment of annual dividends during 1996 to assure that the total guarantee is paid as applied in accordance with the *Connecticut Mutual Life Insurance Company 1996 Annual Dividend Guarantee Policy.*

(emphasis in original). To determine the amount of dividends to be guaranteed, ConnMutual first calculated the dividends it expected to pay to the post–1983 policies pursuant to its 1996 dividend scale, $114,925,864.00, and then calculated the guarantee at 85% of that amount, or $97,686,984.00. The final guaranteed amount was rounded down to $97.0 million. As with the 1995 MassMutual Dividend Guarantee, ConnMutual limited the 1995 ConnMutual Dividend Guarantee to only post–1983 policyholders to avoid adverse tax consequences. The 1995 ConnMutual Dividend Guarantee was set a level that ConnMutual believed was virtually certain to be paid.

The 1995 ConnMutual Dividend Guarantee was substantially similar to the 1995 MassMutual Dividend Guarantee, including, for example, the definitions of Annual Dividend Guarantee and Guaranteed Dividends; however, there were some differences between the two. The definition of Company was different for the 1995 ConnMutual Dividend

Guarantee and 1995 MassMutual Dividend Guarantee, as was the title of the person charged with monitoring and certifying the payments of the dividends, with the 1995 ConnMutual Dividend Guarantee referring to the Company's Chief Financial Officer and 1995 MassMutual Dividend Guarantee referring to the Company's Executive Vice President–Corporate Financial Operations. The only substantive difference between the 1995 ConnMutual Dividend Guarantee and the 1995 MassMutual Dividend Guarantee, however, was Section 4.7. Section 4.7 of the 1995 MassMutual Dividend Guarantee stated: "The Company's Executive Vice President–Corporate Financial Operations shall certify that such payments or applications have been made or that the Annual Dividend Guarantee has been properly implemented." Section 4.7 of the 1995 ConnMutual Dividend Guarantee included the following additional sentence: "The Company's Chief Financial Officer shall certify that such payments or application described in Sections 4.4 and 4.5 have been made and the Annual Dividend Guarantee has been properly implemented. Failure to so certify shall not impair, defeat, or invalidate the action of the Board of Directors in establishing the Annual Guarantee."

In the letter to the Connecticut Insurance Department, ConnMutual indicated that it had included a footnote in its 1995 Annual Statement regarding the 1995 ConnMutual Dividend Guarantee. Footnote 22b in the ConnMutual Annual Statement stated: "The Board of Directors has further guaranteed that in 1996, a total of no less than $97.0 million will be paid or applied in the aggregate as annual dividends on certain life insurance and annuity contracts issued before January 1, 1996."

As of December 31, 1995, at least some of ConnMutual's post–1983 policies were paid through their anniversary dates the following year, including 22,595 post–1983 policies with anniversary dates of January, February, or March. After the merger, MassMutual monitored the payment of ConnMutual's post–1983 policyholder dividends in 1996. Between January 1, 1996 and September 15, 1996, MassMutual paid a total of $77,425,125.00 in policyholder dividends to former ConnMutual post–1983 policyholders. On December 12, 1996, MassMutual determined that ConnMutual's $97.0 million dividend guarantee had been satisfied with post–1983 policyholder dividends paid through November 30, 1996. No second round of payments was required for the 1995 ConnMutual Dividend Guarantee.

**1996 Tax Year**

*1996 MassMutual Dividend Guarantee*

On October 14, 1996, the Board of Directors of MassMutual approved the 1997 dividend scale recommended by the Dividend Policy Committee. The 1997 dividend scale resulted in the apportionment of $873.3 million to all MassMutual's participating policies. On December 11, 1996, MassMutual's Board of Directors stated it was guaranteeing a minimum of $310.0 in policyholder dividend to be paid to post–1983 policyholders the following year. In order to determine the amount of dividends to be guaranteed, MassMutual calculated the dividends it expected to pay to the post–1983 policies pursuant to its 1997 dividend scale, $365.0 million and then set the guaranteed amount at 85% of that amount, or $310.3 million. The final guaranteed amount was rounded down to $310.0 million. The 1996 MassMutual Dividend Guarantee was set at a level MassMutual believed was virtually certain to be paid. At the December 11, 1996, MassMutual Board of Directors meeting, the Board of Directors voted:

> That the Company hereby and absolutely and irrevocably commits and guarantees that, of the total apportionment from its surplus funds for the period beginning January 1, 1997 and ending December 31, 1997, said apportionment having previously been established by vote of this Board of Directors at its meeting held on October 14, 1996, it will pay or cause to be applied during 1997, in all events, annual dividends for participating individual life and annuity policies issued after December 31, 1983, in an amount not less than $310 million; and that the Executive Vice President, Corporate Financial Operations be, and he hereby is, made responsible for monitoring the payment of annual dividends during 1997

to assure that such guaranteed amount is so paid or applied.

The 1996 Dividend Guarantee enacted by the MassMutual Board of Directors on December 11, 1996 was identical to the 1995 MassMutual Dividend Guarantee enacted the previous year.

On December 23, 1996, MassMutual sent a letter to the Massachusetts Division of Insurance indicating that MassMutual had:

> guaranteed absolutely and irrevocably that it would pay a specified amount of the total annual dividend apportionment determined as of December 31, 1995, for the period beginning January 1, 1996 and ending December 31, 1996. MassMutual continued this practice for 1996. MassMutual has guaranteed absolutely and irrevocably that it will pay a specified amount of the total annual dividend apportionment determined as of December 31, 1996, for the period beginning January 1, 1997 and ending December 31, 1997.

The December 23, 1996, letter noted that amount the MassMutual Board of Directors voted to guarantee was "not less than $310 million." The letter continued, "[t]he purpose of this letter is to inform you of the continuation of this guarantee so that you will be fully informed concerning MassMutual's dividend practices." The letter also noted that "[t]he difference between the 1995 MassMutual guarantee amount of $185 million and the 1996 guarantee amount is due primarily to the inclusion of a guarantee on policies issued by Connecticut Mutual, thereby also continuing Connecticut Mutual's practice of guaranteeing the payment of these dividends." Attached to the letter was a copy of the 1996 MassMutual Dividend Guarantee.

On December 26, 1996, Assistant Commissioner McAdoo of the Massachusetts Division on Insurance returned a copy of the MassMutual's December 23, 1996, letter which was stamped "approved." No state regulator, including any Massachusetts state regulator, in his or her official capacity, had objected to the legality of the 1996 MassMutual Dividend Guarantee.

As of December 31, 1996, at least some of the MassMutual's post–1983 policies were paid through their anniversary date in the following year, including 79,269 post–1983 policies with anniversary dates of January, February, or March. Between January 1, 1997 and September 15, 1997, MassMutual paid $136,930,036.00 in policyholder dividends to its post–1983 policyholders and $67,325,356.00 in policyholder dividends to former ConnMutual post–1983 policyholders. During 1997, MassMutual monitored the payment of post–1983 policyholder dividends, and on December 5, 1997, MassMutual determined that the $310.0 million guaranteed amount had been satisfied with post–1983 policyholder dividends paid through November 30, 1997. Under the 1997 dividend scale, MassMutual paid $354.7 million in dividends to post–1983 policyholders, which exceeded the 1996 MassMutual Dividend Guarantee by $44.7 million. No second round of payments was required for the 1996 MassMutual Dividend Guarantee.

**1997 Tax Year**

*1997 MassMutual Dividend Guarantee*

On October 13, 1997, the MassMutual Board of Directors approved the 1998 dividend scale recommended by the Dividend Policy Committee. The 1998 dividend scale resulted in the apportionment of $939.0 million to all MassMutual's participating policies. On December 10, 1997, MassMutual's Board of Directors stated it was guaranteeing a minimum of $360.0 million in policyholder dividend to be paid to post–1983 policyholders the following year. In order to determine the amount of dividends to be guaranteed, MassMutual first calculated the dividends it expected to pay to the post–1983 policies pursuant to its 1998 dividend scale, $425.3 million and then set the guaranteed amount at 85% of that amount, or $361.5 million. The final guaranteed amount was rounded down to $360.0 million. As with the other Dividend Guarantees, the 1997 MassMutual Dividend Guarantee was set at a level MassMutual believed was virtually certain to be paid.

The MassMutual Board of Directors voted at the December 10, 1997, Board of Directors meeting:

That the Company hereby and absolutely and irrevocably commits and guarantees that, of the total apportionment from its surplus funds for the period beginning January 1, 1998 and ending December 31, 1998, said apportionment having previously been established by vote of this Board of Directors at its meeting held on October 13, 1997, it will pay or cause to be applied during 1998, in all events, annual dividends for participating individual life and annuity policies issued after December 31, 1983, in an amount of not less than $360 million; and that the Executive Vice President and Chief Financial Officer be, and he hereby is, made responsible for monitoring the payment of annual dividends during 1998 to assure that such guaranteed amount is so paid or applied.

The 1997 Dividend Guarantee enacted by the MassMutual Board of Directors on December 10, 1997, was substantially similar to the MassMutual Dividend Guarantees had enacted in 1995 and 1996. The only difference between the 1997 MassMutual Dividend Guarantee from the 1995 and 1996 MassMutual Dividend Guarantees, was the title of the Executive Vice President charged with monitoring and certifying the payments of the dividends. In Sections 3.1 and 4.7 of the 1995 and 1996 MassMutual Dividend Guarantees list the title of the Vice President as Executive Vice President–Corporate Financial Operations, whereas in Sections 3.1 and 4.7 of the 1997 MassMutual Dividend Guarantee, the title is listed as the Executive Vice President and Chief Financial Officer.

On December 23, 1997, MassMutual sent a letter to the Massachusetts Division of Insurance indicating that MassMutual had again adopted a dividend guarantee which:

guaranteed absolutely and irrevocably that it would pay a specified amount of the total annual dividend apportionment determined as of December 31, 1995, for the period beginning January 1, 1996 and ending December 31, 1996. MassMutual continued this practice in 1996 and 1997. MassMutual has guaranteed absolutely and irrevocably that it will pay a specified amount of the total annual dividend apportionment determined as of December 31, 1997, for the period beginning January 1, 1998 and ending December 31, 1998.

The letter noted that amount the MassMutual Board of Directors voted to guarantee was "not less than $360 million." The letter continued, "[t]he purpose of this letter is to inform you of the continuation of this guarantee so that you will be fully informed concerning MassMutual's dividend practices." Attached to the letter was a copy of the 1997 MassMutual Dividend Guarantee. No state regulator, including any Massachusetts state regulator, in his or her official capacity, objected to the legality of the 1997 MassMutual Dividend Guarantee.

As of December 31, 1997, at least some of the MassMutual's post–1983 policies were paid through their anniversary date in the following year, including 79,628 post–1983 policies with anniversary dates of January, February, or March. Between January 1, 1998 and September 15, 1998, MassMutual paid $163,402,093.00 in policyholder dividends to its post–1983 policyholders and $75,226,505.00 in policyholder dividends to former ConnMutual post–1983 policyholders. During 1998, MassMutual monitored the payment of post–1983 policyholder dividends, and on December 5, 1997, MassMutual determined that the $360.0 million had been satisfied with post–1983 policyholder dividends paid through November 30, 1998. Under the 1998 dividend scale, MassMutual paid $415.1 million in dividends to post–1983 policyholders, which exceeded the 1997 MassMutual Dividend Guarantee by $55.1 million. No second round of payments was required for the 1997 MassMutual Dividend Guarantee.

Additionally, for the tax years at issue, none of the post–1983 policies had reached the cross-over point, at which point the aggregate dividends paid on a policy exceeded the aggregate premiums paid on the policy. Mr. Jermyn testified that a typical policy issued today "would have to wait at least 30 years before their cumulative dividends would start exceeding their cumulative premiums" or reached the cross-over point. Mr. Jermyn noted that because interest rates were higher and dividend scales were higher, the cross-over point would be shorter for policies purchased in the early 1980s, but he

"would be very surprised if that period was shorter than say 20 years" and none of the post–1983 policies would have been 20 years or older in the years at issue. Mr. Jermyn also noted that the majority of policyholders use their policyholder dividends to purchase insurance as paid-up additions, considered additional premiums, which would extend the time before the cross-over point was reached. Paid-up additions refer to policyholder dividends applied to the following year's premium or used to purchase additional insurance instead of being received by the policyholder.

When asked if she and her fellow employees considered the dividend guarantee revocable, Ms. Sperry stated "we would not have thought that any action taken by the dividend policy committee and then recommend to and acted on by our full board of directors would be viewed as revocable. . . ." Ms. Sperry stated that in addition, MassMutual "would not go to the Commissioner of our state of domicile with an action that we thought would not be a serious commitment, and that we intended it as such and viewed it as such."

Plaintiff's amended complaint alleged that for the taxable years 1995, 1996, and 1997, MassMutual was entitled to claim deductions as a result of the 1995, 1996, and 1997 MassMutual Dividend Guarantees. The parties stipulated that "[b]oth MassMutual and ConnMutual took the necessary administrative steps to elect the 'recurring item exception' within the meaning of Internal Revenue Code § 461(h)(3) with respect to policyholder dividends for the years at issue." The parties agree that the IRS denied MassMutual's claims to accrue its liability to pay the MassMutual Guarantee Dividends and deduct those changes for the tax years 1995, 1996, and 1997. The parties further agree that MassMutual timely filed claims for refund of federal income tax for the taxable years 1995, 1996 and 1997 and that the IRS had not taken any action on MassMutual's claims as of the date of the filing of the lawsuit in this court.

Plaintiff's amended complaint also alleged that for the 1995 tax year, ConnMutual was entitled to claim deductions as a result of the ConnMutual 1995 Dividend Guarantee. The parties agree that the IRS denied ConnMutual's claim to accrue its liability to pay the Guarantee Dividends and deduct that change in the accrual for 1995. The parties further agree that MassMutual, as successor to ConnMutual, filed a timely claim for refund of federal income tax for the 1995 tax year, and that the IRS partially disallowed the refund claim.

In its amended complaint plaintiff claims deductions for $77,425,125.00 in policyholder dividends attributable to ConnMutual's Dividend Guarantee for tax year 1995. Plaintiff also claims deductions for $118,975,383.00 in policyholder dividends attributable to the 1995 MassMutual Dividend Guarantee for tax year 1995, $7,854,784.00 in policyholder dividends attributable to the 1996 MassMutual Dividend Guarantee for tax year 1996, and $34,373,306.00 in policyholder dividends attributable to the 1997 MassMutual Dividend Guarantee for tax year 1997. This opinion addresses only the liability regarding the dividend guarantee issue.

## DISCUSSION

The parties agree that the issue to be resolved during this phase of the litigation is:

For each of the three years before the Court, the ultimate issue is whether, for federal income tax purposes, Plaintiff is entitled to a deduction based on the declared guaranteed minimum amount in the year of declaration. The answer to this question requires a determination of the following sub-issues:

1. Whether, in the years they were adopted, the Resolutions fixed Plaintiff's liability to pay the declared guaranteed minimum amounts in the following year. . . .

2. Whether Plaintiff's policyholder dividends are rebates, refunds, or similar payments under Treas. Reg. § 1.461–4(g)(3) that qualify for the recurring item exception under Treas. Reg. § 1.461–5(b)(5)(ii).

The plaintiff argued that its liability for the guaranteed amount of the policyholder dividends satisfies the requirements of the "all events test" and "[a]ccordingly, Plaintiff was entitled to deduct in tax years 1995, 1996 and

1997 a portion of the guaranteed minimum amount of policyholder dividends declared by Plaintiff's board of directors in 1995, 1996 and 1997." In contrast, the defendant argued that the guaranteed minimum amount of policyholder dividends could not be deducted "in the year in which the boards adopted the resolutions—because the dividend guarantees do not meet the all-events test for accrual under the Internal Revenue Code and the regulations." (citations omitted).

■ In a tax refund case, there is a presumption of the correctness of the findings of the Commissioner of Internal Revenue. *See United States v. Fior D'Italia, Inc.*, 536 U.S. 238, 243, 122 S.Ct. 2117, 153 L.Ed.2d 280 (2002) ("An 'assessment' amounts to an IRS determination that a taxpayer owes the Federal Government a certain amount of unpaid taxes. It is well established in the tax law that an assessment is entitled to a legal presumption of correctness—a presumption that can help the Government prove its case against a taxpayer in court."); *Conway v. United States*, 326 F.3d 1268, 1278 (Fed.Cir.) ("The ruling of the Commissioner of Internal Revenue enjoys a presumption of correctness and a taxpayer bears the burden of proving it to be wrong." (quoting *Transamerica Corp. v. United States*, 902 F.2d 1540, 1543 (Fed.Cir.1990)), *reh'g denied* (Fed.Cir. 2003)); *see also Stobie Creek Inv. LLC v. United States*, 608 F.3d 1366, 1381 (Fed.Cir.2010); *Bubble Room, Inc. v. United States*, 159 F.3d 553, 561 (Fed.Cir.1998) ("In a tax refund case, the ruling of the Commissioner of Internal Revenue is presumed correct."), *reh'g denied, en banc suggestion declined* (Fed. Cir. 1999); *Lima Surgical Assocs., Inc. v. United States*, 944 F.2d 885, 888 (Fed.Cir. 1991) ("[D]eterminations of the Commissioner of Internal Revenue are presumptively correct.").

■ The taxpayer has the burden of rebutting the presumption of correctness, but also "the taxpayer has the burden of establishing entitlement to the specific refund amount claimed." *Bubble Room, Inc. v. United States*, 159 F.3d at 561; *see also United States v. Gen. Dynamics Corp.*, 481 U.S. 239, 245, 107 S.Ct. 1732, 95 L.Ed.2d 226

(1987) ("The taxpayer has the burden of proving its entitlement to a deduction." (citing *Helvering v. Taylor*, 293 U.S. 507, 514, 55 S.Ct. 287, 79 L.Ed. 623 (1935)). Similarly the Supreme Court has endorsed the " ' "familiar rule" that "an income tax deduction is a matter of legislative grace and that the burden of clearly showing the right to the claimed deduction is on the taxpayer." ' " *Knight v. Comm'r*, 552 U.S. 181, 192, 128 S.Ct. 782, 169 L.Ed.2d 652 (2008) (quoting *INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 84, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992) (quoting *Interstate Transit Lines v. Comm'r*, 319 U.S. 590, 593, 63 S.Ct. 1279, 87 L.Ed. 1607 (1943))); *see also United States v. Janis*, 428 U.S. 433, 440–41, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976) ("In a refund suit the taxpayer bears the burden of proving the amount he is entitled to recover." (citing *Lewis v. Reynolds*, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293, *modified*, 284 U.S. 599, 52 S.Ct. 264, 76 L.Ed. 514 (1932)); *Helvering v. Taylor*, 293 U.S. at 515, 55 S.Ct. 287 ("Unquestionably the burden of proof is on the taxpayer to show that the Commissioner's determination is invalid."); *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933) ("The Commissioner of Internal Revenue['s] . . . ruling has the support of a presumption of correctness, and the petitioner has the burden of proving it to be wrong." (citing *Wickwire v. Reinecke*, 275 U.S. 101, 48 S.Ct. 43, 72 L.Ed. 184 (1927)); *Charron v. United States*, 200 F.3d 785, 792 (Fed.Cir.1999) ("Since the [plaintiffs] were seeking refunds of taxes they had paid, they have the burden of proving they are entitled to the amount sought."); *Danville Plywood Corp. v. United States*, 899 F.2d 3, 7–8 (Fed.Cir.1990); *Barenholtz v. United States*, 784 F.2d 375, 381 (Fed.Cir.1986); *Young & Rubicam, Inc. v. United States*, 187 Ct.Cl. 635, 654–55, 410 F.2d 1233, 1244–45 (1969).

■ To rebut the presumption of the Commissioner's correctness, "the taxpayer must come forward with enough evidence to support a finding contrary to the Commissioner's determination." *Bubble Room, Inc. v. United States*, 159 F.3d at 561. Stated otherwise, to overcome the presumption, the taxpayer has the burden of presenting "sub-

stantial evidence as to the wrongfulness of the Commissioner's determination." *KFOX, Inc. v. United States*, 206 Ct.Cl. 143, 151–152, 510 F.2d 1365, 1369 (1975); *Arrington v. United States*, 34 Fed.Cl. 144, 147 (1995), *aff'd*, 108 F.3d 1393 (Fed.Cir.1997) (table). The burden imposed on a plaintiff is both the burden of going forward and the burden of persuasion. Thus, a plaintiff first must come forward with enough evidence to support a finding contrary to the Commissioner's determination. *See Transamerica Corp. v. United States*, 902 F.2d at 1543; *Danville Plywood Corp. v. United States*, 899 F.2d at 7–8; *Arrington v. United States*, 34 Fed.Cl. at 147. Even after satisfying the burden of going forward, a plaintiff must still carry the ultimate burden of proof. *See Transamerica Corp. v. United States*, 902 F.2d at 1543; *Danville Plywood Corp. v. United States*, 899 F.2d at 8.

**The "All Events Test"**

The Tax Code at § 461(a) (2006) states: "The amount of any deduction or credit allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income." 26 U.S.C. § 461(a). The parties agree that MassMutual was an accrual basis taxpayer for tax years 1995, 1996, and 1997, and that ConnMutual was an accrual basis taxpayer for the 1995 tax year.[9] Pursuant to the accrual method of accounting, the Tax Code permits the deduction of an expense in the year in which it is "incurred," regardless of when the expense is actually paid. *See* 26 U.S.C. § 162(a) (2006) ("There shall be allowed as a deduction all the ordinary and necessary expenses paid or

incurred during the taxable year in carrying on any trade or business . . . ."); *see also Avon Prods., Inc. v. United States*, 97 F.3d 1435, 1438 (Fed.Cir.1996).

Treasury Regulation § 1.461–1(a)(2)(i) (2012) states under the accrual method "a liability (as defined in [Treas. Reg.] § 1.446–1(c)(1)(ii)(B))[10] is incurred, and generally is taken into account for Federal income tax purposes, in the taxable year in which all the events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability." Treas. Reg. § 1.461–1(a)(2)(i).

In *United States v. General Dynamics Corp.*, the United States Supreme Court indicated, "[a]s we noted in *United States v. Hughes Properties, Inc.*, 476 U.S. 593, 600, 106 S.Ct. 2092, 2096, 90 L.Ed.2d 569 (1986), whether a business expense has been 'incurred' so as to entitle an accrual-basis taxpayer to deduct it under § 162(a) of the Internal Revenue Code, 26 U.S.C. § 162(a), is governed by the 'all events' test that originated in *United States v. Anderson*, 269 U.S. 422, 441, 46 S.Ct. 131, 134, 70 L.Ed. 347 (1926)." *United States v. Gen. Dynamics Corp.*, 481 U.S. at 242, 107 S.Ct. 1732; *see also United States v. Hughes Props., Inc.*, 476 U.S. 593, 600, 106 S.Ct. 2092, 90 L.Ed.2d 569 (1986). In *Anderson*, the Supreme Court stated "a tax does not accrue until it has been assessed and becomes due; but it is also true that in advance of the assessment of a tax, all the events may occur which fix the amount of the tax and determine the liability of the taxpayer to pay it." *United States v. Anderson*, 269 U.S. 422, 441, 46 S.Ct. 131, 70

---

9. The Tax Code and Treasury Regulations require life insurance companies to utilize the accrual method of accounting, or to the extent permitted in Treasury Regulation § 1.818–2(a)(2), a combination of the accrual method with any other method of accounting permitted by the Tax Code other than the cash receipts and disbursements method. *See* 26 U.S.C. § 811(a) (2006); *see also* Treas. Reg. § 1.818–2(a)(1) and § 1.818–2(a)(1) (2012); *Nat'l Life Ins. Co. v. Comm'r*, 103 F.3d 5, 6 (2d Cir.1996); *Mass. Mut. Life Ins. Co. v. United States*, 66 Fed.Cl. 217, 226 (2005); 2 Mertens, Law of Federal Income Taxation § 12A:118, at 12A–189 (Supp. 2009). Treasury Regulation § 1.818–2(a)(1) states in part,

"Section 818(a)(1) provides the general rule that all computations entering into the determination of taxes imposed by part I, subchapter L, chapter 1 of the Code, shall be made under an accrual method of accounting. Thus, the over-all method of accounting for life insurance companies shall be the accrual method." Treas. Reg. § 1.818–2(a)(1) (2012).

10. Treasury Regulation § 1.446–1(c)(1)(ii)(B) states in part, "[t]he term 'liability' includes any item allowable as a deduction, cost, or expense for Federal income tax purposes." Treas. Reg. § 1.446–1(c)(1)(ii)(B) (2012).

L.Ed. 347 (1926). Subsequently, the Supreme Court described the "all events test" as "a fundamental principle of tax accounting" and "the 'touchstone' for determining the year in which an item of deduction accrues...." *United States v. Consol. Edison Co.*, 366 U.S. 380, 385, 81 S.Ct. 1326, 6 L.Ed.2d 356 (1961); *see also United States v. Hughes Props., Inc.*, 476 U.S. at 600, 106 S.Ct. 2092. In *United States v. General Dynamics Corp.*, the Supreme Court noted in a footnote,

> The "all events" test has been incorporated into the Internal Revenue Code by the Deficit Reduction Act of 1984, Pub.L. 98–369, 98 Stat. 598, 607, 26 U.S.C. § 461(h)(4) (1982 ed., Supp. III). Section 461(h) imposed limits on the application of the test, providing that 'in determining whether an amount has been incurred with respect to any item during any taxable year, the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs.' § 461(h)(1). The pertinent portions of the 1984 amendments were retained in the Tax Reform Act of 1986.

*United States v. Gen. Dynamics Corp.*, 481 U.S. at 243 n. 3, 107 S.Ct. 1732; *see also Metro Leasing and Dev. Corp. v. Comm'r*, 376 F.3d 1015, 1023 (9th Cir.2004) ("In 1984 this 'all events test' was engrafted into the Internal Revenue Code. In general, an accrual basis taxpayer may not deduct an expense until (1) all events have occurred that determine the fact of liability; (2) the amount of the liability can be determined with reasonable accuracy; and (3) economic performance or payment has occurred." (citing 26 U.S.C. § 461(h) and Treas. Reg. § 1.461–1(a)(2))).

Similarly, in *Coltec Industries, Inc. v. United States*, 454 F.3d 1340 (Fed.Cir.), *reh'g denied* (Fed.Cir. 2006), *cert. denied*, 549 U.S. 1206, 127 S.Ct. 1261, 167 L.Ed.2d 76 (2007), the United States Court of Appeals for the Federal Circuit indicated that a liability is incurred in the taxable year in which all events have occurred to establish the fact of the liability. *See id.* at 1347 (citing Treas. Reg. § 1.461–1(a)(2)(i)); *see also Interex, Inc. v. Comm'r*, 321 F.3d 55, 58 (1st Cir.2003) ("Accrual method taxpayers may deduct ex-

penses when they are incurred even if they have not yet been paid, as long as three factors are met: 1) all of the events that establish the fact of the liability must have occurred; 2) the amount must be able to be determined 'with reasonable accuracy;' and 3) economic performance must have occurred."); *Chernin v. United States*, 149 F.3d 805, 808–09 (8th Cir.1998) (citing Treas. Reg. § 1.461–1(a)(2)) ("In general, an accrual basis taxpayer may not deduct an expense until (1) all events have occurred that determine the fact of liability; (2) the amount thereof can be determined with reasonable accuracy; and (3) economic performance has occurred with respect to the expense.").

The Tax Code at § 461(h)(4), defines the requirements of the "all events test" by stating, "[f]or purposes of this subsection, the all events test is met with respect to any item if all events have occurred which determine the fact of liability and the amount of such liability can be determined with reasonable accuracy." 26 U.S.C. § 461(h)(4). According to the United States Court of Appeals for the Federal Circuit, "[a]s that test [the "all events test"] would have it, a liability can only be included in basis 'for the taxable year in which all the events have occurred which determine the fact of liability and the amount thereof can be determined with reasonable accuracy.'" *Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 974 (Fed.Cir. 2009) (quoting *La Rue v. Comm'r*, 90 T.C. 465, 478 (1988) (discussing the "all events test" in the context of a partnership and 26 U.S.C. § 752 (2006))). Likewise, the United States Court of Claims noted,

> [i]f all events which determine liability and fix the amount of the tax occur before the end of the prior year, a deduction is available to an accrual basis taxpayer.... The "all events" test has been applied frequently and regularly in this court and other jurisdictions to determine proper timing for tax expense deductions.

*Eastman Kodak Co. v. United States*, 209 Ct.Cl. 365, 371, 534 F.2d 252, 256 (1976).

Explaining the specific effect of the Deficit Reduction Act of 1984 on tax implications of policyholder dividends to insurance companies and its relation to the "all events test,"

the treatise Federal Taxation of Insurance Companies states:

> [T]he 1984 Act [the Deficit Reduction Act of 1984] permitted the deduction for policyholder dividends to equal the policyholder dividends paid or accrued during the tax year. Thus, the concept of a reserve for policyholder dividends contained in prior law has been eliminated and replaced by a more stringent accrual standard. The intent of the provision was likely to place the liability for dividends declared on a par with other liabilities subject to the "all events" tests.

Federal Taxation of Insurance Companies ¶ 7.03, at 708 (1999) (footnote omitted).

*The Fact of Liability*

The Tax Code states, with respect to the first element of the "all events test," "the all events test is met with respect to any item if all events have occurred which determine the fact of liability...." 26 U.S.C. § 461(h)(4); *see also* Treas. Reg. § 1.461–1(a)(2)(i). According to the United States Supreme Court, "[i]t is fundamental to the 'all events' test that, although expenses may be deductible before they have become due and payable, liability must first be firmly established." *United States v. Gen. Dynamics Corp.*, 481 U.S. at 243, 107 S.Ct. 1732. Similarly, the United States Court of Appeals for the Federal Circuit has indicated "[t]he all events test ... states that *'an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability ....'"* *Iowa S. Utils. Co. v. United States*, 841 F.2d 1108, 1114 (Fed.Cir.1988) (quoting Treas. Reg. § 1.461–1(a)(2)) (emphasis in original). The United States Supreme Court in *United States v. Hughes Properties, Inc.,* noted that "the Court's cases have emphasized that 'a liability does not accrue as long as it remains contingent.'" *United States v. Hughes Props., Inc.,* 476 U.S. at 600, 106 S.Ct. 2092 (quoting *Brown v. Helvering,* 291 U.S. 193, 200, 54 S.Ct. 356, 78 L.Ed. 725 (1934)); *see also Dixie Pine Prods. Co. v. Comm'r,* 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270 (1944); *Lucas v. Am. Code Co.,* 280 U.S. 445, 452, 50 S.Ct. 202, 74 L.Ed. 538 (1930); *Union Pac. R.R. Co. v. United States,* 208 Ct.Cl. 1, 18, 524 F.2d 1343, 1350

(1975) ("So long as a liability remains contingent or if the liability has attached but the amount cannot be reasonably estimated, a business expense deduction is not allowed."), *cert. denied,* 429 U.S. 827, 97 S.Ct. 83, 50 L.Ed.2d 89 (1976).

The Supreme Court in *Hughes Properties* continued:

> Thus, to satisfy the all-events test, a liability must be "final and definite in amount," *Security Flour Mills Co. v. Commissioner,* 321 U.S. 281, 287, 64 S.Ct. 596, 599, 88 L.Ed. 725 (1944), must be "fixed and absolute," *Brown v. Helvering,* 291 U.S. [193,] 201, 54 S.Ct. [356,] 360, [78 L.Ed. 725 (1934) ], and must be "unconditional," *Lucas v. North Texas Lumber Co.,* 281 U.S. 11, 13, 50 S.Ct. 184, 185, 74 L.Ed. 668 (1930). And one may say that "the tax law requires that a deduction be deferred until 'all the events' have occurred that will make it fixed and certain." *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 543, 99 S.Ct. 773, 786, 58 L.Ed.2d 785 (1979).

*United States v. Hughes Props., Inc.,* 476 U.S. at 600–01, 106 S.Ct. 2092. The Supreme Court also has stated, "[n]or may a taxpayer deduct an estimate of an anticipated expense, no matter how statistically certain, if it is based on events that have not occurred by the close of the taxable year." *United States v. Gen. Dynamics Corp.,* 481 U.S. at 243–44, 107 S.Ct. 1732; *see also Hallmark Cards v. Comm'r,* 90 T.C. 26, 34 (1988) ("The all events test is based on the existence or nonexistence of legal rights or obligations at the close of a particular accounting period, not on the probability—or even absolute certainty—that such right or obligation will arise at some point in the future.").

█ Although a liability does not accrue as long as it remains contingent, uncertainties unrelated to the fixing of the amount of the liability do not prevent the taxpayers from meeting the "all events test." *See Washington Post Co. v. United States,* 186 Ct.Cl. 528, 535, 405 F.2d 1279, 1283–84 (1969) (describing a fact situation with "[n]o problem of estimating the amount of the expense is involved here, so this case certainly is not

128

comparable to the cases involving accruals to 'contingency' accounts."). The *Washington Post* court further stated, "[w]e think the message is clear: the 'all-events' test that comes down to us from *United States v. Anderson,* [269 U.S. 422, 46 S.Ct. 131] is not inflexible; when the liability itself is clearly fixed, as in this case, other uncertainties do not necessarily destroy that initial certainty." *Washington Post Co. v. United States,* 186 Ct.Cl. at 536, 405 F.2d at 1284; *see also Eastman Kodak Co. v. United States,* 209 Ct.Cl. at 372, 534 F.2d at 257.

The Supreme Court in *United States v. Hughes Properties, Inc.,* allowed a casino, using the accrual method, to deduct as a business expense guaranteed payouts on progressive slot machines, even though the jackpots had not yet been won. *See United States v. Hughes Props., Inc.,* 476 U.S. at 606, 106 S.Ct. 2092. The Supreme Court indicated "[t]he Government misstates the need for identification of the winning player. That is, or should be, a matter of no relevance for the casino operator. The obligation is there, and whether it turns out that the winner is one patron or another makes no conceivable difference as to basic liability." *Id.* at 602, 106 S.Ct. 2092. In *Washington Post Co. v. United States,* 186 Ct.Cl. 528, 405 F.2d 1279, the United States Court of Claims noted that "indeterminacy at the time of accrual as to the ultimate recipient's exact share of accrued 'bonuses,' or indeterminacy as to the time of payout does not destroy the deductibility of an accrued item when the amount of liability is absolutely fixed." *Washington Post Co. v. United States,* 186 Ct.Cl. at 535, 405 F.2d at 1283. Therefore, the United States Court of Claims in *Washington Post* held that "when a 'group liability' is involved, it is the certainty of the liability which is of utmost importance in the 'all events' test, and not necessarily either the certainty of the time over which payment will be made or the identity of the payees." *Washington Post Co. v. United States,* 186 Ct.Cl. at 536, 405 F.2d at 1284; *see also Willoughby Camera Stores v. Comm'r,* 125 F.2d 607, 609 (2d Cir.1942) ("The Board of Tax Appeals held that an employee of the taxpayer could not ascertain, within the taxable year, his proportionate share of the

accrual. We do not regard that as relevant to the issue of deductibility."). In *Kershaw Mfg. Co. v. Comm'r,* 313 F.2d 942 (5th Cir. 1963), the United States Court of Appeals for the Fifth Circuit determined that bonus payments, which were not to be made until the following year could still be accrued, despite noting that, "it is plain that the amount of bonuses could not be finally ascertained until after the books were otherwise balanced and closed, and that this could not be done until after the end of the year." *Id.* at 944–945. Therefore, the court concluded that the minimum amount the taxpayer was obligated to pay, was properly accrued, even though the final amount paid could be more. *See id.* at 945.

Under the accrual system, the "all events test" allows for payment to occur in the future or even accounts for the possibility that payment may not occur at all as long as the liability is fixed. The Supreme Court in *United States v. Hughes Properties, Inc.,* stated the "potential nonpayment of an incurred liability exists for every business that uses an accrual method, and it does not prevent accrual.... 'The existence of an absolute liability is necessary; absolute certainty that it will be discharged by payment is not.'" *United States v. Hughes Props., Inc.,* 476 U.S. at 605–606, 106 S.Ct. 2092 (citations omitted); *see also Gold Coast Hotel & Casino v. United States,* 158 F.3d 484, 489 (9th Cir.1998) ("[F]or purposes of the 'all events' test, what is critical is the existence of an *absolute liability,* not an *absolute certainty* the liability will be discharged by payment.") (emphasis in original). As previously noted by the Court of Claims, "[t]he 'all events' test thus allows deductions when the taxpayer has a special kind of knowledge which gives him enough facts to demonstrate the absolute necessity of paying an expense at some future date without regard to such matters as actual payment taking place, existence of legal liability, or accrual." *Eastman Kodak Co. v. United States,* 209 Ct.Cl. at 373, 534 F.2d at 257.

■ Moreover, a liability need not be legally enforceable to be fixed under the "all events test." *See Eastman Kodak Co. v. United States,* 209 Ct.Cl. at 373, 534 F.2d at

257 ("The 'all events' test on the other hand looks to a liability that is so fixed that the fact of liability is certain and the amount thereof reasonably ascertainable, although not necessarily legally enforceable."); *see also Flamingo Resort, Inc. v. United States,* 664 F.2d 1387, 1390 (9th Cir.) (indicating a casino's inability to legally enforce its debts was not a sufficient reason to preclude application of "all events test," and stating "[t]he debts which the 'markers' represent are, therefore, fixed; there is a reasonable expectancy of collection; and no contention has been made that the amounts cannot be determined with reasonable accuracy."), *cert. denied sub nom. Hilton Hotels Corp. v. United States,* 459 U.S. 1036, 103 S.Ct. 446, 74 L.Ed.2d 602 (1982); *Burlington N. R.R. Co. v. Comm'r,* 82 T.C. 143, 151 (1984) ("[T]he amount of the liability may be determined with reasonable accuracy and all events determining the fact of the liability occur prior to year-end. Thus the purposes of the all events test are satisfied, and the taxpayer may properly accrue and deduct the expense even though legal liability may not exist until the subsequent year."); *Champion Spark Plug Co. v. Comm'r,* 30 T.C. 295, 298 (1958) ("[I]t may be true that here there was no underlying legal liability compelling the petitioner to make the fixed and definite obligation. But this lack of an underlying legal liability is not fatal to petitioner's argument."), *aff'd,* 266 F.2d 347 (6th Cir.1959).

The cases cited regarding establishing the fact of the liability mostly precede the addition of the economic performance element of the "all events test" by the Deficit Reduction Act of 1984 and codification of the "all events test" at 26 U.S.C. § 461(h). Cases such as *Gold Coast Hotel & Casino v. United States,* 158 F.3d 484, decided after the codification of the "all events test" at 26 U.S.C. § 461(h), do not question the use of cases decided before the Deficit Reduction Act of 1984 and rely on them as precedent. The parties have not been able to identify, nor has the court located a case or regulation which calls into question the precedential value of those cases which address the measure of determining the fact of the liability, which precede the addition of the economic performance element of the now applicable "all events test."

The United States Supreme Court, in *United States v. General Dynamics Corp.,* when analyzing the "all events test," albeit for tax years prior to the codification of 26 U.S.C. § 461(h), noted the addition of the economic performance element in 26 U.S.C. § 461(h), without questioning the Court's prior analysis of the "all events test" or indicating how it might be applied in the future. *See United States v. General Dynamics Corp.,* 481 U.S. at 243 n. 3, 107 S.Ct. 1732. Similarly, in *Maxus Energy Corporation v. United States,* 31 F.3d 1135 (Fed.Cir.1994), the United States Court of Appeals for the Federal Circuit considered the plaintiff's deductions in tax years 1984 and 1985. Prior to considering the economic performance element of 26 U.S.C. § 461(h), the court noted "[u]nder the 'all events' test, the taxpayer cannot deduct an expense until all the events have occurred that fix the amount and fact of the underlying liability," and cited the earlier United States Supreme Court cases of *United States v. Consolidated Edison Company,* 366 U.S. 380, 385, 81 S.Ct. 1326, 6 L.Ed.2d 356 (1961) and *United States v. Anderson,* 269 U.S. at 441, 46 S.Ct. 131, both decided prior to the codification of the "all events test" and the addition of the economic performance element. *See Maxus Energy Corp. v. United States,* 31 F.3d at 1142.

Likewise, in 2006, the United States Court of Appeals for the Sixth Circuit examined whether the taxpayer had established liability with sufficient certainty to satisfy the first element of the "all events test," and considered the Supreme Court precedent of *United States v. Hughes Properties, Inc.* and *United States v. General Dynamics Corp.* without questioning the precedential value of either case, even though the economic performance was not yet a part of the "all events test." *See Chrysler Corp. v. Comm'r,* 436 F.3d 644, 650–51 (6th Cir.2006); *see also Gold Coast Hotel & Casino v. United States,* 158 F.3d at 488 (same); *Metro Leasing and Dev. Corp. v. Comm'r,* 376 F.3d at 1022–23 (citing *United States v. Hughes Properties, Inc.* and *United States v. Anderson)* (same); *Valero Energy Corp. v. Comm'r,* 78 F.3d 909, 915 (5th Cir. 1996) (same).

Finally, the legislative history to the Deficit Reduction Act of 1984 indicates that the addition of the economic performance to the "all events test" was to complement the existing two prongs of the "all events test," and did not call into question the precedential value of cases determining either the fact of liability or if the liability could be determined with reasonable accuracy. *See* H.R. Rep. 98–432, pt. 2, at 1252–56 (1984), 1984 U.S.C.C.A.N. 697, 915–19; Staff of the Joint Comm. on Taxation, 98th Cong., General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 258–62 (Comm. Print 1984). As the House Report No. 98–432(II) indicated, "[t]he Committee believes that the rules relating to the time for accrual of a deduction by a taxpayer using the accrual method of accounting should be changed to take into account the time value of money." H.R. Rep. 98–432, pt. 2, at 1254, 1984 U.S.C.C.A.N. 697 at 917.

There are cases which have held that Board resolutions can fix liability for the purposes of the "all events test." *See Champion Spark Plug Co. v. Comm'r*, 30 T.C. 295; *see also Willoughby Camera Stores, Inc. v. Comm'r*, 125 F.2d 607; *Produce Reporter Co. v. Comm'r*, 18 T.C. 69 (1952), *aff'd*, 207 F.2d 586 (7th Cir.1953). In *Champion Spark Plug*, a company's Board resolutions were found to create a fixed and definite obligation and fixed the Champion's liability for the "all events test." *See Champion Spark Plug Co. v. Comm'r*, 30 T.C. at 300. A Board of Directors' resolution in *Champion Spark Plug* resolved to make sixty semi-monthly payments to a disabled employee. *Id.* at 297. Although the payments would not begin until the year following the Board resolution, the payments would not be fully paid for a number of years, and the company was further under no underlying legal obligation to make the payments, the court determined the expenditure was a fixed and definite obligation that could be deducted as a liability in the year of the Board's resolution. *Id.* at 298. The court indicated "[i]t is sufficient here that the petitioner desired to obligate itself to make the payments that have a connection with its employer-employee relationship. It translated its desire into an unconditional obligation to make the payments. The ex-

penditure, which we feel was ordinary and necessary in the conduct of its business, was properly accruable in the year 1953 when the obligation to pay was made fixed and definite by the resolution." *Id.*

In *Willoughby Camera Stores, Inc. v. Commissioner*, the plaintiff, an accrual basis taxpayer, sought to deduct employee bonuses that had been declared in a Board of Directors' resolution and were to be paid the following year. *See Willoughby Camera Stores, Inc. v. Comm'r*, 125 F.2d at 608. The United States Court of Appeals for the Second Circuit determined that the Board of Directors, in passing a Board resolution, "definitely fix[ed] a minimum for the amount to be paid" the following year to the employees and fixed the liability to comply with the "all events test." *See id.* at 609. The court noted that the amount to be paid was known to the employees, and, therefore, the action on the part of the Board of Directors was viewed by the company and the employees as more than "a statement that so much would be paid if the company did not change its mind." *Id.* (footnote omitted). The court also indicated that the promise to pay at least the amount set up in the reserve to the aggregate group could have been enforced by the employees as a class. *Id.* Therefore, the Second Circuit concluded: "all the events necessary to a determination of the amount to become due were present in the taxable years." *Id.* Notably, the Second Circuit stated "[t]he fact that before the amounts were paid in the succeeding years, new resolutions were passed by the board of directors is irrelevant; later resolutions were necessary to set the date of distribution, and those passed here, though somewhat repetitive, do not militate against the conclusion that the amounts set up by the earlier resolutions were regarded as final." *Id.*

Similarly, in *Produce Reporter Co. v. Commissioner*, 18 T.C. 69, the Tax Court permitted amounts authorized as employee bonuses, pursuant to Board resolutions, to be deducted in the year of the resolution, although the payments were not made until the following year. *Id.* at 76–77. The Tax Court noted the company had a custom of announcing end of the year bonuses, authorized by the com-

pany's Board of Directors. The company would advise the employee of the exact amount the employee would receive the following year. *Id.* at 77. The company accrued the liability in the year the Board authorized the bonuses, and not the year the payments were made. *Id.* The Tax Court stated, "[p]etitioner contends that a fixed, definite obligation to pay the bonuses was incurred in the respective years of accrual. We agree." *Id.*

The United States Court of Claims in *Clevite Corp. v. United States,* 181 Ct.Cl. 652, 386 F.2d 841 (1967), distinguished the case before it from *Champion Spark Plug Co. v. Commissioner,* 30 T.C. 295, and found that liability was not fixed for the "all events test" when a taxpayer deducted payment of vacation pay to its employees prior to when the vacation period begin. *See Clevite Corp. v. United States,* 181 Ct.Cl. at 657, 386 F.2d at 843. The Court of Claims indicated, "the Board of Directors passed no resolution, and the shareholders expressed no opinion on the subject, so that this case is demonstrably distinguishable from *Champion Spark Plug Co.*" *Clevite Corp. v. United States,* 181 Ct. Cl. at 660, 386 F.2d at 844 (citation omitted). The United States Court of Appeals for the Federal Circuit in *Avon Products, Inc. v. United States,* 97 F.3d 1435 also distinguished a number of cases cited above which stated that taxpayers could "deduct in the year of accrual forms of employee compensation that were not paid until late in the following year." *Id.* at 1441. The Federal Circuit, however, was interpreting 26 U.S.C. § 404, which applies to "[d]eductions for contributions of an employer to an employees' trust or annuity plan and compensation under a deferred-payment plan." Regarding *Willoughby Camera Stores, Inc. v. Commissioner,* 125 F.2d 607, the Federal Circuit stated that the *Willoughby* case "predate[d] section 404 and its predecessor." Regarding *Produce Reporter Co. v. Commissioner,* 18

T.C. 69, the Federal Circuit indicated, "the question of the timing of the payments does not appear to have been raised as an issue." *Avon Prods., Inc. v. United States,* 97 F.3d at 1441. Notably, the *Avon Products* court did not question if Board resolutions could fix an accrual basis taxpayer's liability because the accrual of the company's employee profit-sharing payments were not based on the company's Board resolutions fixing the company's liability, but instead involved a foreign tax credit issue for a foreign subsidiary which was "required by Mexican law to pay its employees a percentage of its profits each year within five months of the close of its taxable year." *See id.* at 1437.

For the accrual method of accounting, and pursuant to Treasury Regulation § 1.446–1, "[t]he term 'liability' includes any item allowable as a deduction, cost, or expense for Federal income tax purposes," Treas. Reg. § 1.446–1(c)(ii)(B), and under the Tax Code, policyholder dividends are liabilities which are properly deductible by life insurance companies. *See* 26 U.S.C. § 805(a)(3); *UNUM Corp. v. United States,* 130 F.3d 501, 509 (1st Cir.1997) ("There is no dispute that § 805(a)(3) allows life insurance companies to deduct 'policyholder dividends' from income."), *cert. denied,* 525 U.S. 810, 119 S.Ct. 42, 142 L.Ed.2d 32 (1998); *see also* 26 U.S.C. § 808(c) ("The deduction for policyholder dividends for any taxable year shall be an amount equal to the policyholder dividends paid or accrued during the taxable year."); *CUNA Mut. Life Ins. Co. v. United States,* 39 Fed.Cl. 660, 661 (1997), *aff'd,* 169 F.3d 737 (Fed.Cir.1999).

■ The plaintiff argued that when the Board passed its Dividend Guarantee Resolutions, it fixed plaintiff's liability for the purposes of the "all events test," in that year "to pay the guaranteed minimum amounts of policyholder dividends in each of the years at issue,"[11] even though plaintiff's custom was

---

11. MassMutual also was liable to pay settlement dividends to certain policyholders with policies 15 years or older and whose policies had lapsed or otherwise terminated prior to the policy's anniversary date. For the years at issue, MassMutual deducted, in the year prior to the dividend payment, the lesser of the settlement dividend or

the regular dividend due under the dividend scale adopt by MassMutual. The IRS permitted the deductions of the settlement dividends. For the years at issue, MassMutual also paid policyholder dividends in December for policies with January anniversary dates of the following year, and deducted the policyholder dividends in the

to pay out policyholder dividends to its policyholders the following year. Plaintiff also argued that the Dividend Guarantee Resolutions identified a "defined a group of policyholders that, in the aggregate, were entitled to receive the specified minimum in the following year regardless of which individuals composed the group," and that "[s]uch an identifiable group existed at the end of each of the tax years at issue, as more than 100,000 policyholders had already paid their premiums through their next anniversary date in the following year."

By contrast, the defendant argued "[i]n they [sic] year they were adopted, the dividend-guarantee resolutions did not fix ConnMutual's and MassMutual's liability to pay the declared guaranteed minimum amounts in the following year." Defendant argued that plaintiff cannot demonstrate that at the end of each tax year, plaintiff was obligated to pay the entire guaranteed amount "under the facts as they stood at the end of that year." According to defendant, despite plaintiff's assumption that it was already obligated to pay the guaranteed amount of dividends, conditions existed which demonstrate that "the companies [MassMutual and ConnMutual] had no liability to pay the entire guaranteed amount until a later event

occurred—and that event was not simply the passage of time and the preservation of the status quo at year-end." Therefore, defendant argued, there was not an identifiable group of policyholders eligible to receive the Dividend Guarantee in the year the Dividend Guarantee Resolutions were adopted.

Although Board resolutions can establish the fact of liability, the court must determine if the Dividend Guarantee Resolutions, established the fact of liability. As discussed above, " 'a liability does not accrue as long as it remains contingent.' " *United States v. Hughes Props., Inc.*, 476 U.S. at 600, 106 S.Ct. 2092 (quoting *Brown v. Helvering*, 291 U.S. at 200, 54 S.Ct. 356). The plaintiff's Dividend Guarantees[12] stated in relevant part:

4.1. During each year for which the Company has adopted an Annual Dividend Guarantee, the Company shall pay or apply annual policyholder dividends to its policyholders in accordance with its usual practices and procedures. The Company's adoption of an Annual Dividend Guarantee for any year shall not affect any individual policyholder's right to receive, or the Company's obligation to pay or apply, the annual policyholder dividend otherwise due to

---

year they were paid. The IRS permitted the deductions of the January anniversary date dividends in the year the dividends were paid.

**12.** As noted above, although the Dividend Guarantees were not identical, the operative language was the same, including the definitions of Annual Dividend Guarantee and Guaranteed Dividends, and none of the differences are material to determining if the Dividend Guarantees fixed the fact of liability. Non-material differences between the Dividend Guarantees included: different definitions of Company between the 1995 ConnMutual Dividend Guarantee and the MassMutual Dividend Guarantees, as well as the title of the person charged with monitoring and certifying the payments of the dividends, with the 1995 ConnMutual Dividend Guarantee indicating the individual as the Company's Chief Financial Officer," the 1995 and 1996 MassMutual Dividend Guarantees indicating the individual as the Company's Executive Vice President–Corporate Financial Operations, and the 1997 MassMutual Dividend Guarantee referring to the individual as the "Executive Vice President and Chief Financial Officer. Additionally, Section 4.7 of the 1995 ConnMutual Dividend Guarantee included a sentence not included in Section 4.7 of the

MassMutual Dividends Guarantees, which stated: "The Company's Chief Financial Officer shall certify that such payments or application described in Sections 4.4 and 4.5 have been made and that the Annual Dividend Guarantee has been properly implemented. Failure to so certify shall not impair, defeat, or invalidate the action of the Board of Directors in establishing the Annual Guarantee." There is no indication from the record before the court that ConnMutual's Chief Financial Officer failed to certify the payments, at the certification of the payments is not an issue before this court.

Moreover, the defendant, after describing 1995 MassMutual Dividend Guarantee, noted, "[a]lso in 1995, after consulting with MassMutual, ConnMutual adopted a nearly identical guarantee.... After the merger, MassMutual adopted similar dividend-guarantee resolutions in 1996 and 1997." Additionally, defendant quoted Section 4 "from the dividend guarantee that ConnMutual adopted in 1995 to govern payment of the guaranteed amount of dividends during the year 1996, but every dividend guarantee before the Court contains identical provisions." For purposes of discussion, the court uses the language of the 1995 MassMutual Dividend Guarantee quoted earlier.

that individual policyholder on the applicable anniversary date.

4.2. Prior to December 31st of each year for which the Company has adopted an Annual Dividend Guarantee, the Company shall determine whether it actually has paid or applied annual policyholder dividends with respect to post–1983 policies in an amount at least equal to the specified amount of Guaranteed Dividends.

4.3. If the Company determines that it actually has paid or applied annual policyholder dividends with respect to post–1983 policies in an amount at least equal to the amount of Guaranteed Dividends specified, then the Company's Executive Vice President–Corporate Financial Operations shall certify that the Company has satisfied its obligations imposed under the Annual Dividend Guarantee.

4.4. If the amount of Guaranteed Dividends specified exceeds the amount of annual policyholder dividends that the Company actually has paid or applied during the year (plus the amount that the Company determines will be paid or applied through December 31st of the year) with respect to post–1983 policies, then the Company shall be obligated to pay or apply an additional amount of policyholder dividends, equal to such excess, with respect to post–1983 policies.

4.5. Such excess shall be apportioned among the post–1983 policies still in force in proportion to the annual policyholder dividends otherwise paid or applied with respect to such policies during the year.

4.6. Such excess shall be paid or applied with respect to post–1983 policies during the year in accordance with the apportionment made pursuant to the preceding paragraph.

4.7. The Company's Executive Vice President–Corporate Financial Operations shall certify that such payments or applications have been made and that the Annual Dividend Guarantee has been properly implemented.

The terms Annual Dividend Guarantee and Guaranteed Dividends were defined in the Dividend Guarantees. The definition of the Annual Dividend Guarantee was, "the Company's irrevocable guarantee that it will pay or apply an amount not less than a specified amount of annual policyholder dividends with respect to post–1983 policies in the following year." The definition of Guaranteed Dividends was, "annual policyholder dividends with respect to post–1983 policies in an amount that, pursuant to its Annual Dividend Guarantee, the Company has irrevocably committed itself to pay or apply in the following year." The Dividend Guarantees guaranteed a minimum amount of policyholder dividends to be paid the following year to post–1983 policyholders whose policies were still in effect after the annual policyholder dividends were paid, if the annual policyholder dividend was not equal or greater to the guaranteed minimum amount.

Although the Dividend Guarantees did not identify the amount each individual policyholder would receive under the Dividend Guarantees, or even which specific policyholders would receive the minimum amount of guaranteed dividends, neither is fatal to the fixing of liability. *See Washington Post Co. v. United States*, 186 Ct.Cl. at 536, 405 F.2d at 1284 ("[W]hen a 'group liability' is involved, it is the certainty of the liability which is of utmost importance in the 'all events' test, and not necessarily either the certainty of the time over which payment will be made or the identity of the payees."); *see also Willoughby Camera Stores v. Comm'r*, 125 F.2d at 609.

The parties disagree about two aspects of the plaintiff's Dividend Guarantee Resolutions regarding determining if liability was fixed: (1) whether the Dividend Guarantee Resolutions created a condition precedent, and (2) whether the Dividend Guarantee Resolutions were revocable or likely to be enforced by plaintiff's regulators.[13] First ad-

---

13. The defendant also suggested that plaintiff is trying to use the Dividend Guarantees to return to the reserve method of accounting by arguing, "MassMutual is trying, in effect, to change its accounting method for policyholder dividends from the accrual method back to the reserve method by deducting policyholder dividends in the year in which its board declared them." Plaintiff responded that neither its intent, nor the result of the Dividend Guarantees, was to return

dressing whether the Dividend Guarantee Resolutions created a condition precedent, which would prevent plaintiff's liability from accruing, Black's Law Dictionary defines a condition precedent as "[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises. If the condition does not occur and is not excused, the promised performance need not be rendered," and defines a condition subsequent as "[a] condition that, if it occurs, will bring something else to an end; an event the existence of which, by agreement of the parties, discharges a duty of performance that has arisen." Black's Law Dictionary 334 (9th ed. 2009). In the context of a copyright infringement suit, the United States Supreme Court, quoting an earlier version of Black's Law Dictionary stated, " '[a] condition precedent is one which must happen or be performed before the estate to which it is annexed can vest' or which must be performed 'before some right dependent thereon accrues.' A 'condition subsequent is one annexed to an estate already vested, . . . and by the failure or nonperformance of which it is defeated.' " *Washingtonian Pub. Co. v. Pearson,* 306 U.S. 30, 47, 59 S.Ct. 397, 83 L.Ed. 470 (quoting Black's Law Dictionary (3d ed. 1933)), *reh'g denied* (1939) (omissions in original, footnotes omitted).

The court in *Burnham Corp. v. Commissioner,* 90 T.C. 953 (1988), *aff'd,* 878 F.2d 86 (2d Cir.1989), explained the relationship of a condition precedent and a condition subsequent for the accrual of a liability for the "all events test:"

> If existence of a liability depends on satisfaction of a condition precedent, the liability is not unconditionally fixed as required by the first requirement of the all events test. Liability does not in fact arise until the condition is satisfied. A taxpayer is, therefore, prevented from obtaining the benefit of a deduction for an expense that he has NO liability to pay until some event, other than the passage of time, occurs. A

> liability subject to a condition subsequent, however, is definitely fixed, subject only to a condition which may cut off liability in the future. An accrual basis taxpayer having such a liability may deduct an expense for which it is presently liable.

*Id.* at 956 (emphasis in original); *see also Charles Schwab Corp. v. Comm'r,* 107 T.C. 282, 293 (1996), *aff'd,* 161 F.3d 1231 (9th Cir.1998), *cert. denied,* 528 U.S. 822 [120 S.Ct. 67, 145 L.Ed.2d 58] (1999) (distinguishing between conditions precedent and conditions subsequent for the "all events test" in the context of income).

As it applies to plaintiff's case, if the Dividend Guarantees imposed a condition precedent on the payment of the guaranteed amount of minimum dividends, then the plaintiff's liability cannot be considered fixed and the requirements of the "all events test" are not met. Noting that the plaintiff's Dividend Guarantee Resolutions stated that the policyholders were not eligible to receive the minimum amount of guaranteed dividends until after the annual policyholder were paid, the defendant argued that the Dividend Guarantee Resolutions "demonstrate the that companies [MassMutual and ConnMutual] may not accrue a liability to pay the guaranteed amounts in the years they adopted the dividend guarantees because the liability was contingent on an event that could not happen until the next year." The defendant asserted that the payment of the annual policyholder dividends was the contingent event which prevents the liability from being fixed in the year the Dividend Guarantee Resolutions were adopted. The defendant further argued that "the present case is not one in which identifiable persons had fulfilled a 'condition precedent' during the first year and were already eligible by the end of that year to receive a distribution during the next year." The defendant also maintained that the post–1983 policyholders were eligible only for the guaranteed amount after they received their regular dividend, which they could only receive the following year, and

---

to the reserve method of accounting. According to plaintiff, it "applied the accrual rules to its specific set of facts in each of the tax years at issue." The issue, before the court, however, is whether, using the accrual method of accounting

which plaintiff was required to use, did the Dividend Guarantees meet the criteria of the "all events test," and the court finds no evidence in the record before the court that the reserve method was used by plaintiff.

because the policyholders could have lost their eligibility if their policies were still not in force, a condition precedent persisted.

By contrast, plaintiff argued that a defined group of post–1983 policyholders existed who had already paid their policies through their next anniversary and were already entitled to receive the annual dividend. The plaintiff contended there were no conditions precedent to these policyholders receiving their annual dividend, only the passage of time and the status quo. Therefore, the plaintiff argued, the fact of liability can be established for the Dividend Guarantees for all the tax years at issue. Plaintiff further argued that "[p]laintiff's liability to pay the guaranteed minimum amount of policyholder dividends became fixed and, therefore, accruable in the year the Dividend Guarantee Resolutions were adopted.... Plaintiff had at year end a single dividend liability with a guaranteed minimum and a reasonably estimated maximum." Moreover, plaintiff stated it "purposely chose to set the dividend guarantees at a level that was virtually certain to be paid in the ordinary course under Plaintiff's dividend scale."

At trial, Susan Marchacos, the "reporting and strategy manager" for MassMutual's United States Insurance Group, presented evidence of MassMutual's and ConnMutual's post–1983 policies as paid through their following anniversary, with anniversary dates of January, February and March for each of the tax years at issue. For example, as of December 31, 1995, there were 78,569 post–1983 MassMutual policies with anniversary dates of January, February, or March, with the premiums paid through the next anniversary and 22,595 similar post–1983 ConnMutual policies as of December 31, 1995.[14] This testimony, seemingly, refutes the defendant's argument that there were not a group of identifiable policyholders already eligible for the guarantee minimum amount of dividends in the year the Dividend Guarantee Resolutions were adopted.

The defendant, however, argued that the typical MassMutual policy was entitled to a dividend only if the policyholders had paid premiums for the two previous policy years, and asserted that the summaries of the policies identified by Ms. Marchacos only showed premiums paid for one year. In response the plaintiff argued that defendant's argument is inconsistent with the defendant's own statement in its post-trial brief that the plaintiff's lapse rate is typically between five and six percent. For all the policies identified by Ms. Marchacos, and included in the Joint Exhibits, as policies for which only one year of premiums had been paid, the plaintiff stated that "every single post–1983 policyholder with policies commencing during the first quarter of each year from 1984 to 1993 would have had to lapse or die prior to December 31, 1995. Such an assumption is completely unrealistic and unwarranted given the facts on the record." Indeed, as Mr. Jermyn testified, MassMutual's lapse rate was in the 5 to 6 percent range during the mid to late 1990s and the lapse rate was relatively stable. It would be highly unusually for the lapse rate to increase to one hundred percent for the post–1983 policies with January, February, or March anniversary dates. This is further supported by the number of MassMutual and ConnMutual post–1983 policies paid through their following anniversary, with anniversary dates of January, February and March as of December 31, 1996 and 1997. As of December 31, 1996, there were 79,269 MassMutual post–1983 policies paid through their following anniversary, with anniversary dates of January, February and March, an increase from the 78,569 such policies as of December 31, 1995. Similarly, as of December 31, 1997, there were 79,628 MassMutual post–1983 policies paid through their following anniversary. Likewise, for ConnMutual, as of December 31, 1996, there were 22,758 MassMutual post–1983 policies paid through their following anniversary, with anniversary dates of January, February and March and 23,111 similar policies as of December 31, 1997—for both companies an increase from the 22,595

---

**14.** The information presented by Ms. Marchacos at trial and included in Joint Exhibits was in the form of summaries. At trial, Ms. Marchacos testified that the summaries were reliable summaries of the data that underlined them. Defendant did not object to the Joint Exhibits providing the numbers of policies paid through the following anniversary date or paid-up policies.

policies as of December 31, 1995. Defendant's position regarding the MassMutual and ConnMutual post–1983 policies paid through their following anniversary appears to be unfounded in the record.

There also is a distinct group of MassMutual and ConnMutual post–1983 policies which were no longer required to pay any further premiums on their policies. Ms. Marchacos presented evidence at trial of MassMutual and ConnMutual post–1983 policies which were paid-up policies for each of the tax years at issue. Ms. Marchacos explained that paid-up policies were "policies where premiums were no longer due" and policies which have paid all the premiums they were ever going to have to pay. Although a smaller group of policies, the plaintiff demonstrated there was an identifiable group of policyholders with paid-up policies. For example, as of December 31, 1995, there were 1,848 post–1983 MassMutual policies with anniversary dates of January, February or March, which were paid-up policies, and 287 similar post–1983 ConnMutual paid-up policies as of December 31, 1995. For the group of policyholders with paid-up policies, no event but the passage of time would occur before those policyholders would receive their annual dividend and, thus, be eligible for the minimum guaranteed dividends. Indeed, if any event prevented the paid-up policyholders from receiving their policyholder dividends or rendered the paid-up policyholders ineligible for receiving the minimum guaranteed dividends, it would not be a condition precedent, rather a condition subsequent, which would not prevent liability for being fixed. See Burnham Corp. v. Comm'r, 90 T.C. at 956. Notably, in all of the years at issue plaintiff's payment of annual policyholder dividends exceeded the guaranteed minimum of dividends and an additional round of payments to the post–1983 policyholders with policies still in force was not required.

In addition to arguing that there was not an identifiable group of policyholders eligible to receive the Dividend Guarantee in the year the Dividend Guarantee Resolutions were adopted, the defendant devoted substantial effort to the words of the Dividend Guarantee. The defendant emphasized that "[n]o policyholder is entitled to share in the entire guaranteed amount before receiving the regular annual policyholder dividend 'during the year,' and the dividend guarantees and enacting resolutions, read as a whole, demonstrate that the phrase 'during the year' can refer only to the year after the year in which the guarantees were adopted." The defendant argued that "[i]n each of the years before the Court, the Board instructed the company to assure that the guaranteed amount was properly paid or applied by monitoring payment of the annual dividends *during the following year*. Thus, according to the defendant, the documents themselves demonstrate that the guaranteed amounts can comprise only dividends paid in the year after the guarantees were adopted." (internal citations omitted; emphasis in original).

As discussed above, however, simply because the plaintiff will not pay out the liability until the following year does not prevent the liability from accruing under the "all events test." See United States v. Hughes Props., Inc., 476 U.S. at 605–606, 106 S.Ct. 2092; see also Eastman Kodak Co. v. United States, 209 Ct.Cl. at 373, 534 F.2d at 257 ("The 'all events' test thus allows deductions when the taxpayer has a special kind of knowledge which gives him enough facts to demonstrate the absolute necessity of paying an expense at some future date without regard to such matters as actual payment taking place, existence of legal liability, or accrual."). Although a condition precedent can prevent a liability from being fixed, if the only event(s) still to occur are the passage of time and/or the payment, the liability is considered fixed. See generally Burnham Corp. v. Comm'r, 90 T.C. 953. For the identifiable group of post–1983 policyholders with paid-up policies, no events other than the passage of time and payment of the policyholder dividend were required.

The defendant also argued that simply because the plaintiff was certain to be obligated to pay the guaranteed amount the following year, does not mean the liability was fixed in the year before the Dividend Guarantee Resolutions were passed, citing to Hallmark Cards, Inc. v. Commissioner, 90 T.C. 26. In Hallmark Cards, the taxpayer did not accrue

income in one year for merchandise because title and risk of loss did not pass to the purchaser until the following year, even though the merchandise had shipped in the first year. *See id.* at 30. It was the taxpayer's practice to ship Valentine's Day merchandise the year before Valentine's Day, but not to pass the risk of loss and title to the purchaser until the following year. *See id.* at 29. The taxpayer had this arrangement for Valentine's Day merchandise to address customer concerns about receiving Valentine's Day merchandise while they still had Christmas merchandise and the financial impact of inclusion of the Valentine's Day merchandise in their year-end inventories. *See id.* at 28. Although title was certain to pass to the purchaser the following year, the Tax Court concluded that the income could be not be accrued in the first year by the taxpayer, because the fact of liability under the "all events test" was not met. *Id.* at 32. The Tax Court determined "petitioner does not possess any fixed and definite rights to payment at year end. The fact that at the stroke of midnight petitioner knows with absolute certainty that in the next instant these rights will arise cannot compensate for the fact that as of the close of the old year they do not exist. The all events test is based on the existence or nonexistence of legal rights or obligations at the close of a particular accounting period, not on the probability—or even absolute certainty—that such right or obligation will arise at some point in the future." *Id.* at 34.

The defendant tried to analogize the *Hallmark Cards* case as applicable to the plaintiff's Dividend Guarantees. The *Hallmark Cards* case, however, is factually distinct, as the *Hallmark Cards* case addressed the ac-

crual of income to the taxpayer, whereas the instant case relates to the accrual of a liability to the plaintiff. Although the analysis is similar for fixing liability under the "all events test," *see* Rev. Rul. 98–39, 1998–2 C.B. 198, the accrual of income is distinct from the accrual of a liability.[15]

Unlike the plaintiff, the taxpayer in *Hallmark Cards* adopted the practice of shipping the merchandise without passing the risk of loss and title in response to concerns from its purchasers so that Hallmark did "not possess any fixed and definite rights to payment at year end," *Hallmark Cards, Inc. v. Comm'r,* 90 T.C. at 34. MassMutual adopted the Dividend Guarantees, not due to policyholder concerns about guaranteeing payment of dividends, but to align their tax accounting with their financial reporting for the post–1983 policies. Moreover, MassMutual established a binding commitment before year's end to pay out a guaranteed minimum of dividends to policyholders, albeit with payment to occur in the following year. Moreover, in the case of *Hallmark Cards,* it was the IRS which was trying to demonstrate that the "all events test" was met, and the taxpayer was resisting the application of the test, the inverse of the positions of the parties in this case. The *Hallmark Cards* case also is not binding precedent on this court. *See Amergen Energy Co., LLC ex rel. Exelon Generation Co., LLC v. United States,* 94 Fed.Cl. 413, 422 (2010); *see also Alpha I, L.P. v. United States,* 93 Fed.Cl. 280, 309 n. 15 (2010) ("Although decisions of the Tax Court are not precedential for and are not binding upon the Court of Federal Claims, decisions of the Tax Court are substantial authority under Treasury Regulation § 1.6662–4(d)(3)(iii).").[16]

---

15. The Revenue Ruling indicates that "[g]enerally, in a transaction where one taxpayer is accruing a liability to pay another taxpayer, the last event necessary to establish the fact of liability under the all events test of § 1.461–1(a)(2)(i) is the same event that fixes the right to receive income under the all events test of § 1.451–1(a)." Rev. Rul. 98–39, 1998–2 C.B. 198.

16. Defendant also relied on a case decided by a Judge of the United States District Court for the Southern District of New York, *New York Life Insurance Co. v. United States,* 780 F.Supp.2d 324 (S.D.N.Y.2011), in which the Judge dis-

missed the case on a motion for failure to state a claim, *see* Fed.R.Civ.P. 12(b)(6) (2011), following review of the plaintiff's complaint. At issue in *New York Life Insurance* was, were all the elements of the "all events test" met, such that plaintiff could deduct policyholder dividends. *See New York Life Ins. Co. v. United States,* 780 F.Supp.2d at 326. The District Court found in the case before it, "the liability was contingent upon the continuation of an internal recordkeeping practice that was not required by law," *id.* at 328, which was insufficient to establish "a plausible inference that [plaintiff] was *required* to do so," under the "all events test." *Id.* (emphasis in

An identified group of plaintiff's policyholders were certain to receive the regular dividend and, therefore, qualify for the guaranteed dividend, subject only to the passage of time even though plaintiff might not be liable to a segment of post–1983 policyholders since some post–1983 policyholders might not receive the regular dividends if their policies lapsed. Furthermore, the group of policyholders with paid-up policies were not at risk for their policies lapsing as they never had to pay another premium on their policies. Therefore, unlike the taxpayer in *Hallmark Cards*, plaintiff's Dividend Guarantees did not impose conditions precedent on the payment of the guaranteed amount of policyholder dividends. Plaintiff had an unconditional obligation to post–1983 policyholders with paid-up policies to pay the guaranteed amounts of policyholder dividends in the year the Dividend Guarantee Resolutions were adopted.

In addition to arguing that the Dividend Guarantee Resolutions created a condition precedent, the defendant also argued that the resolutions did not impose any obligation on the plaintiff because the Dividend Guarantee Resolutions were both revocable and unlikely to be enforced by a regulator. Counsel for the defendant framed the argument as "[t]his issue comes down to the question of this: Would anyone or anything have forbidden MassMutual to withdraw the dividend resolution if it wanted to?" The defendant contends "a board of directors can always rescind or ignore its own resolutions; and a board with the power to add the word 'irrevocable' to a resolution also has the power to remove or ignore the word 'irrevocable.'" Defendant's counsel quoted from an unpublished opinion from the Court of Chancery of Delaware for the proposition "'[i]f the board has the power to adopt resolutions (or policies), then the power to rescind resolutions (policies) must reside with the board as well.'" *Unisuper, Ltd. v. News Corp.*, No. 1699–N, 2005 WL 3529317, *5 (Del.Ch. Dec. 20, 2005).

Defendant argued that had the beneficiaries been aware of the resolutions, the resolutions might not have been revocable, because the beneficiaries could have relied upon the resolutions and kept their policies in force because of the guaranteed dividend. Defendant also intimated that cases which permitted accrual of expenses by Board resolution uniformly informed the beneficiaries. In the case of *Willoughby Camera Stores, Inc. v. Commissioner*, discussed above, however, in which accrual was permitted, it is not apparent that the beneficiary was aware of the Board resolution or that such knowledge was required for the liability to be fixed. *See Willoughby Camera Stores, Inc. v. Comm'r*, 125 F.2d 607. Similarly, in *Champion Spark Plug Co. v. Commissioner*, 30 T.C. 295, the Tax Court did not mention if the disabled employee or his widow were provided notice of the Board's resolution prior to payment of the benefits.

Even if notice of a Board's resolutions might be an important element for consideration, which does not appear so from the case law, defendant acknowledged that ConnMutual included a footnote disclosing the dividend guarantee of payment of policyholder dividends in its 1995 Annual Statement. Defendant argued, however, that ConnMutual did not disclose the terms or that the guarantee applied only to post–1983 policyholders.

---

original). In the case before this court, the facts have been more fully developed after trial, and in the court's view, results in a different result. Moreover, without much discussion, the New York court references its reliance on the Supreme Court decision in *United States v. General Dynamics Corp.*, 481 U.S. 239, 107 S.Ct. 1732, determining "[t]his Court finds the case at hand to be more akin to [*United States v.*] *General Dynamics* [*Corp.*, 481 U.S. 239, 107 S.Ct. 1732] than to [*United States v.*] *Hughes Properties* [*Inc.*, 476 U.S. 593, 106 S.Ct. 2092]." *New York Life Ins. Co. v. United States*, 780 F.Supp.2d at 328. This court does not find *United States v. General Dynamics Corp.* to be particularly helpful in applying the "all events test" to the facts of the case before the court. In *General Dynamics*, the accrual basis taxpayer sought to deduct an estimate of its obligation to pay for employee medical care in the taxable year when all of the claims had not been submitted or processed. *See United States v. Gen. Dynamics Corp.*, 481 U.S. at 241–42, 107 S.Ct. 1732. The facts in *General Dynamics* do not appear to be similar to the plaintiff's passage of Board Resolutions to enact Dividend Guarantees which fixed liability in the taxable year the resolutions were enacted, and would not have provided sufficient guidance for this court to have dismissed plaintiff's claim for failure to state a claim.

Defendant stated "[e]xcept for this meager information in a footnote of a financial statement, ConnMutual did not disclose the dividend guarantee to its policyholders or its field force; and according to a former Connecticut insurance commissioner, even a trained insurance investigator could easily overlook footnotes in a financial statement," and MassMutual did not make any such disclosure.

Moreover, in response to the defendant's argument that the Board Resolutions could be revoked, the plaintiff argued that "the government does not (and cannot) point to a single tax accounting case, statute or regulation requiring 'irrevocability' as an element necessary to accrue a liability. No such requirement exists under the federal tax law." Counsel for the defendant admitted at closing argument "that of all my arguments this is the weakest. The impression I'm left with, perhaps no good, is that a revocable board resolution that is respected is respected voluntarily pretty much because they're voluntarily not revoking it. That may be a weak argument." The court agrees.

In addition, the defendant also argued that the plaintiff's regulators never approved the Dividend Guarantees and would not have monitored MassMutual's compliance with them. Defendant conceded, however, that Mr. McAdoo, Assistant Commissioner of the Massachusetts Division of Insurance, stamped "approved" on the letter sent to him by MassMutual regarding the Dividend Guarantee in 1996 and returned the stamped letter to MassMutual. The defendant argued this was an error because the Massachusetts Division of Insurance did not have the authority to approve policies such as the Dividend Guarantees. Noting, given that the Dividend Guarantees were set in an amount virtually certain to be paid, plaintiff argued that it is not surprising the Massachusetts Division of Insurance "did not devote regulatory resources to something that was virtually self-enforcing." Moreover, as stipulated by the parties, no state insurance regulator objected to the legality of the guarantees. In fact, both ConnMutual and MassMutual corresponded with their respective regulators for each year the companies adopted a Dividend Guarantee, to inform the regulators in advance of the Dividend Guarantee and none of the regulators questioned their ability to monitor the Dividend Guarantees and payment of the policyholder dividends. Notably, Massachusetts Division of Insurance Assistant Commissioner McAdoo, in response to MassMutual's letter informing the Division of Insurance of its intention to adopt a Dividend Guarantee, stated "[w]e intend to instruct the examiners who perform MassMutual's Examination to verify that the guaranteed aggregate amount is paid in accordance with the 'Terms of the Annual Dividend Guarantee.'"

Furthermore, the defendant alleged that an "insurance commissioner would have been unlikely to enforce the dividend guarantees," however, defendant's sole witness for this assertion was Robert Wilcox, a former Utah insurance commissioner, who was qualified as an expert generally on insurance regulation and insurance industry practice, with no particular Massachusetts or Connecticut expertise. By contrast, one of plaintiff's expert witness was a former Connecticut Insurance Commissioner, Robert Googins. Mr. Wilcox himself noted that Mr. Googins was more knowledgeable than he was about Connecticut insurance regulation,[17] and acknowledged that Mr. Googins was "right that the Connecticut commissioner has ample authority over dividends." Moreover, as plaintiff noted, "not a single deponent testified that the DOI [Massachusetts Division of Insurance] or [Connecticut] Insurance Department lacked the authority to enforce the dividend guarantees in the unlikely event enforcement should ever become necessary," nor was other evidence to that effect introduced into the record.

Defendant also raised the possibility that if a second round of payments was required under the Dividend Guarantees, then post–1983 policyholders would receive an extra amount of dividends, greater than received by the pre–1984 policyholders in the same dividend class. This, defendant argued,

17. Mr. Wilcox, however, also asserted that he and Mr. Googins "we're on equal footing" regarding knowledge of Massachusetts insurance regulation.

would result in the post–1983 policyholders receiving a disproportionate share of the divisible surplus in relation to their contributions and would violate the contribution principle, which "addresses the fair equitable ... payment of dividends to policyholders." Defendant also cited to Massachusetts and Connecticut statutes, Mass. Ann. Laws ch. 175 § 120 (1995) and Conn. Gen.Stat. § 38a–446 (1994), prohibiting discrimination in the amount of dividends paid to insurants in the same class, i.e., a violating the contribution principle. Addressing this concern, Mr. Jermyn testified that as MassMutual's Senior Vice President and Chief Actuary, he "would have expected that we most certainly would have made any second round of payments had they been necessary," explaining that "every decision that has ever been made relative to the payment of dividends of Mass-Mutual have [sic] been to ensure that we're fair and consistent with our policyholders to ensure that we're consistent with our practices, so it would be inconceivable to me that if the payments that have been made to our policyholders were less than the guarantee such that there was a difference that had to be made up, that we would not have made that difference up." Similarly, Ms. Sperry stated that "MassMutual stands by its commitments, and if it made a guarantee, if its board took an action, they would take actions that they view as serious and binding, and if they made that commitment ... I feel that they would have made whole on that guarantee." In response, defendant argued that even if the insurance commissioners had known about the potential for violations of the contribution principle by the terms of the Dividend Guarantees, the commissioners could not have known about "MassMutual's nonexistent plans to remedy potential violations."

Although the defendant raised the possibility that plaintiff's regulators might have been unlikely to enforce the dividend guarantees and that a second round of payments might have violated the contribution principle, or even state law, the defendant does not demonstrate how this would prevent plaintiff from establishing the fact of liability. As plaintiff pointed out, and defendant acknowledged, a liability need not be legally enforce-able to be fixed under the "all events test." *See Eastman Kodak Co. v. United States,* 209 Ct.Cl. at 373, 534 F.2d at 257; *see also Burlington N. R.R. Co. v. Comm'r,* 82 T.C. at 151; *Champion Spark Plug Co. v. Comm'r,* 30 T.C. at 298. Even if the parade of horribles that defendant envisions were to have come true, a second round of payments, which defendant itself noted would not be triggered absent some unforeseeable cataclysmic event, such as a total breakdown of the financial system or a nuclear war, and plaintiff failed to make a similar payment to similarly situation pre–1984 policyholders in violation of the contribution principle and state law, none of the above demonstrates that the Dividend Guarantees did not fix the fact of liability.

Plaintiff's Dividend Guarantees created an unconditional obligation to pay an aggregate group of policyholders the following year. The Dividend Guarantees were not subject to a condition precedent and neither defendant's concerns regarding enforceability or revocability of the Dividend Guarantee Resolutions prevents plaintiff's liability from being fixed in the year in which plaintiff enacted the Dividend Guarantees. Plaintiff has demonstrated that the Dividend Guarantees establish the fact of liability, meeting the first requirement of the "all events test."

After the close of testimony in the above captioned case, on November 9, 2011, the IRS released Revenue Ruling 2011–29, which held that: "An employer can establish the 'fact of the liability' under § 461 for bonuses payable to a group of employees even though the employer does not know the identity of any particular bonus recipient and the amount payable to that recipient until after the end of the taxable year." Rev. Ruling 2011–29, 2011 WL 5379455 (Nov. 9, 2011). The example used in the Revenue Ruling was an employer who used an accrual method of accounting and paid bonuses to group of employees after the end of a tax year pursuant to a defied bonus program, previously described to the employees, for performance during the tax year. *See id.* Although the employer would not know the identity of any particular bonus recipient and the amount payable to that recipient until after the end

of the taxable year, the aggregate minimum of bonuses to be paid was fixed, as the employer would reallocate the bonuses to other employees if an employee was no longer employed on the date the bonuses were paid, and, therefore, was not qualified to receive a bonus. *See id.*

As noted by a Judge on the United States Court of Federal Claims, "Revenue rulings typically contain the Service's interpretation of how the law applies to a commonly encountered set of hypothetical facts. Although not as broad in application as regulations, revenue rulings are considered authoritative." *Reliant Energy Inc. v. United States*, 45 Fed.Cl. 302, 306 n. 6 (1999).[18] Because Revenue Ruling 2011–29 was enacted on November 9, 2011, years after the first tax year at issue in this case, there is some debate if the ruling would be retroactively effective. As discussed at length in a footnote in *Principal Life Insurance Co. v. United States*, the court stated that:

Odd as it might seem, some courts have held that, under section 7805 of the Code, revenue procedures relate back to the effective date of the statute they implement, unless they prescribe otherwise. *See Cohen v. Comm'r of Internal Revenue*, 910 F.2d 422, 427 (7th Cir.1990); *Shore v. Comm'r of Internal Revenue*, 631 F.2d 624, 628 n. 8 (9th Cir.1980) ("Revenue Rulings and Procedures are normally given retroactive application."); *United States v. Lavi*, 2006 WL 1305288, at *3 (E.D.N.Y. March 30, 2006), *aff'd*, 168 Fed.Appx. 454 (2d Cir.2006) ("Section 7805 of Title 26 of the United States Code applies to both Revenue Rulings and Revenue Procedures and requires both to be applied retroactively unless the Treasury Secretary states otherwise."); *cf. Matson Navigation Co. v. Comm'r of Internal Revenue*, 68 T.C. 847, 852–55 (1977) (rejecting this view).

*Principal Life Ins. Co. v. United States*, 95 Fed.Cl. 786, 799 n. 30 (2010). The court continued, noting that:

That said, there are several reasons to question whether the IRS, without any prior warning, may establish procedures that apply retroactively. First, it is well-established that "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988); *see also Durr v. Nicholson*, 400 F.3d 1375, 1380 (Fed.Cir.2005). Nothing in section 6603 provides such an "express" power. And it is debatable whether section 7805 of the Code does so, as the Secretary's authority thereunder to issue retroactive regulations deals primarily, if not exclusively, with interpretative rules. Legislative regulations, by comparison, are generally viewed as springing from the specific enactment language and not from the general authorization for the Secretary to "prescribe all needful rules and regulations" found in section 7805(a). *See E.I. du Pont de Nemours & Co. v. Comm'r of Internal Revenue*, 41 F.3d 130, 135 n. 20 (3d Cir. 1994). Second, it is unclear whether the Secretary may use a revenue procedure to effectuate a grant of legislative rulemaking authority, even a grant that, unlike some, does not explicitly require the issuance of "regulations." *Cf.* 26 U.S.C. § 2663 ("The Secretary shall prescribe such regulations ...."). Affording such a revenue procedure the weight of a legislative regulation seems particularly problematic if, as happened here, the IRS issues the procedures without complying with the notice-and-comment requirements of the Administrative Procedure Act, 5 U.S.C. § 553(b)—the ones that normally apply to legislative rules. *See Schwalbach v. Comm'r of Inter-*

---

**18.** The Federal Circuit has indicated that it has not determined if Revenue Rulings are binding on the court of appeals and this court. *See Am. Mut. Life Ins. Co. v. United States*, 267 F.3d 1344, 1352 n. 3 (Fed.Cir.2001) ("We leave for another day the issue of whether IRS revenue rulings are binding on this court ...."); *but see B.F. Good-*

*rich Co. v. United States*, 94 F.3d 1545, 1550 n. 5 (Fed.Cir.1996) ("We recognize, however, that IRS Revenue Rulings have no binding effect on this court."); 26 U.S.C. § 6110(k)(3) (2006) ("Unless the Secretary otherwise establishes by regulations, a written determination may not be used or cited as precedent.").

*nal Revenue*, 111 T.C. 215, 220 (1998) (Secretary must comply with APA, 5 U.S.C. § 553(b) when he prescribes legislative regulations); *see also Fransen v. United States*, 191 F.3d 599, 600 (5th Cir.1999). *Principal Life Ins. Co. v. United States*, 95 Fed.Cl. at 799 n. 30. Regardless of whether the Revenue Ruling can be applied retroactively to the facts of this case, the holding of Revenue Ruling 2011–29, that the fact of liability can be established even though an employer making bonus payments does not know the identity of any particular recipient and bonus is not paid until the following year, is consistent with the court's conclusion that plaintiff's Dividend Guarantees established the fact of liability even though the Dividend Guarantees did not identify which policyholders would receive the minimum amount of guaranteed dividends or what amount each individual policyholder would receive under the Dividend Guarantees. Similar to the example cited in the Revenue Ruling, in which the fact of liability was established, plaintiff in the above captioned case established a guaranteed minimum amount of dividends to pay policyholders, which was sufficient to establish the fact of liability.

*Liability Determined with Reasonable Accuracy*

■ The second element of the "all events test" is that "the amount of such liability can be determined with reasonable accuracy." 26 U.S.C. § 461(h)(4); Treas. Reg. § 1.461–1(a)(2)(i) *see also United States v. Gen. Dynamics Corp.*, 481 U.S. at 242, 107 S.Ct. 1732 (quoting Treas. Reg. § 1.461–1(a)(2) (1986) ("The test is now embodied in Treas. Reg. § 1.461–1(a)(2), 26 C.F.R. § 1.461–1(a)(2) (1986), which provides that '[u]nder an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy.' ")); *Hughes Props., Inc. v. United States*, 760 F.2d 1292, 1293 (Fed.Cir.1985) (citing Treas. Reg. § 1.446–1(c)(1)(ii) (1984) ("Under the accrual method of accounting, an expense is deductible for a tax year in which all of the events have occurred that determine the fact

of liability and the amount thereof can be determined with reasonable accuracy."), *aff'd*, 476 U.S. 593, 106 S.Ct. 2092, 90 L.Ed.2d 569 (1986)). Notably, "the all events test does not require that the amount of liability be known with certainty. The second prong of the test makes clear that the amount only need be known with reasonable accuracy." *Burnham Corp. v. Comm'r*, 878 F.2d at 88.

The defendant did not allege at trial, or argue in filings submitted to the court, that the Dividend Guarantees did not satisfy the second element of the "all events test." Defendant also conceded that "[e]ach of the dividend guarantee resolutions did establish a minimum amount of policyholder dividends to be paid to post–1983 policyholders in the following year." In *Burnham Corp. v. Commissioner*, the court concluded that the "[b]y failing to argue that the test's second prong had not been satisfied, the [defendant] has in effect conceded that the amount of liability could be determined with reasonable accuracy." *Id.* Like the United States in the cause currently before the court, in *United States v. General Dynamics Corp.*, 481 U.S. 239, 107 S.Ct. 1732, in determining whether all the events necessary to fix liability had occurred, the Supreme Court noted in a footnote, that the "United States did not seek review of whether the amount of liability in this case could be determined with reasonable accuracy." *Id.* at 242 n. 2, 107 S.Ct. 1732.

■ Each of the Dividend Guarantees at issue had an identical definition for the Annual Dividend Guarantee: "the Company's irrevocable guarantee that it will pay or apply an amount not less than a specified amount of annual policyholder dividends with respect to post–1983 policies in the following year." As a specific example, at the December 13, 1995, MassMutual Board of Directors meeting, the Board of Directors stated it was guaranteeing a minimum amount of $185.0 million in policyholder dividends to be paid to post–1983 policyholders in the following year. The MassMutual Board of Directors voted:

That the Company hereby absolutely and irrevocably commits and guarantees that, of the total apportionment from its surplus

funds for the period beginning January 1, 1996 and ending December 31, 1996, said apportionment having previously been established by vote of this Board of Directors at its meeting held on October 9, 1995, it will pay or cause to be applied during 1996, in all events, annual dividends for participating individual life and annuity policies issued after December 31, 1983, in an amount of not less than $185 million; and that the Executive Vice President, Corporate Financial Operations be, and he hereby is, made responsible for monitoring the payment of annual dividends during 1996 to assure that such guaranteed amount is so paid or applied.

Therefore, in 1995, the minimum amount of policyholder dividends guaranteed by the 1995 MassMutual Dividend Guarantee was $185.0 million and the minimum amount of policyholder dividends guaranteed by the 1995 ConnMutual Dividend Guarantee was $97.0 million. In 1996, the minimum amount of policyholder dividends guaranteed by the 1996 MassMutual Dividend Guarantee was $310.0 million and in 1997, the minimum amount of policyholder dividends guaranteed by the 1997 MassMutual Dividend Guarantee was $360.0 million. Each of the Dividend Guarantees identified a specific minimum amount of guaranteed policyholder dividends for which MassMutual and ConnMutual were liable and, although not stated in dollar amounts in the Board Resolutions, the amount of plaintiff's liability for the Dividend Guarantees was determinable with "reasonable accuracy" for each tax year at issue. Plaintiff has established, and defendant has not effectively contested, that for the second element of the "all events test," the amount of liability was determined with reasonable accuracy.

### Economic Performance

The Federal Circuit has indicated that "I.R.C. § 461(h) embodies an 'economic per-

formance' test, according to which an accrual method taxpayer may not deduct an expense prior to the time when 'economic performance' occurs in relation to the expense." *Maxus Energy Corp. v. United States,* 31 F.3d 1135, 1142 (Fed.Cir.1994); *see also United States v. Gen. Dynamics Corp.,* 481 U.S. at 243 n. 3, 107 S.Ct. 1732. The Tax Code at 26 U.S.C. § 461(h)(1) states, "[i]n determining whether an amount has been incurred with respect to any item during any taxable year, the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs." 26 U.S.C. § 461(h)(1); *see also Metro Leasing and Develop. Corp. v. Comm'r,* 376 F.3d at 1023; *Gold Coast Hotel & Casino v. United States,* 158 F.3d at 487 n. 5 ("Section 461(h)(1) further provides that the 'all events' test is not satisfied any earlier than when 'economic performance' has occurred."). Therefore, although the fact of liability may be established and the amount of the liability can be established with reasonable accuracy, unless economic performance has occurred, the "all events test" has not been met. *See* 2 Mertens Law of Federal Income Taxation, § 12A:119, at 12A–191 ("For accrued expenses, the all-events test is modified by the rule of Section 461(h), that the all-events test is not deemed to have been met any earlier than the occurrence of the economic performance of the item or obligation underlying the taxpayer's liability.") (footnote omitted).[19] Section 461(h)(3) of the Tax Code, however, provides an exception for certain recurring items. Section 461(h)(3) states:

(A) In general.—Notwithstanding paragraph (1) an item shall be treated as incurred during any taxable year if—

(i) the all events test with respect to such item is met during such taxable

---

**19.** As the United States Claims Court stated, "[t]he addition of I.R.C. § 461(h)(1), section 91(a) of the TEFRA, [Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, 96 Stat. 411 (1982)] precludes an accrual basis taxpayer from meeting the 'all events' test prior to the completion of economic performance." *Long v. United States,* 10 Cl.Ct. 46, 57 n. 6 (1986), *aff'd,* 824 F.2d 976 (Fed.Cir.1987) (table). Al-

though the court in *Long v. United States* referenced the Tax Equity and Fiscal Responsibility Act, the Claims Court was more likely referring to the Deficit Reduction Act of 1984, which amended 26 U.S.C. § 461 to include subsection h, titled, "Certain Liabilities Not Incurred Before Economic Performance." *See* Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 91, 98 Stat. 494.

year (determined without regard to paragraph (1)),

(ii) economic performance with respect to such item occurs within the shorter of—

(I) a reasonable period after the close of such taxable year, or

(II) 8 1/2 months after the close of such taxable year,

(iii) such item is recurring in nature and the taxpayer consistently treats items of such kind as incurred in the taxable year in which the requirements of clause (i) are met, and

(iv) either-

(I) such item is not a material item, or

(II) the accrual of such item in the taxable year in which the requirements of clause (i) are met results in a more proper match against income than accruing such item in the taxable year in which economic performance occurs.

26 U.S.C. § 461(h)(3); *see also* 2 Mertens Law of Federal Income Taxation, § 12A:123, at 12A–201. Treasury Regulation § 1.461–5(a), promulgated pursuant to 26 U.S.C. § 461(h), *see* Treas. Dec. 8408, 57 Fed.Reg. 12411 (Apr. 10, 1992), states, in part, that "[e]xcept as otherwise provided in paragraph (c) of this section, a taxpayer using an accrual method of accounting may adopt the recurring item exception described in paragraph (b) of this section as method of accounting for one or more types of recurring items incurred by the taxpayer." Treasury Regulation § 1.461–5(b) states,

Under the recurring item exception, a liability is treated as incurred for a taxable year if—

(i) As of the end of that taxable year, all events have occurred that establish the fact of the liability and the amount of the liability can be determined with reasonable accuracy;

(ii) Economic performance with respect to the liability occurs on or before the earlier of—

(A) The date the taxpayer files a timely (including extensions) return for that taxable year; or

(B) The 15th day of the 9th calendar month after the close of that taxable year;

(iii) The liability is recurring in nature; and

(iv) Either—

(A) The amount of the liability is not material; or

(B) The accrual of the liability for that taxable year results in a better matching of the liability with the income to which it relates than would result from accruing the liability for that taxable year in which economic performance occurs.

Treas. Reg. § 1.461–5(b) (2012); *see also* Rev. Rul. 2007–3, 2007–1 C.B. 350 (Jan. 22, 2007); Stephen F. Gertzman, Federal Tax Accounting ¶ 4.04[3][f] (2010). Although the Tax Code and the Treasury Regulations permit the recurring item exception to economic performance to be met if the amount of the liability is not material, 26 U.S.C. § 461(h)(3)(iv)(I); Treas. Reg. § 1.461–5(b)(iv)(A), neither party has argued that the amount of liability is not material for any of the tax years at issue.

■■■ The parties have stipulated that "[b]oth MassMutual and ConnMutual took the necessary administrative steps to elect the 'recurring item exception' within the meaning of Internal Revenue Code § 461(h)(3) with respect to policyholder dividends for the years at issue." As noted above, plaintiff's policyholder dividends are liabilities because pursuant to Treasury Regulation § 1.446–1, "[t]he term liability includes any item allowable as a deduction, cost or expense for Federal income tax purposes," Treas. Reg. § 1.446–1(c)(ii)(B), and policyholder dividends are properly deductible by life insurance companies under the Tax Code. *See* 26 U.S.C. § 805(a)(3); *see also* 26 U.S.C. § 808(c); *UNUM Corp. v. United States*, 130 F.3d at 509. The policyholder dividends were payment liabilities for the purposes of economic performance, because the payment of the liability is the economic performance. *See Gold Coast Hotel & Casino v. United States*, 158 F.3d at 487 n. 5 (citing Treas. Reg. § 1.461–4(k)(3) ("[F]or payment liabili-

ties for which payment is economic performance, the requirement applies to liabilities that would otherwise be deductible or incurred for taxable years beginning after December 31, 1991.")). Moreover, the parties have jointly stipulated that the plaintiff's "liability to pay policyholder dividends is a payment liability within the meaning of Treas. Reg. § 1.461–4." In 1995, ConnMutual set aside as a liability on its 1995 Annual Statement, an estimate of the total amount of dividends payable for the following year and in the years 1995–1997, MassMutual set aside as a liability on its Annual Statement for an estimate of the total amount of dividends payable for the following year. As determined above, the liability for each year was fixed and determined. The liabilities were recurring in nature, as the plaintiff not only paid policyholder dividends in each of the tax years at issue, but paid policyholder dividends on an annual basis.

The parties also have stipulated that ConnMutual timely filed its federal income tax return in 1995 and MassMutual timely filed its federal income tax return for 1995, 1996, and 1997. The parties also have stipulated the amount of policyholder dividends the plaintiff paid to former ConnMutual policyholders between January 1, 1996 and September 15, 1996 and the amount of policyholder dividends that MassMutual paid in policyholders dividends between January 1, 1996 and September 15, 1996, January 1, 1997 and September 15, 1997 and January 1, 1998 and September 15, 1998, in each instance, on "the 15th day of the 9th calendar month after the close of that taxable year." Treas. Reg. § 1.461–5(b)(ii)(B).

The only remaining criteria for the plaintiff to satisfy the recurring item exception for economic performance is the matching requirement. *See* 26 U.S.C. § 461(h)(3)(iv)(II); Treas. Reg. § 1.461–5(b)(iv)(B). "The exception to the economic performance test under

Section 461(h) requires that the accrual of an item in a particular taxable year results in better matching of the deduction with the income to which the item relates. To determine whether a better matching results generally accepted accounting principles are an important factor." 2 Mertens Law of Federal Income Taxation, § 12A:123, at 12A–203. Indeed, as Treasury Regulation § 1.461–5(b)(5)(i) states, "[i]n determining whether the matching requirement of paragraph (b)(1)(iv)(B) of this section is satisfied, generally accepted accounting principles are an important factor, but are not dispositive." Treas. Reg. § 1.461–5(b)(5)(i).

Pursuant to Treasury Regulation § 1.461–5(b)(5)(ii), the matching requirement of Treasury Regulation § 1.461–5(b)(1)(iv)(B) may be deemed satisfied in the case of certain liabilities. *See* Treas. Reg. § 1.461–5(b)(5)(ii). Treasury Regulation § 1.461–5(b)(5)(ii) states:

> In the case of a liability described in paragraph (g)(3) (rebates and refunds), paragraph (g)(4) (awards, prizes, and jackpots), paragraph (g)(5) (insurance, warranty, and service contracts), paragraph (g)(6) (taxes), or paragraph (h) (continuing fees under the Nuclear Waste Policy Act of 1982) of § 1.461–4, the matching requirement of paragraph (b)(1)(iv)(B) of this section shall be deemed satisfied.

Treas. Reg. § 1.461–5(b)(5)(ii). The matching requirement of Treasury Regulation § 1.461–5(b)(5)(ii) refers to "rebates and refunds" in Treasury Regulation § 1.461–4(g)(3), which provides, in part: "If the liability of a taxpayer is to pay a rebate, refund, or similar payment to another person (whether paid in property, money, or as a reduction in the price of goods or services to be provided in the future by the taxpayer), economic performance occurs as payment is made to the person to which the liability is owed." Treas. Reg. § 1.461–4(g)(3) (2012).[20]

---

**20.** Treasury Regulation § 1.461–4(g)(3) states:
Rebates and refunds. If the liability of a taxpayer is to pay a rebate, refund, or similar payment to another person (whether paid in property, money, or as a reduction in the price of goods or services to be provided in the future by the taxpayer), economic performance occurs as payment is made to the person to

which the liability is owed. This paragraph (g)(3) applies to all rebates, refunds, and payments or transfers in the nature of a rebate or refund regardless of whether they are characterized as a deduction from gross income, an adjustment to gross receipts or total sales, or an adjustment or addition to cost of goods sold. In the case of a rebate or refund made

The parties sole source of disagreement regarding the economic performance element of the "all events test" is whether policyholder dividends constitute rebates, refunds, or similar payments, such that plaintiff can satisfy the matching requirement of the recurring item exception to economic performance. The plaintiff argued that "[t]he question of whether Plaintiff's policyholder dividends are 'in the nature of' rebates or refunds is the issue disputed between the parties and presented to the Court." In its pre-trial memorandum, the defendant stated that even if the court determined the fact of liability was fixed, the court must also determine whether "a mutual life insurer's policyholder dividends constitute rebates, refunds, or similar payments under Treas. Reg. § 1.461–4(g)(3)." In its post-trial brief, the defendant argued that the policyholders dividends are not rebates, refunds or similar payments, but rather "they are 'other liabilities' described in [Treasury Regulation] § 1.461–4(g)(7), for which 'economic performance occurs as the taxpayer makes payments in satisfaction of the liability to the person to which the liability is owed.'" (quoting Treas. Reg. § 1.461.4(g)(7)).

Treasury Regulation § 1.461–4(g)(7) is a catch-all provision for economic performance of a liability. Treasury Regulation § 1.461–4(g)(7) states:

> In the case of a taxpayer's liability for which economic performance rules are not provided elsewhere in this section or in any other Internal Revenue regulation, revenue ruling or revenue procedure, economic performance occurs as the taxpayer makes payments in satisfaction of the liability to the person to which the liability is owed. This paragraph (g)(7) applies only if the liability cannot properly be characterized as a liability covered by rules provided elsewhere in this section. If a liability may properly be characterized as, for example, a liability arising from the provision of services or property to, or by, a

taxpayer, the determination as to when economic performance occurs with respect to that liability is made under paragraph (d) of this section and not under this paragraph (g)(7).

Treas. Reg. § 1.461–4(g)(7). The plaintiff does not allege that the liability for policyholder dividends would be characterized as a liability for any other section of Treasury Regulation § 1.461–4 if the court were to find policyholder dividends were not in the nature of a rebate or a refund. If the policyholder dividends are "a rebate, refund, or similar payment" pursuant to Treasury Regulation § 1.461–4(g)(3) and fulfill the matching requirement of 26 U.S.C. § 461(h), thereby qualifying for the recurring item exception to economic performance, and the Dividend Guarantees meets each of the elements of the "all events test."

▮▮▮ Section 461 of the Tax Code does not indicate if rebates or refunds satisfy the matching requirement. Therefore, the court must look to the rules of statutory construction. The first step in statutory construction is "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)); *see also Jimenez v. Quarterman*, 555 U.S. 113, 118, 129 S.Ct. 681, 172 L.Ed.2d 475 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain language of the statute."); *Strategic Hous. Fin. Corp. of Travis Cnty. v. United States*, 608 F.3d 1317, 1323 (Fed.Cir.) ("When interpreting any statute, we look first to the statutory language."), *reh'g and reh'g en banc denied* (Fed.Cir. 2010), *cert. denied,* —— U.S. ——, 131 S.Ct. 1513, 179 L.Ed.2d 308 (2011). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader

---

as a reduction in the price of goods or services to be provided in the future by the taxpayer, "payment" is deemed to occur as the taxpayer would otherwise be required to recognize income resulting from a disposition at an unreduced price. See Example 2 of paragraph

(g)(8) of this section. For purposes of determining whether the recurring item exception of § 1.461–5 applies, a liability that arises out of a tort, breach of contract, or violation of law is not considered a rebate or refund.

Treas. Reg. § 1.461–4(g)(3).

context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. at 341, 117 S.Ct. 843 (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) and *McCarthy v. Bronson*, 500 U.S. 136, 139, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991)). " 'Beyond the statute's text, the traditional tools of statutory construction include the statute's structure, canons of statutory construction, and legislative history.' " *Bartels Trust for the Benefit of Cornell Univ. ex rel. Bartels v. United States*, 617 F.3d 1357, 1361 (Fed.Cir.) (quoting *Bull v. United States*, 479 F.3d 1365, 1376 (Fed.Cir.2007)), *reh'g en banc denied* (Fed.Cir. 2010).

The initial inquiry into the statutory text ceases "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.' " *Barnhart v. Sigmon Coal Co.*, 534 U.S. at 450, 122 S.Ct. 941 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. at 340, 117 S.Ct. 843). In interpreting the plain meaning of the statute, it is the court's duty, if possible, to give meaning to every clause and word of the statute. *See Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 489 n. 13, 124 S.Ct. 983, 157 L.Ed.2d 967 (2004) ("It is, moreover, ' "a cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or otherwise insignificant." ' " (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001)))); *Williams v. Taylor*, 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (describing as a "cardinal principle of statutory construction" the rule that every clause and word of a statute must be given effect if possible). Similarly, the court must avoid an interpretation of a clause or word which renders other provisions of the statute inconsistent, meaningless, or superfluous. *See Duncan v. Walker*, 533 U.S. at 174, 121 S.Ct. 2120 (noting that courts should not treat statutory terms as "surplusage"). "[W]hen two statutes are capable of co-existence, it is the duty of the courts ... to regard each as effective." *Radzanower v. Touche Ross & Co.*, 426 U.S.

148, 155, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976); *see also Hanlin v. United States*, 214 F.3d 1319, 1321 (Fed.Cir.), *reh'g denied* (Fed. Cir. 2000).

When the statute provides a clear answer, the court's analysis is at an end. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. at 450, 122 S.Ct. 941; *see also Arko Foods Int'l, Inc. v. United States*, 654 F.3d 1361, 1364 (Fed.Cir.2011) (" '[W]here Congress has clearly stated its intent in the language of a statute, a court should not inquire further into the meaning of the statute.' " (quoting *Millenium Lumber Distrib., Ltd. v. United States*, 558 F.3d 1326, 1328 (Fed.Cir.2009), *reh'g denied*, 558 F.3d 1326 (2009)); *Am. Airlines, Inc. v. United States*, 551 F.3d 1294, 1300 (Fed.Cir.2008), *reh'g granted*, 319 Fed.Appx. 914 (Fed.Cir.2009). Thus, when the "statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.' " *Johnson v. United States*, 529 U.S. 694, 723, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) (quoting *United States v. ·Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917))); *see also Bartels Trust for the Benefit of Cornell Univ. ex. rel. Bartels v. United States*, 617 F.3d at 1361 (citing *Sharp v. United States*, 580 F.3d 1234, 1237 (Fed.Cir.2009), *Jimenez v. Quarterman*, 555 U.S. at 118, 129 S.Ct. 681, and *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000)). In such instances, the court should not consider "conflicting agency pronouncements" or "extrinsic evidence of a contrary intent." *Weddel v. Sec'y of Dep't of Health and Human Servs.*, 23 F.3d 388, 391 (Fed.Cir.) (noting that courts must not defer to agency interpretation contrary to the intent of Congress evidenced by unambiguous language) (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476, 112 S.Ct. 2589, 120 L.Ed.2d 379, *cert. denied*, 505 U.S. 1218, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992) and *Darby v. Cisneros*, 509 U.S. 137, 147, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993))), *reh'g denied* and en banc *suggestion declined* (Fed.Cir. 1994). "[O]nly language that meets the constitution-

al requirements of bicameralism and presentment has true legal authority." *Weddel v. Sec'y of Dep't of Health and Human Servs.*, 23 F.3d at 391 (citing *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983)). " '[C]ourts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point.' " *Shannon v. United States*, 512 U.S. 573, 583–84, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) (quoting *Int'l Bhd. of Elec. Workers, Local Union No. 474 v. NLRB*, 814 F.2d 697, 712 (D.C.Cir.1987)). *AFL–CIO v. NLRB*, 814 F.2d 697, 712 (D.C.Cir.1987). Indeed, in construing a statute courts " 'must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.' " *Schindler Elevator Corp. v. United States*, —— U.S. ——, 131 S.Ct. 1885, 1891, 179 L.Ed.2d 825 (2011) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 129 S.Ct. 2343, 2350, 174 L.Ed.2d 119 (2009)) (internal quotation marks omitted). Even " '[w]hen terms used in a statute are undefined, we give them their ordinary meaning.' " *Schindler Elevator Corp. v. United States*, 131 S.Ct. at 1891 (quoting *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995)). Consequently, if a statute is plain and unequivocal on its face, there is usually no need to resort to the legislative history underlying the statute. *See Whitfield v. United States*, 543 U.S. 209, 125 S.Ct. 687, 160 L.Ed.2d 611 ("Because the meaning of [the statute's] text is plain and unambiguous, we need not accept petitioners' invitation to consider the legislative history ...."), *reh'g denied sub nom. Hall v. United States*, 544 U.S. 913, 125 S.Ct. 1606, 161 L.Ed.2d 293 (2005); *but see Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1196 (Fed.Cir.2004) ("Though 'we do not resort to legislative history to cloud a statutory text that is clear,' *Ratzlaf v. United States*, 510 U.S. 135, 147–48 [114 S.Ct. 655, 126 L.Ed.2d 615] (1994), we nevertheless recognize that 'words are inexact tools at best, and hence it is essential that we place the words of a statute in their proper context by resort to the legislative history.' " (quoting *Tidewater Oil Co. v. United States*, 409 U.S. 151, 157, 93 S.Ct. 408, 34 L.Ed.2d 375

(1972))), *cert. denied*, 544 U.S. 923, 125 S.Ct. 1669, 161 L.Ed.2d 481 (2005).

Legislative history may be helpful in certain instances "to shed light on what legislators understood an ambiguous statutory text to mean when they voted to enact it into law." *Bruesewitz v. Wyeth LLC*, —— U.S. ——, 131 S.Ct. 1068, 1081–82, 179 L.Ed.2d 1 (2011) (citing *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005)); *see also Xianli Zhang v. United States*, 640 F.3d 1358, 1373 (Fed.Cir.2011), *petition for cert. filed* (U.S. Jan. 9, 2012). However, legislative history does not "trump[ ] clear text." *Bartels Trust for the Benefit of Cornell Univ. ex rel. Bartels v. United States*, 617 F.3d at 1361 (citing *Sharp v. United States*, 580 F.3d at 1238, *Glaxo Operations UK Ltd. v. Quigg*, 894 F.2d 392, 396 (Fed.Cir.1990), and *Coltec Indus., Inc. v. United States*, 454 F.3d 1340).

The United States Supreme Court also has held that the specific terms of a statute supersede general terms within that statute or within another statute that would otherwise control. *See Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228–29, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957). ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling." (quoting *D. Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208, 52 S.Ct. 322, 76 L.Ed. 704 (1932))); *see also Bulova Watch Co. v. United States*, 365 U.S. 753, 761, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961). A more specific statute will not be superseded by a more recent, general statute unless there is a clear indication of the intent to do so. *Morton v. Mancari*, 417 U.S. 535, 550–551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (holding specific controlling over general, irrespective of priority of enactment). Therefore, for a subsequently enacted statute to be held controlling, the circumstances must explicitly indicate the congressional intent to do so. *United States v. United Cont'l Tuna*, 425 U.S. 164, 168, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976) (holding that "... repeals by implication are not favored.") The principle is particularly applicable in situations in which a party seeks to have a specific statute superseded by a more general one. *Southwest*

*Marine of San Francisco, Inc. v. United States,* 896 F.2d 532, 533 (Fed.Cir.1990). The view of a later Congress on a statute, however, does not control how to interpret an earlier enacted statute, *O'Gilvie v. United States,* 519 U.S. 79, 90, 117 S.Ct. 452, 136 L.Ed.2d 454 (1996), although subsequent legislation "does have persuasive value," *Bell v. New Jersey,* 461 U.S. 773, 784, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983), and "is entitled to great weight in statutory construction," *Red Lion Broad. Co. v. FCC,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

 "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (footnote omitted); *see also Household Credit Servs., Inc. v. Pfennig,* 541 U.S. 232, 239, 124 S.Ct. 1741, 158 L.Ed.2d 450 (2004). The Supreme Court also has written that "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); *see also Cuomo v. Clearing House Ass'n, L.L.C.,* 557 U.S. 519, 129 S.Ct. 2710, 2715, 174 L.Ed.2d 464 (2009) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778) ("Under the familiar *Chevron* framework, we defer to an agency's reasonable interpretation of a statute it is charged with administering."); *Yanco v. United States,* 258 F.3d 1356, 1362 (Fed.Cir. 2001).

Elaborating on the *Chevron* doctrine, the United States Supreme Court in *Mead* stated:

When Congress has "explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," *Chevron,* 467 U.S., at 843–844 [104 S.Ct. 2778], and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute. See *id.,* at 844 [104 S.Ct. 2778]; *United States v. Morton,* 467 U.S. 822, 834 [104 S.Ct. 2769, 81 L.Ed.2d 680] (1984); APA, 5 U.S.C. § 706(2)(A), (D). But whether or not they enjoy any express delegation of authority on a particular question, agencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they certainly may influence courts facing questions the agencies have already answered. "[T]he well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance,' " *Bragdon v. Abbott,* 524 U.S. 624, 642 [118 S.Ct. 2196, 141 L.Ed.2d 540] (1998) (quoting *Skidmore* [*v. Swift & Co.*], 323 U.S. [134], at 139–140 [65 S.Ct. 161, 89 L.Ed. 124 (1944) ]), and "[w]e have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer . . . ." *Chevron, supra,* at 844 [104 S.Ct. 2778] (footnote omitted); *see also Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565 [100 S.Ct. 790, 63 L.Ed.2d 22] (1980); *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450 [98 S.Ct. 2441, 57 L.Ed.2d 337] (1978). The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position, see *Skidmore, supra,* at 139–140 [65 S.Ct. 161].

*United States v. Mead Corp.,* 533 U.S. at 227–28, 121 S.Ct. 2164 (omissions in original and footnotes omitted); *see also Household Credit Servs., Inc. v. Pfennig,* 541 U.S. at 239, 242, 124 S.Ct. 1741; *Lacavera v. Dudas,*

441 F.3d 1380, 1383 (Fed.Cir.2006), *cert. denied,* 549 U.S. 1205, 127 S.Ct. 1246, 167 L.Ed.2d 74 (2007); *California Indus. Prods., Inc. v. United States,* 436 F.3d 1341, 1352–57 (Fed.Cir.2006); *Rotech Healthcare Inc. v. United States,* 71 Fed.Cl. 393, 421, *appeal dismissed,* 214 Fed.Appx. 973 (Fed.Cir.2006). Moreover, explaining the relevance and purpose of *Chevron* deference, the Supreme Court has noted:

> In *Chevron,* this Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling these gaps, the Court explained, involves difficult policy choices that agencies are better equipped to make than courts. If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 980, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) (internal citations omitted).

██ *Chevron* deference requires that a court ask the following questions when reviewing an agency's construction of a statute: First, the court must ask "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. at 842–43, 104 S.Ct. 2778. If the congressional intent is clear, then the court looks no further, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778 (footnote omitted). However, if Congress is silent, or if it has left the statute "ambiguous with respect to the specific issue," the court must ask the second question: "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778 (footnotes omitted). *see also Judulang v. Holder,* —— U.S. ——, 132 S.Ct. 476, 484 n. 7, 181 L.Ed.2d 449 (2011) ("[U]nder *Chevron* step two, we ask whether an agency interpretation is ' "arbitrary or capricious in

substance." ' " (quoting *Mayo Found. for Medical Ed. and Research v. United States,* —— U.S. ——, 131 S.Ct. 704, 711, 178 L.Ed.2d 588 (2011) (quoting *Household Credit Servs., Inc. v. Pfennig,* 541 U.S. at 242, 124 S.Ct. 1741))). "[I]f Congress has not specifically addressed the question, a reviewing court must respect the agency's construction of the statute so long as it is permissible. Such deference is justified because '[t]he responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones,' and because of the agency's greater familiarity with the ever-changing facts and circumstances surrounding the subjects regulated." *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. at 866, 104 S.Ct. 2778) (other citations omitted).

██ With respect to an agency's statutory construction: "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question had arisen in a judicial proceeding." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. at 843 n. 11, 104 S.Ct. 2778 (citations omitted). However, "[d]eference does not mean acquiescence." *Presley v. Etowah County Comm'n,* 502 U.S. 491, 508, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992). "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. at 843 n. 9, 104 S.Ct. 2778 (citations omitted). Thus, this court should defer to an agency's construction of the statute if it "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' express intent." *Rust v. Sullivan,* 500 U.S. 173, 184, 111 S.Ct. 1759, 114

L.Ed.2d 233 (1991) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. at 842–43, 104 S.Ct. 2778). The converse is likewise true that the court should only defer to the agency's interpretation if it is not in conflict with the congressional intent.

The United States Supreme Court has stated for "the 'normal rule of statutory construction' that 'identical words used in different parts of the same act are intended to have the same meaning.'" *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 570, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (quoting *Dep't of Revenue of Oregon v. ACF Indus., Inc.*, 510 U.S. 332, 342, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994)). The Supreme Court has applied this normal rule of statutory construction to the Internal Revenue Code. *See Sorenson v. Treasury*, 475 U.S. 851, 860, 106 S.Ct. 1600, 89 L.Ed.2d 855 (1986).

The United States Supreme Court also has indicated that regulations issued by the IRS are accorded *Chevron* deference if consistent with the relevant statute. "Treasury Regulations 'must be sustained unless unreasonable and plainly inconsistent with the revenue statutes.'" *Comm'r v. Portland Cement Co.*, 450 U.S. 156, 169, 101 S.Ct. 1037 (quoting *Comm'r v. South Texas Lumber Co.*, 333 U.S. 496, 501, 68 S.Ct. 695, 92 L.Ed. 831 (1948)). The Supreme Court elaborated that courts "must defer to Treasury Regulations that 'implement the congressional mandate in some reasonable manner.'" *Comm'r v. Portland Cement Co.*, 450 U.S. at 169, 101 S.Ct. 1037 (quoting *United States v. Correll*, 389 U.S. 299, 307, 88 S.Ct. 445, 19 L.Ed.2d 537 (1967)). The Supreme Court noted that "[w]e do this because Congress has delegated to the [Commissioner], not to the courts, the task of prescribing all needful rules and regulations for the enforcement of the Internal Revenue Code," *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 219, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001) (quoting *Nat'l Muffler Dealers Ass'n, Inc. v. United States*, 440 U.S. 472, 477, 99 S.Ct. 1304, 59 L.Ed.2d 519 (1979)) and because the Supreme Court does not "'sit as a committee of revision to perfect the administration of the tax laws.'" *United States v. Cleveland Indi-*

*ans Baseball Co.*, 532 U.S. at 218, 121 S.Ct. 1433 (quoting *United States v. Correll*, 389 U.S. at 306–307, 88 S.Ct. 445); *see also Keener v. United States*, 551 F.3d 1358, 1363 (Fed.Cir.) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. at 843, 104 S.Ct. 2778) ("Since the statute is ambiguous with respect to this issue, we give deference to the agency's interpretation of the statute."), *reh'g en banc denied* (Fed. Cir.), *cert. denied*, —— U.S. ——, 130 S.Ct. 153, 175 L.Ed.2d 38 (2009); *Khan v. United States*, 548 F.3d 549, 554 (7th Cir.2008) ("We review general authority tax regulations under the criteria articulated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).").

The Federal Circuit likewise has indicated that: "'Treasury regulations are entitled to great deference, and must be sustained unless unreasonable and plainly inconsistent with the revenue statutes.'" *CUNA Mut. Life Ins. Co. v. United States*, 169 F.3d 737, 742 (Fed.Cir.1999) (quoting *Am. Mut. Life Ins. Co. v. United States*, 43 F.3d 1172, 1176 (8th Cir.1994)); *see also Dow Corning Corp. v. United States*, 984 F.2d 416, 419 (Fed.Cir. 1993); *Dillon, Read & Co., Inc. v. United States*, 875 F.2d 293, 299 (Fed.Cir.1989) (citing *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 26, 102 S.Ct. 821, 70 L.Ed.2d 792 (1982)) (Treasury Regulations "are to be sustained unless disharmonious with the controlling statute...."). "'Congress has delegated to the Commissioner, not to the courts, the task of prescribing "all needful rules and regulations for the enforcement" of the Internal Revenue Code. 26 U.S.C. § 7805(a).'" *Colt Indus., Inc. v. United States*, 880 F.2d 1311, 1314 (Fed.Cir.1989) (quoting *United States v. Correll*, 389 U.S. at 307, 88 S.Ct. 445 (quoting 26 U.S.C. § 7805(a))); *see also Murfam Farms, LLC v. United States*, 88 Fed.Cl. 516, 522 (2009) ("Section 7805(a) of the Code authorizes the Secretary of the Treasury to promulgate rules and regulations in connection with the enforcement of the Code.") (internal citation omitted), *motion to vacate denied* (2010).

Section 461(h)(3) of the Tax Code does not contain a general definition for rebate or

refund. Nor is there a general definition of rebate or refund for the Tax Code generally or in Treasury Regulations § 1.461–5 or § 1.461–4. The economic performance element of the "all events test," Section 461(h)(3) of the Tax Code, identifies the recurring item exception to that test and the requirements necessary to meet the exception. One of the requirements is that the accrual of such item occur in the taxable year in which the requirements of clause "(i) are met results in a more proper match against income than accruing such item in the taxable year in which economic performance occurs." 26 U.S.C. § 461(h)(3)(A)(iv)(II). However, 26 U.S.C. § 461(h)(3) does not identify how a more proper match is achieved pursuant to the "all events test." The Treasury Regulations attempt to address how an accrual taxpayer can achieve a "more proper match." *See* Treasury Regulations §§ 1.461–4(g)(3), 1.461–5(b)(5)(ii). The Tax Code language at Section 461(h)(3) is broad and ambiguous, and the court is left to determine if the Treasury Regulation is a reasonable and consistent interpretation of the statute. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. at 843, 104 S.Ct. 2778 and *Comm'r v. Portland Cement Co.,* 450 U.S. at 169, 101 S.Ct. 1037. The Tax Code provides, at 26 U.S.C. § 7805(a) (2006), that: "Except where such authority is expressly given by this title to any person other than an officer or employee of the Treasury Department, the Secretary shall prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue." Moreover, 26 U.S.C. § 461(h), which governs economic performance, states "[i]n the case of any other liability [not enumerated in 26 U.S.C. § 461(h)(2) ] of the taxpayer, economic performance occurs at the time determined under regulations prescribed by the Secretary [of the Treasury]." 26 U.S.C. § 461(h)(2)(D).[21]

Treasury Regulation § 1.461–5, titled, "Recurring item exception," addresses the matching requirement of 26 U.S.C. § 461(h)(3), and restates the matching requirement from the statute and states: "The accrual of the liability for that taxable year results in a better matching of the liability with the income to which it relates than would result from accruing the liability for the taxable year in which economic performance occurs." Treas. Reg. § 1.461–5(b)(1)(iv)(B). Treasury Regulation § 1.461–5 provides some clarification of the matching requirement at § 1.461–5(b)(5), "Matching requirement," noting "[i]n determining whether the matching requirement of paragraph (b)(1)(iv)(B) of this section is satisfied, generally accepted accounting principles are an important factor, but are not dispositive." Treas. Reg. § 1.461–5(b)(5)(i). The Treasury Regulation continues, "[i]n the case of a liability described in paragraph (g)(3) (rebates and refunds), paragraph (g)(4) (awards, prizes, and jackpots), paragraph (g)(5) (insurance, warranty, and service contracts), paragraph (g)(6) (taxes), or paragraph (h) (continuing fees under the Nuclear Waste Policy Act of 1982) of § 1.461–4, the matching requirement of paragraph (b)(1)(iv)(B) of this section shall be deemed satisfied." Treas. Reg. § 1.461–5(b)(5)(ii). Because the standard identified in the statute is that the recurring item exception is applicable when a more proper match can be met, and the application in the Treasury Regulation lists specific liabilities that may be conclusively considered to be a better match for accrual in the taxable year than the taxable year economic performance occurred, the Treasury Regulation was consistent in the aim of the statute and was, therefore, not " 'unreasonable and plainly inconsistent with the revenue statutes.' " *Comm'r v. Portland Cement Co.,* 450 U.S. 156, 169, 101 S.Ct. 1037, 67 L.Ed.2d 140 (1981) (quoting *Comm'r v. South Texas Lumber Co.,* 333 U.S. 496, 501, 68 S.Ct. 695, 92 L.Ed. 831 (1948)).

The words rebate and refund, however, do not appear in the statute, 26 U.S.C. § 461(h), and neither word is defined in Treasury Regulations § 1.461–5 or § 1.461–4 nor in the

---

**21.** The liabilities specifically identified in 26 U.S.C. § 461(h)(2) include: "Services and property provided to the taxpayer," 26 U.S.C. § 461(h)(2)(A), "[s]ervices and property provided to the taxpayer," 26 U.S.C. § 461(h)(2)(B), and "[w]orkers compensation and tort liabilities of the taxpayer," 26 U.S.C. § 461(h)(2)(C), none of which are at issue in this case.

Tax Code or the Treasury Regulations more generally.[22] For example, the Tax Code at 26 U.S.C. § 808, which relates to policyholder dividends, defines an "experience-rated refund," which are not before the court, the definition merely states, "[t]he term 'experience-rated refund' means any refund or credit based on the experience of the contract or group involved," and does not define a "refund." 26 U.S.C. § 808(d)(3).

Two other sections of the Tax Code provide a definition of the term rebate, but within the context of a deficiency or underpayment of taxes. First, 26 U.S.C. § 6664 (2006), relating to accuracy-related and fraud penalties, states:

> For purposes of this part, the term "underpayment" means the amount by which any tax imposed by this title exceeds the excess of—
>
> > (1) the sum of—
> >
> > > (A) the amount shown as the tax by the taxpayer on his return, plus
> > >
> > > (B) amounts not so shown previously assessed (or collected without assessment), over
> >
> > (2) the amount of rebates made.
>
> For the purposes of paragraph (2) the term "rebate" means so much of an abatement, credit, refund or other repayment, as was made on the ground that the tax imposed was less the excess of the amount specified in paragraph (1) over the rebates previously made.

26 U.S.C. § 6664. Similarly, in the subchapter of the Tax Code relating to "Deficiency Procedures in the Case of Income, Estate, Gift, and Certain Excise Taxes," 26 U.S.C. § 6211, definition of a deficiency, states:

> (a) In general.—For purposes of this title in the case of income, estate, and gift taxes imposed by subtitles A and B and excise taxes imposed by chapters 41, 42, 43, and 44 the term "deficiency" means the amount by which the tax imposed by subtitle A or B, or chapter 41, 42, 43, or 44 exceeds the excess of—
>
> > (1) the sum of
> >
> > > (A) the amount shown as the tax by the taxpayer upon his return, if a return was made by the taxpayer and an amount was shown as the tax by the taxpayer thereon, plus
> > >
> > > (B) the amounts previously assessed (or collected without assessment) as a deficiency, over—
> >
> > (2) the amount of rebates, as defined in subsection (b)(2), made.
>
> (b) Rules for application of subsection (a).—For purposes of this section—
>
> > (1) The tax imposed by subtitle A and the tax shown on the return shall both be determined without regard to payments on account of estimated tax, without regard to the credit under section 31, without regard to the credit under section 33, and without regard to any credits resulting from the collection of amounts assessed under section 6851 or 6852 (relating to termination assessments).
> >
> > (2) The term "rebate" means so much of an abatement, credit, refund, or other repayment, as was made on the ground that the tax imposed by subtitle A or B or chapter 41, 42, 43, or 44 was less than the excess of the amount specified in subsection (a)(1) over the rebates previously made.

26 U.S.C. § 6211 (2006). Neither use of the term rebate provides a general definition of the term rebate, nor does either definition further an understanding of the term rebate as used in Treasury Regulation § 1.461–4(g)(3), or as the term applies to the facts of the current case.

There also is no general definition for the terms rebate or a refund in the Treasury Regulations.[23] The Treasury Regulations do

---

**22.** The term rebate appears in 22 provisions of the Tax Code, either current or subsequently amended, and the term "refund" appears in over 275 provisions of the Tax Code, either current or subsequently amended. *See* 26 U.S.C. § 1 *et seq.* The majority of the provisions of the Tax Code with the term refund relate to claims for a tax refund.

**23.** The term rebate appears in 65 Treasury Regulations, and the term refund appears in over 800 Treasury Regulations. As with the Tax Code, the vast majority of the Treasury Regulations using the term refund relate to claims for a tax refund.

have a definition for a rebate, but it is found in the specific context of an arbitrage rebate. *See* Treas. Reg. § 1.148–3(b) (2012). Treasury Regulation § 1.148–3(b) states: "Definition of rebate amount. As of any date, the rebate amount for an issue is the excess of the future value, as of that date, of all receipts on nonpurpose investments over the future value, as of that date, of all payments on nonpurpose investments." Treas. Reg. § 1.148–3(b). As noted by the United States Court of Appeals for the Federal Circuit, "[a]rbitrage is the practice of 'simultaneous[ly] buying and selling ... identical securities in different markets, with the hope of profiting from the price difference in those markets.'" *Strategic Hous. Fin. Corp. of Travis Cnty. v. United States*, 608 F.3d at 1319 (quoting Black's Law Dictionary 112 (8th ed. 2004)) (omission in original). Arbitrage is not at issue in this case, and a definition of a rebate amount in the context of arbitrage is not helpful as a general definition of a rebate in the Treasury Regulations or to further the understanding of the use of the term rebate under Treasury Regulation § 1.461–4(g)(3), or as applied to the facts of this case.

The Treasury Regulations also provide another definition of a rebate, albeit in the context of an underpayment for the purposes of an accuracy-related penalty or a fraud. Treasury Regulation § 1.6664–2(e) states:

Rebates. The term "rebate" means so much of an abatement credit, refund or other repayment, as was made on the ground that the tax imposed was less than the excess of—

(1) The sum of—

(i) The amount shown as the tax by the taxpayer on his return, plus

(ii) Amounts not so shown previously assessed (or collected without assessment), over

(2) Rebates previously made.

Treas. Reg. § 1.6664–2(e) (2012). Similarly, Treasury Regulation § 301.6653–1, "Failure to pay tax," referencing 26 U.S.C. § 6211, discussed above, in subsection c, "Definition of underpayment" states that "[f]or purposes of this subparagraph, the term 'rebates' means so much of an abatement, credit, re-fund, or other repayment as was made on the ground that the tax imposed was less than the excess of the amount specified in subdivision (i) or (ii) of this subparagraph, whichever is applicable, over any rebates previously made." Treas. Reg. § 301.6653–1(c) (2012). The definition of a rebate in the context of fraud or an "accuracy-related penalty" is not useful in understanding the definition of rebate under the Treasury Regulation § 1.461–4(g)(3) or as applied to the facts of the case before the court.

Additionally, although a definition is not provided, Treasury Regulation § 1.419A(f)(6)–1, "Exception for 10 or more employer plan," in the context of an example mentions if an employer "uses the amount contributed by each employer to purchase one-year term insurance coverage on the lives of the covered employees with a face amount equal to the death benefit provided by the plan. No employer is entitled to any rebates or refunds provided under the insurance contract." Treas. Reg. § 1.419A(f)(6)–1 (2012). Although Treasury Regulation § 1.419A(f)(6)–1 uses the very phrase at issue in the present case, "rebates or refunds" and applies in the context of an insurance contract, the Treasury Regulation fails to provide a definition for either term. Nor does reviewing the terms in the context of Treasury Regulation § 1.419A(f)(6)–1 provide any guidance for the instant case.

The Treasury Regulations also offer specific definitions for the term refund, but do not offer a general definition or one that is applicable to this case. For example, Treasury Regulation § 1.148–4, "Yield on an issue of bonds," subsection (f)(7) states "Refund or reduction of guarantee payments. If as a result of an investment of proceeds of a refunding issue in a refunding escrow, there will be a reduction in, or refund of, payments for a guarantee (savings), the savings must be treated as a reduction in the payments on the refunding issue." Treasury Regulation § 1.148–4(f)(7) (2012). An additional definition, which does not provide much illumination regarding rebates or refunds, is Treasury Regulation § 1.522–1, "Tax treatment of farmers' cooperative marketing and purchasing associations exempt under section 521."

Treasury Regulation § 1.522–1(b)(4) states: "Patronage dividends, rebates, and refunds. The term patronage dividend, rebate, or refund includes any amount allocated by a cooperative association, to the account of a patron on the basis of the business done with or for such patron." Treas. Reg. § 1.522–1(b)(4) (2012).

The definition of the term refund that would appear to be the most helpful to understanding the definition of a rebate or a refund in the context of the policyholder dividends at issue in this case is in Treasury Regulation § 1.404(a)–8 (2012). Subsection (a)(3) of Treasury Regulation § 1.404(a)–8, "Contributions of an employer under an employees' annuity plan which meets the requirements of section 401(a)" states that: "There must be a definite written arrangement between the employer and the insurer that refunds of premiums, if any, shall be applied within the taxable year of the employer in which received or within the next succeeding taxable year toward the purchase of retirement annuities.... For the purpose of this condition, 'refunds of premiums' means payments by the insurer on account of credits such as dividends, experience rating credits, or surrender or cancellation credits." Treas. Reg. 1.404(a)–8(a)(3). Although the Treasury Regulation offers a definition of a refunds of premium, which includes dividends, it is in the context of account of credits and also includes other types of credits not applicable to this case, such as experience rating credits, surrender credits and cancellation credits. Moreover, the definition is specific to employer contributions to an employees' annuity plan, which is not at issue in the present case.

In sum, neither the Tax Code nor the Treasury Regulations provide a specific definition for rebate or refund applicable to this case. As recently stated by the Federal Circuit:

> When terms are not defined, it is a basic principle of statutory interpretation that they are deemed to have their ordinary

meaning. *Am. Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982); *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). For that meaning, it is appropriate to consult dictionaries. *See BP Am. Prod. Co. v. Burton,* 549 U.S. 84, 91–92, 127 S.Ct. 638, 166 L.Ed.2d 494 (2006); *Lamar v. United States,* 241 U.S. 103, 113, 36 S.Ct. 535, 60 L.Ed. 912 (1916).

*Nielson v. Shinseki,* 607 F.3d 802, 805–806 (Fed.Cir.2010); *see also Salman Ranch Ltd v. United States,* 573 F.3d 1362, 1374 (Fed. Cir.2009) (citing *Fed. Deposit Ins. Corp. v. Meyer,* 510 U.S. 471, 476, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) for the proposition "that, in the absence of a statutory definition, statutory terms are construed in accordance with their ordinary or natural meaning."). The Federal Circuit also has indicated, "[i]n construing statutory language, we look to dictionary definitions published at the time that the statute was enacted." *Res. Conservation Grp., LLC v. United States,* 597 F.3d 1238, 1243 (Fed.Cir.2010) (footnote omitted).

Treasury Regulation § 1.461–4 was published in the Federal Registry on April 10, 1992. *See* T.D. 8408; 57 Fed.Reg. 12411–02 (Apr. 10, 1992), *corrected* by 69 Fed.Reg. 44596–01 (Jul. 27, 2004).[24] Likewise, Treasury Regulation § 1.461–5 was published in the Federal Registry on April 10, 1992. *See* T.D. 8408; 57 Fed.Reg. 12411–02. The then-current Black's Law Dictionary defines a rebate as a "[d]iscount; deduction or refund of money in consideration of prompt payment. A deduction from a stipulated premium on a policy of insurance, in pursuance of an antecedent contract. A deduction or drawback from a stipulated payment, charge or rate (as, a rate for the transportation of freight by a railroad), not taken out in advance of payment, but handed back to the payer after he has paid the full stipulated sum. Refund of purchase price made by manufacturer to consumer to induce purchase of product." Black's Law Dictionary 1266 (6th ed. 1990).[25]

---

**24.** The correction to Treasury Regulation § 1.461–4 related to Treasury Regulation § 1.461–4(d)(4), which is not at issue in this case, and does not change the court's analysis of Trea-

sury Regulation § 1.461–4. *See* 69 Fed.Reg. 44596–01.

**25.** Black's Law Dictionary also states that a rebate is "[p]ortion of a transportation charge re-

Black's Law Dictionary defines a refund as, "[t]o repay or restore; to return money in restitution or repayment; e.g. to refund overpaid taxes; to refund purchase price of returned goods. See also Rebate; Refund claim; Refunds." *Id.* at 1281.[26]

The 1993 Random House Unabridged Dictionary defines a rebate as: "1. a return of part of the original payment for some service or merchandise; partial refund. 2. to allow as a discount. 3. to deduct (a certain amount), as from a total. 4. to return (part of an original payment) .... 5. to provide a rebate for (merchandise) after purchase. 6. to blunt (an edged or pointed weapon). 7. to cover the edge or point of (an edged weapon) in order to make it incapable of cutting or piercing. 8. to allow rebates, esp. as the policy or practice of a company, store, etc." Random House Unabridged Dictionary 1608 (2d ed. 1993). The Random House Unabridged Dictionary defines a refund as: "1. to give back or restore (esp. money); repay. 2. To make repayment to; reimburse. 3. To make repayment. 4. An act or instance of refunding. 5. An amount refunded." *Id.* at 1622. (parts of speech omitted).

The plaintiff argued that the policyholder dividends are in the nature of rebates, refunds, or similar payments because the policyholder dividends are a return of premium. The above dictionary definitions of rebate and refund support plaintiff's view that a return of premium would be considered a rebate or return. For instance, Black's Law Dictionary defines a rebate in part as rebate as a "[d]iscount; deduction or refund of money in consideration of prompt payment. A deduction from a stipulated premium on a policy of insurance, in pursuance of an antecedent contract," Black's Law Dictionary 1266 and a refund as "[t]o repay or restore; to return money in restitution or repayment." *Id.* at 1281. Similarly, the first definition for rebate in the Random House Una-

bridged Dictionary is "a return of part of the original payment for some service or merchandise; partial refund," Random House Unabridged Dictionary 1608, and the first definition of refund as, "to give back or restore (esp. money); repay." *Id.* at 1622.

The court also may look to industry terminology to assist in interpreting the definition of a word. *See Star–Glo Assocs., LP v. United States,* 414 F.3d 1349, 1356 (Fed.Cir.) ("This is quite plainly an instance where the statutory term is a term of art that is defined most appropriately by the preexisting industry usage. *See, e.g., La. Pub. Serv. Comm'n v. F.C.C.,* 476 U.S. 355, 372, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) (defining a statutory term 'in accordance with the rule of construction that technical terms of art should be interpreted by reference to the trade or industry to which they apply.')."), *reh'g and reh'g en banc denied* (Fed.Cir. 2005), *cert. denied,* 547 U.S. 1147, 126 S.Ct. 2286, 164 L.Ed.2d 812 (2006); *see also Corning Glass Works v. Brennan,* 417 U.S. 188, 201–02, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). The industry view supports the plaintiff's position that policyholder dividends are a return of premium. For example, the American Council of Life Insurers defines a policy dividend as: "A refund of part of the premium on a participating life insurance policy, reflecting the difference between the premium charged and actual experience." Similarly, the Connecticut Department of Insurance, the regulators for ConnMutual, in its glossary, defines a policy dividend as: "A refund of part of the premium on a Participating Life Insurance policy reflecting the difference between premium charged and actual experience." Notably, the glossary for the Connecticut Department of Insurance included a statement, which stated in part, "[t]his page is a glossary of insurance terms and definitions

---

funded to a shipper. Rebates are forbidden by the Interstate Commerce Act. Tax rebate is an amount returned (i.e. refunded) to the taxpayer after he has made full payment of the tax." Black's Law Dictionary 1266.

**26.** Black's Law Dictionary also states that a refund is "[t]o fund again or anew; specifically, finance, to borrow, usually by the sale of bonds,

in order to pay off an existing loan with the proceeds." Black's Law Dictionary 1281. Black's Law Dictionary provides a further definition of the term refund: "As generally referred to in connection with income taxes, is the amount a taxpayer or reporting entity would receive from the government due to an overpayment of taxes." *Id.*

that are commonly used in the insurance business." *Id.*

Additionally, MassMutual's correspondence for the tax years at issue demonstrates MassMutual considered policyholder dividends to be a return of premium. In both the July 1, 1996 issue and the September 22, 1997 issue of The Word, which Mr. Jermyn described as "a printed communication that the company prepares and distributed to its career agents and general agents and to some home office employees," MassMutual noted, "[i]n a sense, dividends are the return of a portion of premium resulting from experience that is more favorable than was assumed in setting the premium."

Testimony at trial also supports the plaintiff's position that the participating policyholder dividends constitute a return of premium. Plaintiff's expert, Mr. Lombardi, examined the policyholder dividends for the tax years at issue on the post–1983 policies and testified he "view[ed] them as a return of premium." Mr. Lombardi explained that regarding participating policies, "I view that higher premium is being returned as the company reviews the experience and becomes comfortable that it can pay it back to the policyholder." Mr. Lombardi further testified that this view was shared by the National Association of Insurance Commissioners. Isadore Jermyn, the Senior Vice President and Chief Actuary of MassMutual, stated that, "[t]he payment of those [participating policyholder] dividends in my view can then be viewed as a return of the premium that has been paid in order to enjoy the potential benefit of getting dividends."

During opening arguments, counsel for the defendant remarked, "the dividend you can say at least from a tax purpose is a return of premium...." [27] In his expert report, defense expert, Robert Wilcox, referring to plaintiff's expert, stated: "Mr. Lombardi also concludes, at least in part correctly, that the dividends paid in 1995, 1996, and 1997 were a return of premiums paid in prior periods." Mr. Wilcox concluded in his expert report,

however, that "[i]n my opinion, the conclusion that policy dividends are simply a return of premiums paid in prior periods is an oversimplification of material facts relating to the determination of dividends," and testified to the same at trial. In this case, however, as both Mr. Jermyn and plaintiff's expert Mr. Lombardi testified, none of the post–1983 policies had reached the cross-over point for the years at issue, and, therefore, the aggregate dividends paid to any of post–1983 policyholders had not exceeded the aggregate premiums paid by the policyholder.

In addition to industry definitions and expert testimony at trial, treatises on both federal income taxation and insurance regard policyholder dividends as a return of premium. For example, the glossary of the Federal Taxation of Insurance Companies offers a general definition of dividends which supports the view that dividends are a return of premium, stating that dividends are "[t]hat part of unabsorbed premium or operating profits of an insurance company returned to policyholders as provided in the bylaws and as authorized by the board of directors." Federal Taxation of Insurance Companies ¶ 40.01, at 4017. The glossary of the Federal Taxation of Insurance Companies noted that "[t]his glossary defines and explains words and phrases, that through usage, have acquired a special meaning in the field of insurance company taxation." *Id.* at 4001. Mertens Law of Federal Income Taxation states "dividends paid by a mutual company on a life insurance policy, whether paid in cash or used to reduce premiums, are treated as a return of premiums that is not subject to tax until the amounts received exceed the aggregate premiums or other consideration paid for the policy." 1 Mertens Law of Fed. Income Tax'n § 7:69, at 7–187–88. Similarly, Couch on Insurance states: "[a] dividend represents a share of the surplus earnings apportioned by the insurance carrier's directors for distribution to its policyholders. A dividend is commonly considered a reduction of premium. In mutual insurance companies, the dividend is a return of the policy-

---

**27.** Counsel for the defendant continued, however, "[a] return of premium is not a refund of premium...."

holder's actual unearned, or unused portion of the premium previously paid." Steven Plitt, Daniel Maldonado and Joshua D. Rogers, Couch on Insurance § 80:50 (3d ed. 2010). Another insurance treatise, Appleman on Insurance 2d, indicates that: "[d]ividends on insurance policies are, in reality, adjustments of the premium paid...." 28 Eric Mills Holmes, Appleman on Insurance 2d § 173.05, at 15 (2006). Regarding participating policies, Appleman on Insurance specifically states, "[m]utual insurance companies issue participating policies on which they pay 'dividends' to their policyholders, returning or crediting a portion of the premium to the policyholders. These dividends are not distributions of corporate earnings, but in reality are premium adjustments." *Id.* § 179.05, at 288.

Furthermore, other reference materials relied upon by plaintiff's expert Lombardi, demonstrate that policyholder dividends are considered a return of premium. For example, Life Insurance, by Dan M. McGill states that "[t]he refund to mutual policyholders is called a 'dividend.' This an unfortunate term, since only with respect to the excess of actual over assumed investment earnings can such a refund be regarded as a return on invested capital—the usual connotation of the word. It is nothing more than a refund of a deliberate overcharge and should not be confused with ordinary dividends payable to corporate stockholders." Dan M. McGill, Life Insurance 331 (rev. ed. 1967) Additionally, in Life & Health Insurance Law, Muriel L. Crawford states:

> Participating policies are issued at a premium high enough to cover all likely future experience. The insurer expects to be able to operate on a smaller premium. The difference is a margin of safety. The

insurer refunds any excess premium if the experience of that class warrants such a refund. This refund is the dividend. The dividend is a premium abatement. The policyowner does not pay income tax on this dividend because it is not income. The policyowner is simply receiving back part of the premium he paid.

Muriel L. Crawford, Life and Health Insurance Law 255 (8th ed. 1998) (footnote omitted). In the glossary of the Life and Health Insurance Law, a policyowners' dividend is defined as "[t]he refund of excess premium to the owner of a participating policy; a premium abatement." *Id.* at 503.

The same view also is evident in the legislative history to the Life Insurance Company Income Tax Act of 1959, Pub.L. No. 86–169, 73 Stat. 112 (codified as amended at 26 U.S.C. §§ 801–18), in which Senate Report number 291 noted: "Policyholder dividends in part reflect the fact that mutual insurance is usually written on a higher initial premium basis than nonparticipating insurance, and thus the premiums returned as policyholder dividends, in part, can be viewed as a return of redundant premium charges." S.Rep. No. 86–291, at 22 (1959), 1959 U.S.C.C.A.N. 1575, 1597. Although the Life Insurance Company Income Tax Act of 1959 predates the Deficit Reduction Act of 1984 and 26 U.S.C. § 808, the view expressed in the Senate Report is not contradicted by the Deficit Reduction Act of 1984 or its legislative history.

Although the issue of whether mutual life insurer's policyholder dividends constitute rebates, refunds, or similar payments under Treasury Regulation § 1.461–4(g)(3) is one of "first impression," according the defendant, and, according to the plaintiff, has "never been interpreted by any court,"[28] the United

---

**28.** The court agrees with the parties that the issue of whether policyholder dividends constitute rebates, refunds, or similar payments under Treasury Regulation § 1.461–4(g)(3) is one of first impression. Although the plaintiff states that "the language of Treas. Reg. § 1.461–4(g)(3) has never been interpreted by any court," the court notes that the United States Tax Court in *MidAmerican Energy Co. v. Commissioner,* 114 T.C. 570 (2000), considered petitioner's argument that Treasury Regulation § 1.461–4(g)(3) allowed for a refund by means of a setoff qualify as a deductable expense. The court concluded,

however, "[t]his regulation does not assist petitioner, because there is no liability of petitioner to repay its customers.... In addition, section 1.461–4(g)(3), Income Tax Regs., was not in effect for the years in issue. It is effective only for years after December 31, 1991." *MidAmerican Energy Co. v. Comm'r,* 114 T.C. at 587; *see also Roanoke Gas Co. v. United States,* 1991 WL 214295, *3 (W.D.Va. Aug. 16, 1991). Additionally, a 2009 Internal Revenue Service Technical Advice Memorandum considered if policyholder dividends could be considered "rebates or refunds under section 1.461–4(g)(3)." *See* Techni-

States Court of Appeals for the Federal Circuit has addressed policyholder dividends in other contexts and used the term rebates. *See John Hancock Fin. Servs., Inc. v. United States*, 378 F.3d 1302 (Fed.Cir.2004); *Principal Mut. Life Ins. Co. v. United States*, 295 F.3d 1241 (Fed.Cir.), *reh'g en banc denied* (Fed.Cir. 2002); *CUNA Mut. Life Ins. Co. v. United States*, 169 F.3d 737; *Gulf Life Ins. Co. v. United States*, 118 F.3d 1563 (Fed.Cir. 1997).

In *Gulf Life Insurance Co. v. United States*, the taxpayer sought a refund for policyholder dividends for which the insurer had obtained indemnity reinsurance of the dividends. The Federal Circuit framed the issue as "the placement of tax liability in connection with 'participating' life insurance policies upon which indemnity reinsurance has been obtained" and noted that "[t]he policyholder receives premium rebates, called dividends...." *Gulf Life Ins. Co. v. United States*, 118 F.3d at 1564. Although the issue in *Gulf Life* was whether the reimbursement by reinsurance "imparts tax liability to the insurer, or is correctly treated for tax purposes as flowing directly from the reinsurer to the policyholder," *id.*, it is notable that the Federal Circuit did not specifically limit the reference of dividends as rebates only to reinsurance.

In *CUNA Mutual Life Insurance Co. v. United States*, the Federal Circuit considered whether a mutual life insurance company was entitled to a tax refund for policyholder dividends when an adjustment rate to reduce policyholder dividends of a mutual life insurance company was a negative amount. *See CUNA Mutual Life Ins. Co. v. United States*, 169 F.3d at 742. When considering the issue, the Federal Circuit drew a distinction between mutual life insurance companies and stock life insurance companies in interpreting the statute which created the adjust-

ment for policyholder dividends of mutual life insurance companies, 26 U.S.C. § 809 (2000), *repealed by* the Pension Funding Equity Act of 2004, Pub.L. 108–218, Title II, § 205(a), 118 Stat. 610 (2004),[29] and stated:

> Life insurance companies traditionally rebate to their policy holders, as excessive charges, part of the premiums paid and deduct these payments from their income. In addition to these so-called policyholder dividends, stock life insurance companies also pay dividends out of earnings to their shareholders, which the company cannot deduct. Mutual companies, however, have no stockholders; the policyholders in effect own the company.

*CUNA Mut. Life Ins. Co. v. United States*, 169 F.3d at 738.

In *Principal Mutual Life Insurance Co. v. United States*, 295 F.3d 1241, the Federal Circuit interpreted 26 U.S.C. § 809, in the context of the IRS's calculation of a mutual life insurance company's equity basis, and again highlighted the distinction between stock life insurance companies and mutual life insurance companies. *Id.* at 1242. The Federal Circuit indicated:

> Stock life insurance companies frequently rebate to their policyholders part of the premiums paid. Those premium rebates are tax deductible by the company. Stock life insurance companies also pay their shareholders a portion of their profits as dividends. Those dividend payments, however, are not tax deductible. Mutual life insurance companies give premium rebates to their policyholders, but because the policyholders are also the company's owners, payments to policyholders are in part price rebates, in part policyholder benefits, and in part returns on equity.

*Id.*

Most recently in *John Hancock Financial Services, Inc. v. United States*, 378 F.3d

cal Advice Memorandum 200948042 (Nov. 27, 2009). Although concluding they could not be, the Technical Advice Memorandum offered little analysis and noted that pursuant to 26 U.S.C. § 6110(k)(3), the Technical Advice Memorandum could not be used or cited as precedent. *See* 26 U.S.C. § 6110(k)(3); *Strategic Hous. Fin. Corp. of Travis Cnty. v. United States*, 86 Fed.Cl. 518, 541 n. 43 (2009), *aff'd in part, vacated in part*, 608 F.3d 1317 (Fed.Cir.2010).

**29.** The Pension Funding Equity Act of 2004, Pub.L. 108–218, Title II, § 205(c), 118 Stat. 610 (2004) stated: "The amendments made by this section shall apply to taxable years beginning after December 31, 2004." The tax years at issue in this case are, therefore, unaffected by the repeal of 26 U.S.C. § 809, as the statute was in effect for 1995, 1996, and 1997.

1302, the Federal Circuit considered a tax refund suit and the "tax benefit rule" [30] for a mutual life insurance company's policyholder dividends in the context of 26 U.S.C. § 809. *See John Hancock Fin. Servs., Inc. v. United States*, 378 F.3d at 1303; *see also* 26 U.S.C. § 809 (2000), *repealed* by Pension Funding Equity Act of 2004, Pub.L. 108–218, Title II, § 205(a), Apr. 10, 2004, 118 Stat. 610. As in *CUNA Mutual Life Insurance Co.* and *Principal Mutual Life Insurance Co.* the Federal Circuit drew a distinction between mutual life insurance companies and stock life insurance companies, noting:

> Stock life insurance companies are owned by shareholders, who receive shareholder dividends based on company earnings. Stock companies also make payments known as policyholder dividends to their policyholders. Policyholder dividends are price rebates that the company can deduct from its taxable earnings. Shareholder dividends, on the other hand, constitute a disbursement of the company's earnings and may not be deducted.

> Unlike stock companies, mutual life insurance companies are owned by their policyholders. They pay "policyholder dividends" to their policyholders, but because mutual companies have no separate group of shareholders, the policyholder dividends do not distinguish between price rebates and distributions of earnings. If mutual companies were allowed to deduct the entire amount of their policyholder dividends, they would have a potential tax advantage over stock companies because they would be allowed to deduct the component of their policyholder dividends constituting distributions of earnings, which for stock companies would be non-deductible.

*John Hancock Fin. Servs., Inc. v. United States*, 378 F.3d at 1303. All three Federal Circuit decisions, *John Hancock Financial Services, Inc. v. United States, Principal Mutual Life Insurance Co. v. United States,* and *CUNA Mutual Life Insurance Co. v. United States,* focused primarily on policyholder dividends as rebates in the context of 26 U.S.C. § 809, and draw distinctions between the rebates which are properly deductable by mutual life insurance companies and return of equity, which are not deductible by mutual life insurance companies. *See, e.g., John Hancock Fin. Servs., Inc. v. United States*, 378 F.3d at 1303.

Section 809 of the Tax Code, since repealed by the Pension Funding Equity Act of 2004, was the result of Congress attempting to "solve the problem of the differing tax treatment of stock and mutual companies by enacting legislation that permitted mutual companies to deduct only a portion of their policyholder dividends." *John Hancock Fin. Servs., Inc. v. United States*, 378 F.3d at 1303 (citing Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, 733). Section 809 determined the amount of policyholder dividends that could be deducted. *See John Hancock Fin. Servs., Inc. v. United States*, 378 F.3d at 1303; *see also Principal Mutual Life Ins. Co. v. United States,* 295 F.3d at 1243 ("Under the 1984 Act [Deficit Reduction Act of 1984], stock companies and mutual companies were both permitted to deduct payments to policyholders, but the amount of the deduction for mutual companies was reduced to prohibit mutual companies from deducting the portion of the payments that the statute treated as a return on equity to owners rather than a price rebate to customers."). As the legislative history to the Deficit Reduction Act of 1984 noted, 26 U.S.C. § 809 was a reflection of "Congress' recognition that, to some extent, policyholder dividends paid by mutual companies are distributions of the companies' earnings to the policyholders as owners." Staff of the Joint Comm. on Taxation, 98th Cong., General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, 612 (Comm. Print 1984).

Section 809(a)(1) stated that: "In the case of any mutual life insurance company, the amount of the deduction allowed under section 808 shall be reduced (but not below zero) by the differential earnings amount." 26 U.S.C. § 809(a)(1). As noted by the Federal

---

**30.** As noted by the Federal Circuit, the tax benefit rule relates to a tax benefits a taxpayer was unable to use in earlier years. *See John Hancock*

*Fin. Servs., Inc. v. United States,* 378 F.3d at 1303.

Circuit, 26 U.S.C. § 809 "created a complex formula for calculating the portion of the policyholder dividends that a mutual company could deduct." *John Hancock Fin. Servs., Inc. v. United States,* 378 F.3d at 1303. The Federal Circuit summarized the formula as follows:

> The statutory scheme for calculating the deduction for mutual companies in the affected years works as follows: First, the "current stock earnings rate" is calculated. The current stock earnings rate is derived by averaging the earnings rates of 50 major domestic stock life insurance companies for the previous three years. The current stock earnings rate is calculated after payment of the policyholder dividends but before payment of the shareholder dividends. Next, the "average mutual earnings rate" is calculated. The average mutual earnings rate is based on the aggregate gain or loss from operations for all domestic mutual life insurance companies divided by their aggregate equity bases for a particular year. That rate is determined after the payment of policyholder dividends.
>
> The statute next provides for the calculation of an "imputed earnings rate." That rate is set by statute at 16.5 percent in the case of taxable years beginning in 1984....
>
> The next step is to determine an initial "differential earnings rate," or DER, which is the excess of the imputed earnings rate for the taxable year over the average mutual earnings rate for the second calendar year preceding the calendar year in which the taxable year begins. In the event that the average mutual earnings rate exceeds the imputed earnings rate, the DER is treated as zero. *See CUNA Mut. Life Ins. Co. v. United States,* 169 F.3d 737, 742 (Fed.Cir.1999).
>
> The initial DER is then multiplied by the equity of the particular mutual company taxpayer. The resulting amount is subtracted from the deduction the mutual company is allowed to take based on its policyholder dividends.
>
> Once the actual earnings rate of the mutual companies is known, which usually happens in the following year, a recomputed DER is calculated. This recomputed DER is then compared to the initial DER and the mutual companies are required to adjust their earnings for the subsequent year based on the relationship between the two amounts. If the recomputed DER is greater than the initial DER, the mutual companies are required to make an upward adjustment in their income for the subsequent year. If the recomputed DER is less than the initial DER, the mutual companies are permitted to reduce their income for the subsequent year by a corresponding amount. Thus, the recomputed DER ultimately determines the amount by which the policyholder deduction is reduced for a given year.

*John Hancock Fin. Servs., Inc. v. United States,* 378 F.3d at 1303–4.

For each year, the Department of Treasury computed the Differential Earnings Rate and a Recomputed Differential Earnings Rate, each of which were published in Revenue Rulings. The reason for both the Differential Earnings Rate and the Recomputed Differential Earnings Rate was "Congress recognized that the use of the older average mutual earnings rate would lead to inaccuracy. Because it could not directly correct the problem it required mutual insurance companies to base their tax calculations upon the older rate and then, in the next year, after the average mutual rate for the previous year is published, determine a recomputed differential earnings amount by making the same calculations but using the updated average mutual industry rate." *CUNA Mut. Life Ins. Co. v. United States,* 169 F.3d at 739. For the tax years at issue in this case the Differential Earnings Rate was 0% in 1995 and 1997. *See* Rev. Rul. 96–42, 1996–2 C.B. 45; Rev. Rul. 98–38, 1998–2 C.B. 132. In 1996, the Differential Earnings Rate was 6.447%. *See* Rev. Rul. 97–35, 1997–2 C.B. 71. For each of the tax years at issue, however, the Recomputed Differential Earnings Rate was 0%. *See* Rev. Rul. 97–35, 1997–2 C.B. 71; Rev. Rul. 98–38, 1998–2 C.B. 132; Rev. Rul. 99–35, 1999–2 C.B. 278. In 1995 and 1997, because the Differential Earnings Rate was 0%, the plaintiff was permitted to deducted all of its policyholder dividends pur-

suant to 26 U.S.C. § 808. For 1996, the plaintiff stated "[o]n its 1996 tax return, Plaintiff applied the 6.447% DER [Differential Earnings Rate] to calculate its section 809 reduction, resulting in a reduced policyholder dividends deduction," but noted that the 1996 Recomputed Differential Earnings Rate was zero, and the plaintiff made an adjustment on its 1997 tax return to reverse the Section 809 reduction for the 1996 tax year.

The plaintiff argued that application of section 809 supports plaintiff's view that the policyholder dividends at issue are in the nature of rebates or refunds. The plaintiff asserted that for 1995 and 1997, "the Code treated 100% of Plaintiff's policyholder dividends in that year as representing rebates or refunds of premium," and for all tax years at issue, 26 U.S.C. § 809 did not reduce plaintiff's policyholder dividend deduction. According to plaintiff, this demonstrated that the plaintiff's policyholder dividends for the tax years at issue did not include any of the distributions of earnings or shareholder-like dividends, identified by the Federal Circuit in *John Hancock Financial Services, Inc. v. United States*, 378 F.3d at 1303, and the "most reasonable inference is that, for federal income tax purposes, Plaintiff's policyholder dividends deducted in tax years 1995, 1996 and 1997 consisted solely of premium rebates or refunds."

The defendant did not challenge the plaintiff's calculations or conclusions that none of plaintiff's policyholder dividends were reduced by application of 26 U.S.C. § 809. Instead, defendant argued that "[u]nlike MassMutual, Congress never believed that a mutual company's policyholder dividends comprise only deductible 'rebates' and non-deductible returns on equity ...." (footnote omitted). Moreover, defendant, in an attempt to minimize the value of consideration of 26 U.S.C. § 809, claimed that because Congress choose "an arbitrary percentage" for the imputed earnings rate, instead of the actual rate of return, Congress never intended "to reduce the mutual companies' policyholder-dividend deductions by the real economic equivalent of the dividends actually paid to shareholders of stock companies,"

and that 26 U.S.C. § 809 "was the result of a political compromise." (footnotes omitted). Citing to the Department of the Treasury, Final Report to The Congress on Life Insurance Company Taxation, 1989, defendant noted that Treasury Department identified conceptual problems with Section 809, including that Section 809 linked the taxes owed by mutual life insurance companies to the performance of stock life insurance companies, such that if stock life insurance companies became more profitable, mutual life insurance companies could owe more taxes, even if they lost money. The defendant also observed one of the Treasury Department's suggestion was a repeal of Section 809 (citing Department of the Treasury, Final Report to The Congress on Life Insurance Company Taxation, 1989 33, 39), which defendant noted Congress eventually did enact.

Although defendant cited extensively to non-binding legislative history and the Treasury Final Report for support, the Federal Circuit precedent, which is binding on this court, has repeatedly spoken to 26 U.S.C. § 809 and policyholder dividends without identifying the limitations that the defendant articulates. *See generally John Hancock Fin. Servs., Inc. v. United States*, 378 F.3d 1302; *Principal Mut. Life Ins. Co. v. United States*, 295 F.3d 1241; *CUNA Mut. Life Ins. Co. v. United States*, 169 F.3d 737. In fact, the Federal Circuit specifically addressed the legislative history of 26 U.S.C. § 809 in *CUNA Mutual Life Insurance Co.* Quoting from the House Report, the Federal Circuit noted how Congress, in part, created the framework for 26 U.S.C. § 809:

"Because mutual companies' policyholders are also the owners of the enterprise, policyholder dividends paid to them are distributions from the company that are a combination of price rebates, policyholder benefits and returns of company profits. Although there is no precise way to segregate a policyholder dividend or other payment into these various components, the committee believes that it is valid to conclude that profit oriented enterprises tend to distribute earnings to their owners in amounts that are proportional to the owners' equity in the business. Thus,

the committee believes that the portion of a policyholder dividend that is a distribution of earnings can be measured as a percentage of the mutual company's equity...."

CUNA Mut. Life Ins. Co. v. United States, 169 F.3d at 738 (quoting H.R.Rep. No. 98–432, pt. 2, at 1422 (1984), reprinted in 1984 U.S.C.C.A.N. 697 at 1067).

Defendant also questioned the value of relying on John Hancock Financial Services, Inc. v. United States, stating that, the Federal Circuit's statement that, "[p]olicyholder dividends are price rebates that the company can deduct from its taxable earnings," John Hancock Fin. Servs., Inc. v. United States, 378 F.3d at 1303, is dicta because it does not address applying 26 U.S.C. § 809, and is factually incorrect, because, when the crossover point is reached, the dividend is more than a rebate. As testified to at trial, for the policyholder dividends at issue in this case, none of the policies reached the cross-over point, so all the dividends can be properly characterized at rebates. Moreover, the Federal Circuit, in John Hancock Financial Services, Inc. v. United States, was attempting to address the difference between the stock life insurance companies and mutual life insurance companies, precisely at issue when interpreting 26 U.S.C. § 809. The defendant did not address the other Federal Circuit statements regarding policyholder dividends as rebates in the context of 26 U.S.C. § 809, notably that "[m]utual life insurance companies give premium rebates to their policyholders," Principal Mut. Life Ins. Co. v. United States, 295 F.3d at 1242, or "[l]ife insurance companies traditionally rebate to their policy holders, as excessive charges, part of the premiums paid and deduct these payments from their income." CUNA Mut. Life Ins. Co. v. United States, 169 F.3d at 738. Instead, defendant argued that these Federal Circuit cases examining policyholder dividends were not construing Treasury Regulation § 1.461–4(g)(3), and the plaintiff did not cite a case in which a federal court has recognized policyholder dividends are in the nature of rebates or refunds.

As noted above, both parties acknowledge the issue of whether policyholder dividends constitute rebates, refunds, or similar payments under Treasury Regulation § 1.461–4(g)(3) is one of first impression. Only two cases briefly discussed Treasury Regulation § 1.461–4(g)(3), and did not mention policyholder dividends. See MidAmerican Energy Co. v. Comm'r, 114 T.C. at 587; see also Roanoke Gas Co. v. United States, 1991 WL 214295, *3, an unreported United States Western District of Virginia case which also briefly mentioned Treasury Regulation § 1.461–4(g)(3), but also not in the context of policyholder dividends. The use of the term rebate by the Federal Circuit regarding policyholder dividends supports plaintiff's argument that policyholder dividends are in the nature of a rebate or a refund to the extent they are returns of premium and not shareholder's earnings. See John Hancock Fin. Servs., Inc. v. United States, 378 F.3d at 1303; Principal Mut. Life Ins. Co. v. United States, 295 F.3d at 1242; CUNA Mut. Life Ins. Co. v. United States, 169 F.3d at 738. As none of plaintiff's policyholder dividends deductions were ultimately reduced for the tax years at issue under 26 U.S.C. § 809, plaintiff's policyholder dividends are in the nature of the price rebates identified by the Federal Circuit. See John Hancock Fin. Servs., Inc. v. United States, 378 F.3d at 1303. Defendant's arguments regarding 26 U.S.C. § 809 are not persuasive.

Defendant further argued that "[w]hatever the nature of policyholder dividends may be, the dividend guarantees do not promise to pay anything that has the nature of a refund or rebate." As 26 U.S.C. § 461(h)(1) states, however, "in determining whether an amount has been incurred with respect to any item during any taxable year, the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs." 26 U.S.C. § 461(h)(1). The liability the court looks to in determining whether an amount has been incurred is plaintiff's liability to pay policyholder dividends. Therefore, for the economic performance element of the "all events test," the court considers whether policyholder dividends, not merely the guaranteed portion of the plaintiff's policyholder dividends constitute rebates, refunds, or similar payments.

The plaintiff argued that 26 U.S.C. § 72(e) (2006) supports its position that the policyholder dividends are returns of premium, arguing that the Tax Code does not treat policyholder dividends as taxable income to individual policyholders until the policy reaches the cross-over point. Focusing on the individual policyholder, and not on the mutual life insurance company, the plaintiff stated that "policyholder dividends are generally not treated as income to policyholders, until and unless the policy reaches the point where aggregate dividends paid to the policyholder exceed the aggregate premiums paid by the policyholder...." [31] By contrast, the defendant argued that "[p]olicyholder dividends are not 'rebates or refunds' because the Internal Revenue Code treats them (for a time) as a return of the policyholder's basis in the insurance contract."

Section 72 of the Tax Code addresses annuities and certain proceeds of endowment and life insurance contracts, and provides that "[e]xcept as otherwise provided in this chapter, gross income includes any amount received as an annuity (whether for a period certain or during one or more lives) under an annuity, endowment, or life insurance contract." 26 U.S.C. § 72(a). Treasury Regulation § 1.72–1(a) (2012) states, "[i]n general, these rules provide that amounts subject to the provisions of section 72 are includible in the gross income of the recipient except to the extent that they are considered to represent a reduction or return of premiums or other consideration paid." Treas. Reg. § 1.72–1(a); see also Shimota v. United States, 21 Cl.Ct. 510, 514 (1990).

A dividend is one of the specifically identified exceptions in 26 U.S.C. § 72(e)(1)(B), and would, therefore, "represent a reduction or return of premiums." Section 72(e)(1)(B) states, "[f]or purposes of this section, any amount received which is in the nature of a dividend or similar distribution shall be treated as an amount not received as an annuity." 26 U.S.C. § 72(e)(1)(B); see also Fisher v. United States, 82 Fed.Cl. 780, 783 n. 5 (2008) (quoting 26 U.S.C. § 72(e)(1)(B)) ("Section 72 of the Code provides rules governing the reporting of income corresponding to annuities received under annuity, endowment or life insurance contracts. Section 72(e)(2) excludes from gross income certain amounts not received as annuities, among them 'any amount received which is in the nature of a dividend or similar distribution,' as defined in section 72(e)(1)(B)."), aff'd, 333 Fed.Appx. 572 (Fed.Cir.2009); Grow v. Comm'r, No. 20185–94, T.C. Memo. 1995–594, 1995 WL 738592, at *1 (T.C. Dec. 14, 1995) ("Section 72(e) provides that an amount not received as an annuity is includable in gross income, except to the extent attributable to an individual's investment in the contract.").

As noted by the plaintiff, the policyholder dividends are treated as income only if the aggregate dividends paid to the policyholder exceed the aggregate premiums paid by the policyholder. Section 72(e)(5) of the Tax Code limits the amount of income to the taxpayer to the amount exceeding the investment in the contract or policy. See 26 U.S.C. § 72(e)(5); see also McGowen v. Comm'r, No. 14116–07, T.C. Memo. 2009–285, 2009 WL 4797538, *4 (T.C. Dec. 14, 2009). Section 72(e)(6) of the Tax Code further defines the investment of the contract and provides the investment in the contract as of any date is "(A) the aggregate amount of premiums or other consideration paid for the contract before such date, minus (B) the aggregate amount received under the contract before such date, to the extent that such amount was excludable from gross income under this subtitle or prior income tax laws." 26 U.S.C. § 72(e)(6)(A–B). "Section 72(e)(1)(B) [referring to what is now 26 U.S.C. § 72(e)(6) ] [32]

**31.** The defendant seemingly accepted plaintiff's argument regarding the tax treatment of policyholder dividends to the taxpayer. As the defendant stated, "MassMutual notes that the Internal Revenue Code treats policyholder dividends as a non-taxable return of premium until the aggregate dividends paid to the policyholder exceed the aggregate premiums paid by the policyholder," and further acknowledged, "[b]e-

cause policyholder dividends are variable and non-guaranteed, they are 'amounts not received as an annuity' and are generally taxable only after the total dividends received exceed total premiums paid, as MassMutual has stated."

**32.** The Tax Reform Act of 1986, Pub.L. 99–514, § 1852(c)(4)(B), 100 Stat. 2867 (1986) amended 26 U.S.C. § 72 "by striking out 'subsection

provides that if any amount is received under a life insurance contract and if that amount is not received as an annuity, the amount is included in gross income 'only to the extent that it ... exceeds the aggregate premiums or other consideration paid.'" *Moseley v. Comm'r*, 72 T.C. 183, 186 (1979) (omission in original; footnote omitted).

Treasury Regulation § 1.72–1(d) also describes how amounts which are not received as an annuity, such as policyholder dividends, are not treated as income until reaching the cross-over point. Treasury Regulation § 1.72–1(d) states "[a]mounts not received as an annuity which are received at any other time are generally includible in the gross income of the recipient only to the extent that such amounts, when added to all amounts previously received under the contract which were excludable from the gross income of the recipient under the income tax law applicable at the time of receipt, exceed the premiums or other consideration paid." Treas. Reg. § 1.72–1(d). In explaining the rationale behind the treatment of policyholder dividends not as taxable income, the treatise Appleman on Insurance states, "[d]ividends on insurance policies, are in reality, adjustments of the premium paid and are therefore not treated as taxable income unless the aggregate dividends received exceed the aggregate premiums paid." 28 E. Holmes, Appleman on Insurance 2d § 173.05, at 15. Similarly, at trial, in response to cross-examination regarding the cross-over point, defendant's expert, Mr. Wilcox, stated "for tax purposes only," a portion of policyholder dividends would be a return of premium to the policyholder.

Defendant argued that when participating policies reach the cross-over point, "nothing of substance changes the nature of the policyholder dividends," and "[i]n economic reality dividends have the same nature before and after the cut-off point: they remain what they were—the policyholder's share of the insurer's profits, not refunds of the premiums." In fact, the policyholder dividends are different after the cross-over point, the policyholder dividends are no·longer only the return of the premium, but also a portion of the insurer's profits. Section 72 of the Tax Code accurately captures the difference; the tax treatment of the policyholder dividend changes and the policyholder dividends are treated as income to the policyholder when the aggregate dividends paid to the policyholder exceed the aggregate premiums paid by the policyholder. Although policyholder dividends might not properly be considered solely rebates or refunds if the participating policies have reached the cross-over point, that issue is not before the court, as none of the post–1983 policies for the tax years at issue in this case reached the cross-over point. Any dividend payments made for the years at issue would have been treated as a return of premium and not taxable income.

The defendant further asserted that if "MassMutual correctly argues that policyholder dividends constitute refunds or rebates because the Internal Revenue Code treats them as a return of premium until the cross-over point, then it must follow that a portion of amounts received as annuity payments constitutes a refund or a rebate because the Code also treats that portion as a return for the consideration paid for the annuity contract. But it is obviously not correct to say that the purchaser of an annuity receives regular 'refunds' or 'rebates' over the life of the annuity in any recognizable sense of the words." The plaintiff, argued, "[t]hat Congress afforded similar tax treatment to annuity payments is both irrelevant and legally inaccurate," noting that the Tax Code pursuant to Section 72(e)(2) treats annuity payments differently than policyholder dividends under Section 72(e)(5). The statute at 26 U.S.C. § 72(e)(5), limits the amount of income to the taxpayer to the amount exceeding the investment in the contract or policy, or when the cross-over point is reached. By contrast, 26 U.S.C. § 72(e)(2), specifically provides for any amount "received on or after the annuity starting date, shall be included in gross income." The comparison to a policyholder dividend, received after the beginning of an insurance contract and an amount received pursuant to an annuity is, therefore, not applicable. Moreover, an annuity is factually distinct

(e)(1)(B)' in subparagraph (C) and inserting in lieu thereof 'subsection (e)(6).'"

from a policyholder dividend. As noted by the plaintiff, "[t]he evidence also demonstrates that, factually, policyholder dividends are in the nature of rebates, refunds or similar payments." Unlike policyholder dividends, which may or may be not distributed to participating policyholders from year to year, and which are unlikely to be the same amount from year to year, an annuity "may be defined broadly, as the right to a series of fixed payments independent of market forces." *Cook v. Comm'r*, 349 F.3d 850, 855 (5th Cir.2003). Additionally, the United States Court of Appeals for the Ninth Circuit has drawn a distinction between annuities and life insurance policies, noting, "[a] single-premium annuity that provides a guaranteed stream of income and has no contingencies that can divest the debtor or his beneficiaries of their right to payment is an investment, not a life insurance policy." *In re Simpson*, 557 F.3d 1010, 1015 (9th Cir.2009).

Defendant additionally argued that "people buy participating policies in part because they hope to receive or benefit from a stream of income; the income (i.e., the dividend) is part of what the policyholder buys—not a refund of the money used to buy it." Despite the defendant's assertion, the policyholder is not purchasing a stream of income or even an investment. Plaintiff's expert, Mr. Lombardi, testified that "[t]here is a fundamental difference between a life insurance policy and a bank account or what I would generalize and say an investment. A bank account or a mutual fund for that matter are investments. A life insurance policy is not an investment. It's a life insurance policy." Additionally, a stream of income is not a certainty with a life insurance policy, because dividends are not guaranteed in a typical life insurance policy. As stated in the exemplary MassMutual participating policy included as a Joint Exhibit, the word participating "means this policy *may* share in any dividends we pay," and continued, "[e]ach year we determine how much money can be paid as dividends. This is called divisible surplus." (emphasis added). Mr. Jermyn testified that "[d]ividends are not guaranteed ... and depending upon the company's experience, they may or may not be paid." This view is echoed in insurance treatises. As

Couch on Insurance notes "[a] policyholder of a mutual life insurance company is only entitled to dividends after a divisible surplus has been ascertained or apportioned." S. Plitt, D. Maldonado and J. Rogers, Couch on Insurance § 80:51. Likewise, Life & Health Insurance Law indicates that "[t]he insurer does not have to pay a dividend unless it has sufficient earned surplus. Moreover, the insurer has a right to keep surplus for contingencies, as it deems necessary, as long as it acts in good faith." M. Crawford, Life & Health Insurance Law 255 (footnote omitted). Moreover, defendant offers no evidence that policyholders buy participating policies to receive or benefit from a stream of income, only stating that policyholders are the owners of mutual life insurance companies, like shareholders are owners of a stock company.

The defendant also suggested that shareholders expect a return on their investment in the form of dividends, and likewise, participating policyholders expect a share of the mutual life insurance company's profits in the form of policyholder dividends. As plaintiff noted, however, stockholders are distinct from policyholders, as "an interest in a mutual life insurance company can only be acquired by purchase of a participating insurance policy," and unlike a stock exchange, no market exists to buy or sell an interest in a mutual life insurance company. Plaintiff stated, "[a]ccordingly, policyholders purchase life insurance policies primarily for the death benefit protection rather than equity participation." Without more, the court cannot conclude policyholder dividends are not in the nature of a rebate or a refund based on the defendant's conclusory statements.

After consideration of the arguments presented, the policyholder dividends constitute rebates, refunds, or similar payments, and, therefore, the matching requirement of 26 U.S.C. § 461(h)(3) is satisfied, and the requirements of economic performance have been fulfilled. The plaintiff has demonstrated that all events have occurred which determine the fact of liability, that the liability can be determined with reasonable accuracy and that economic performance has occurred.

**Economic Substance**

■ In addition to defendant's arguments regarding the "all events test," discussed above, the defendant also asserted before this court that the Dividend Guarantees did not possess economic substance, because the "dividend-guarantee resolutions had no economic effect" and "MassMutual's dividend-guarantee resolutions had no non-tax business purpose." Therefore, according to the defendant, the "tax law cannot recognize the existence of the guarantees." Quoting the United States Court of Appeals for the Federal Circuit's decision in *Coltec Industries, Inc. v. United States*, 454 F.3d at 1355, the defendant argued that the economic substance doctrine "prevents taxpayers 'from subverting the legislative purpose of the tax code by engaging in transactions that are fictitious or lack economic reality simply to reap a tax benefit,'" *id.* at 1353–54 and that "for over seventy years 'has required disregarding, for tax purposes, transactions that comply with the literal terms of the tax code but lack economic reality.'" *Id.* at 1352.[33]

■ The United States Court of Appeals for the Federal Circuit in *Coltec Industries, Inc. v. United States*, 454 F.3d 1340, stated that "the economic substance doctrine is merely a judicial tool for effectuating the underlying Congressional purpose that, despite literal compliance with the statute, tax benefits not be afforded based on transactions lacking in economic substance." *Id.* at

1354. The issue of economic substance has been addressed repeatedly over the years. In *Frank Lyon Co. v. United States*, the United States Supreme Court held that a transaction will be respected "where ... there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached." *Frank Lyon Co. v. United States*, 435 U.S. 561, 583–84, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978). The United States Court of Appeals for the Federal Circuit followed this guidance in *Coltec Industries, Inc. v. United States*, 454 F.3d at 1355, when it articulated the general principles of the economic substance doctrine as the relevant test to be used in this Circuit. The economic substance doctrine permits transactions to take advantage of tax benefits so long as those transactions also have a non-tax business purpose. As further indicated by the Federal Circuit, "[t]he doctrine disregards for tax purposes transactions that comply with the literal terms of the tax code but lack economic reality in order to prevent taxpayers from subverting the legislative purpose of the Code." *Bartels Trust for Benefit of Cornell University ex rel. Bartels v. United States*, 617 F.3d at 1362–63 (citing *Coltec Indus., Inc. v. United States*, 454 F.3d at 1352 and *Tank Truck Rentals v. Comm'r*, 356 U.S. 30, 35, 78 S.Ct. 507, 2 L.Ed.2d 562

**33.** Defendant's also cited to the addition of a subsection to the Tax Code, 26 U.S.C.A. § 7701(o) (2010) in the Healthcare and Education Reconciliation Act of 2010, which states:

(o) Clarification of economic substance doctrine.—

(1) Application of doctrine.—In the case of any transaction to which the economic substance doctrine is relevant, such transaction shall be treated as having economic substance only if—
(A) the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position, and
(B) the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction.
26 U.S.C.A. § 7701(o); *see also* Healthcare and Education Reconciliation Act of 2010, § 1409(a), Pub.L. 111–152, 124 Stat. 1029 (2010). The defendant noted that "[o]n March 30, 2010, the President signed the Healthcare and [sic] Recon-

ciliation Act of 2010, H.R. 4872, which codifies the economic substance doctrine." It is unclear the purpose of the defendant's citation to the Healthcare and Education Reconciliation Act of 2010, because as defendant notes, "[t]he new provision is effective for transactions occurring after the date of enactment." *See also* Staff of the Joint Comm. on Taxation, 111th Cong., Technical Explanation of the Revenue Provisions of the Reconciliation Act of 2010, as amended in combination with the Patient Protection and Affordable Care Act 157 (2010 WL 1047322) and, therefore, is not applicable to the tax years at issue in this case. Subsequent to the enactment of the Healthcare and Education Reconciliation Act of 2010, the United States Court of Appeals for the Federal Circuit addressed economic substance, but did not reference the Healthcare and Education Reconciliation Act of 2010. *See generally Wells Fargo & Co. v. United States*, 641 F.3d 1319 (Fed.Cir.2011); *Stobie Creek Invs. LLC v. United States*, 608 F.3d 1366.

(1958)); *see also Wells Fargo & Co. v. United States*, 641 F.3d at 1325; *Stobie Creek Invs. LLC v. United States*, 608 F.3d at 1375 (emphasis in original) ("The economic substance doctrine seeks to distinguish between structuring a real transaction in a particular way to obtain a tax benefit, which is legitimate, and *creating* a transaction to generate a tax benefit, which is illegitimate."); *Jade Trading, LLC ex rel. Ervin v. United States*, 598 F.3d 1372, 1376 (Fed.Cir.2010) (quoting *Coltec Indus., Inc. v. United States*, 454 F.3d at 1352) ("The economic substance doctrine 're-quire[s] disregarding, for tax purposes, transactions that comply with the literal terms of the tax code but lack economic reality.'"); *ACM P'ship v. Comm'r*, 157 F.3d 231, 248 n. 31 (3d Cir.1998) ("[W]e do not intend to suggest that a transaction which has actual, objective effects on a taxpayer's non-tax affairs must be disregarded merely because it was motivated by tax considerations."), *cert. denied*, 526 U.S. 1017, 119 S.Ct. 1251, 143 L.Ed.2d 348 (1999); *Gilman v. Comm'r*, 933 F.2d 143, 147–48 (2d Cir. 1991) (Utilizing the business purpose/economic effect analysis based on objective standards, and stating that " '[a] transaction is a sham if it is fictitious or if it has no business purpose or economic effect other than the creation of tax deductions.' " (quoting *Jacobson v. Comm'r*, 915 F.2d 832, 837 (2d Cir. 1990) (quoting *DeMartino v. Comm'r*, 862 F.2d 400, 406 (2d Cir.1988))), *cert. denied*, 502 U.S. 1031, 112 S.Ct. 871, 116 L.Ed.2d 776 (1992)).

In *Coltec*, the Federal Circuit wrote:

First, although the taxpayer has an unquestioned right to decrease or avoid his taxes by means which the law permits, *Gregory [v. Helvering]*, 293 U.S. at 469, 55 S.Ct. 266 ... the law does not permit the taxpayer to reap tax benefits from a transaction that lacks economic reality.... The Supreme Court later explained that "[if] ... the *Gregory* case is viewed as a precedent for the disregard of a transfer of assets without a business purpose ... it gives support to a natural conclusion that

transactions, which do not vary control or change the flow of economic benefits, are to be dismissed from consideration." *Higgins v. Smith*, 308 U.S. 473, 476, 60 S.Ct. 355, 84 L.Ed. 406 (1940).

. . .

While the doctrine may well also apply if the taxpayer's sole subjective motivation is tax avoidance even if the transaction has economic substance, a lack of economic substance is sufficient to disqualify the transaction without proof that the taxpayer's sole motive is tax avoidance.

Second, when the taxpayer claims a deduction, it is the taxpayer who bears the burden of proving that the transaction has economic substance.

. . .

Third, the economic substance of a transaction must be viewed objectively rather than subjectively.

. . .

Fourth, the transaction to be analyzed is the one that gave rise to the alleged tax benefit.... [T]here is a material difference between structuring a real transaction in a particular way to provide a tax benefit (which is legitimate), and creating a transaction, without a business purpose, in order to create a tax benefit (which is illegitimate).

*Coltec Indus., Inc. v. United States*, 454 F.3d at 1355–57 (footnotes omitted).[34]

The plaintiff responded to defendant's assertion that the economic substance doctrine does not bar its claim by pointing out that "the United States does not contest Plaintiff's entitlement to deduct the policyholder dividends at issue." Plaintiff correctly stated that, as argued before this court, "the parties' sole dispute is *when* Plaintiff's legitimate deductions should be taken under the accrual method of tax accounting." (emphasis in original).

Plaintiff asserted that the economic substance doctrine "does not apply in tax accounting cases such as this one where the

---

**34.** The Federal Circuit noted one additional element of an economic substance analysis, "arrangements with subsidiaries that do not affect the economic interest of independent third parties deserve particularly close scrutiny." *Coltec Indus., Inc. v. United States*, 454 F.3d at 1357. No subsidiary of either MassMutual or ConnMutual is implicated in the plaintiff's case.

legitimacy of the underlining transaction, is not challenged by the government." Plaintiff cited to *Dana Corp. v. United States,* 174 F.3d 1344, 1346 (Fed.Cir.1999), for the proposition that taxpayers are not required to prove an independent business purpose to "satisfy the tax accounting rules laid down by Congress." Plaintiff asserted that the United States Court of Appeals for the Federal Circuit in *Dana Corp. v. United States* "accepted that the taxpayer's 'tax motive [wa]s not controlling,' and that the strict rules for tax accounting applied even though the taxpayer's prepayment of interest was made 'for tax advantages.'" (quoting *Dana Corp. v. United States,* 174 F.3d at 1346, 1348) (brackets in original). In *Dana Corp.,* plaintiff's subsidiary was a party to a number of leases for which it entitled to accrued rents and was also obligated to pay interest on loans related to the properties it received accrued rents. *Id.* at 1346. In 1984 and 1985, the subsidiary paid interest that had accrued, but was not due until the following year, and "[u]nder the cash method of accounting, receipts are recognized in the year in which received and expenses in the year in which paid." *Id.* (footnote omitted). In *Dana Corp.,* as a result of making the interest payments, which were ordinary and necessary business expenses, the subsidiary's expenses exceeded its gross income resulting in no tax liability. The IRS determined that the cash method of accounting used by the subsidiary did not clearly reflect the subsidiary's income, stating that the cash method caused excess interest deductions and pursuant to 26 U.S.C. § 446(b), required the subsidiary's federal income tax liability to be recalculated, using the accrual method of accounting. *See Dana Corp. v. United States,* 174 F.3d at 1346. This requirement effectively eliminated the deductions for the advance payments. *Id.* The Federal Circuit held that "the Code allows a taxpayer, such as [the subsidiary], to pay in advance its interest obligations which have already accrued in the way done here for tax advantages. Such advance payments of interest by cash method taxpayers are lawful so long as the interest has accrued, or is otherwise allocable to the tax year for which the interest

deduction was taken." *Id.* at 1348 (footnote omitted).

Respecting *Dana Corp. v. United States,* defendant responded that the issue was not whether the transactions should be respected for tax purposes, but whether the IRS erred in requiring the subsidiary to delay a deduction until the year the liability accrued. Defendant also argued that the Federal Circuit's statement in *Dana,* that a tax motive is not controlling in determining if a refund is proper, was not the holding of the case. While *Dana Corp. v. United States* is not directly on-point, given that the subsidiary used the cash method accounting, and an interest deduction was at issue, the case is still informative as to the Federal Circuit's view regarding plaintiff's use of the Dividend Guarantees. Like the subsidiary in *Dana Corp. v. United States,* the plaintiff used the Tax Code to its advantage in order to take a deduction. The plaintiff deducted a liability that had accrued, but had not yet been paid. The Supreme Court in *Gregory v. Helvering,* 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596 (1935) stated that "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." *Id.* The Federal Circuit, likewise, has indicated that "[t]ax planning is not a disapproved activity." *Gulf Life Ins. Co., v. United States,* 118 F.3d at 1566. In *Gulf Life Insurance Co. v. United States,* the Federal Circuit, after noting the government had stipulated that the taxpayer's reinsurance agreement was entered into for valid business purposes and had economic substance and that the taxpayer had stipulated that tax planning was a principal business purpose, indicated that "[a] 'major motive' to reduce taxes is not grounds of illegality." *Gulf Life Ins. Co., v. United States,* 118 F.3d at 1566 (citing *United States v. Cumberland Pub. Serv. Co.,* 338 U.S. 451, 455, 70 S.Ct. 280, 94 L.Ed. 251 (1950)).

The plaintiff further argued that the "determinations as to timing are governed by the detailed rules for tax accounting (because the underlying transaction has all the economic substance it needs). The United States' preoccupation with cases on econom-

ic substance should not blur the clarity of that distinction." It appears that the defendant sought to characterize the economic substance inquiry in this case as a typical one, arguing that "[m]any courts, including the Court of Appeals for the Federal Circuit, 'have identified a number of different factors pertinent to the determination of whether a transaction lacks economic substance and thus should be disregarded for tax purposes.'" (quoting *Coltec Indus., Inc. v. United States*, 454 F.3d at 1355). The examination of Dividend Guarantees under an economic substance analysis, however, differs from the typical transaction previously reviewed in the courts. In its analysis of the economic substance doctrine, the United States Court of Appeals for the Federal Circuit in *Coltec Industries, Inc. v. United States* repeatedly refers to the determination of whether the *"transaction"* has economic substance. *See generally Coltec Indus., Inc. v. United States*, 454 F.3d 1340. For example, at the beginning of its analysis, the Federal Circuit states "[t]he Supreme Court, various courts of appeals, and our predecessor court, have identified a number of different factors pertinent to the determination of whether a transaction lacks economic substance and thus should be disregarded for tax purposes." *Id.* at 1355. The United States Supreme Court in *Frank Lyon v. United States*, likewise uses the term "transaction" to discuss economic substance. *See generally Frank Lyon v. United States*, 435 U.S. 561, 98 S.Ct. 1291. The Supreme Court in *Frank Lyon v. United States* also held that when "there is a genuine multiple-party transaction with economic substance ... the Government should honor the allocation of rights and duties effectuated by the parties." *Frank Lyon v. United States*, 435 U.S. at 583–84, 98 S.Ct. 1291. In the case before this court, there was not a multiple-party transaction, nor was there "rights and duties effectuated by the parties." In fact, there was no independent transaction at all. Instead, there was MassMutual's and ConnMutual's unilateral, "irrevocable guarantee that it will pay or apply an amount not less than a specified amount of annual policyholder dividends with respect to post–1983 policies in the following

year," followed by the payment of the policyholder dividends as part of its underlying insurance business with its original business partners, their policyholders. There were no agreements or multiple parties structuring a transaction, rather what occurred was a unilateral decision by plaintiff in the regular course of its primary insurance business. The payment of policyholder dividends was an inherent part of the structure of MassMutual's and ConnMutual's core business model. This is not a case in which tax deductions were generated unrelated to plaintiff's business. The dispute is not really about entitlement to, or the permissibility of the business deductions. Defendant has conceded plaintiff is entitled to take these deductions at some point. Unlike the issue in the typical economic substance case, the dispute between the parties is solely about in which year those deductions should be taken.

Because the issue in plaintiff's case is the timing of when to take the deductions, the case is unique from transactions that typically raise economic substance concerns, or regarding alleged sham transactions. Plaintiff's case was not a lease-in, lease-out transaction, as "[i]n a typical LILO [lease-in, lease-out], a U.S. taxpayer leases property from a tax-exempt entity and simultaneously leases that property back to the owner. The tax-exempt owner's sublease has a shorter term than the taxpayer's lease. Upon expiration of the shorter sublease, the owner may exercise an option to buy back the remainder of the taxpayer's lease. Thus, in practical terms, the tax-exempt property owner continues to use the property during the sublease term just as it did before the transaction and bears no risk of losing control of its asset(s)." *BB&T Corp. v. United States*, 523 F.3d 461, 464 (4th Cir.2008). Likewise, plaintiff's actions were not in the nature of a sale-in, lease out structure [SILO], in which "a United States taxpayer ... enters into various agreements with an entity that is not subject to federal income tax, and with financing institutions. The agreements are described as 'leases,' 'subleases,' and 'loans,' among others, but they are all part of a single, integrated 'sale in, lease out' transaction." *Wells Fargo &*

*Co. v. United States,* 91 Fed.Cl. 35, 39 (2010), *aff'd,* 641 F.3d 1319 (Fed.Cir.2011). Moreover, no BOSS or Son of BOSS transaction occurred, "where 'BOSS' stands for 'Bond and Option Sales Strategy,' in which transactions in securities are employed to create an artificially high basis in unrelated property." *Salman Ranch Ltd. v. United States,* 573 F.3d 1362, 1379 (Fed.Cir.) (citing IRS Notice 2000–44, 2000–2 C.B. 255 (Aug. 13, 2000)), *reh'g denied* (Fed.Cir. 2009); *see also Stobie Creek Inves. LLC v. United States,* 608 F.3d at 1368 n. 1 (" 'BOSS' is an acronym for 'Bond and Option Sales Strategy.' Son of BOSS is a variation on the BOSS tax shelter."). Nor was it any other type of tax shelter devise, for example a "tax shelter product known as 'Currency Options Bring Reward Alternatives' ('CO-BRA')," *Murfam Farms, LLC v. United States,* 88 Fed.Cl. 516, 519 (2009), *motion to vacate denied* (2010), or "a tax shelter known as Bond Linked Issue Premium Structure ('BLIPS')," *Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States,* 568 F.3d 537, 540 (5th Cir. 2009), of which " '[t]he principal purpose of an entity, plan or arrangement is to avoid or evade Federal income tax if that purpose exceeds any other purpose.' " *Alpha I, L.P. v. United States,* 93 Fed.Cl. at 304 (quoting Treas. Reg. § 1.6662–4(g)(2)(i)). Finally, MassMutual and ConnMutual did not engage in a typical transaction with an investment followed by a deduction. Instead, as plaintiff notes, plaintiff's payment of policyholder dividends was not designed to generate a tax benefit, rather "the payment of policyholder dividends is central to Plaintiff's business and that of the mutual life insurance industry as a whole," and to the benefit of the policyholder.

As the plaintiff noted, "*Coltec* [*Industries, Inc. v. United States*] and other cases cited by the United States focus on whether *transactions,* i.e., events that give rise to deductions for federal income tax purposes, should be respected, and not on *when* legitimate deductions, e.g., Plaintiff's liability for its policyholder dividends, should be accounted for." (emphasis in original). The Board Resolutions enacting the Dividend Guarantees are not transactions as typically understood by the Supreme Court or the Federal Circuit and do not implicate the same fears of a sham transaction that a typical multi-party transaction designed to only achieve tax benefits might engender. The originally "judicially created economic substance doctrine," *ACM P'ship v. Comm'r,* 157 F.3d at 259, does not fit the Dividend Guarantees enacted by plaintiff, which already has met the "all events test." *See Bartels Trust for benefit of Cornell University ex rel. Bartels v. United States,* 617 F.3d at 1363 ("The [economic substance] doctrine is a judicial tool for enforcing the Code. . . .").

The atypical nature of this case and the difficulty of trying to pigeonhole plaintiff's case into the model of the standard economic substance analysis is reinforced by the absence of case law applying the economic substance doctrine to policyholder dividends. The only case from the United States Court of Appeals for the Federal Circuit which has addressed economic substance and policyholder dividends, was *Gulf Life Insurance Co. v. United States,* 118 F.3d 1563, discussed above, in which the court addressed indemnity reinsurance of policyholder dividends and mentioned economic substance only to note that "the government stipulated Taxpayer's reinsurance agreement was entered into for valid business purposes and had economic substance." *Gulf Life Ins. Co. v. United States,* 118 F.3d at 1566. There are also two district court cases which mention policyholder dividends in the context of an economic substance analysis. The first case, decision in the United States District Court for the Southern District of Ohio, *American Electric Power, Inc. v. United States,* 136 F.Supp.2d 762 (S.D.Ohio 2001), *aff'd,* 326 F.3d 737 (6th Cir.), *reh'g denied,* 338 F.3d 534 (6th Cir.2003), *cert. denied,* 540 U.S. 1104, 124 S.Ct. 1043, 157 L.Ed.2d 888 (2004), mentions policyholder dividends in the context of an economic substance analysis, as it related to the deduction for interest due on loans made against life insurance policies that were bought by taxpayer on lives of American Electric Power Co., Inc.'s employees pursuant to a corporate-owned life insurance plan (COLI). *See generally id.* The discussion of policyholder dividends was

not related to the economic substance analysis, but instead, was described by the court as an added benefit of participating whole life policies over term life insurance policies. *See id.* at 766–67.

The remaining case to mention policyholder dividends in the context of economic substance, is also in the context of a corporate-owned life insurance plan and is from the United States District Court for the District of Delaware, *In re CM Holdings, Inc.,* 254 B.R. 578 (D.Del.2000), *aff'd,* 301 F.3d 96 (3d Cir.2002). The District Court analyzed a complex transaction, which involved interest deductions taken by the taxpayer on loans to fund a corporate-owned life insurance plan and determined that the interest deductions were taken pursuant to a sham transaction and not deductable. In *In re CM Holdings, Inc.,* the plaintiff purchased life insurance policies for 1,430 of its employees and designated itself as the beneficiary of the policies. *Id.* at 581. The COLI VIII policies were "designed to be owned on a broad base of employees, to be financed through a highly leveraged transaction, and to provide the policyholder with a positive cash flow in every year of the policy." *Id.* at 581–82. The court explained the structure of the corporate-owned life insurance plan as follows:

> The COLI VIII policies were designed to be owned on a broad base of employees, to be financed through a highly leveraged transaction, and to provide the policyholder with a positive cash flow in every year of the policy. To achieve these design goals, the designers of the COLI VIII policies incorporated several innovative features in an attempt to comply with the Internal Revenue Code governing life in-

surance. In doing so, the designers obviously inched toward that invisible line which separates true life insurance from tax driven or tax sheltering investments.

*Id.*

The insurance company treated nearly all of the premium as an expense charge and returned nearly all of it to the company in the form of a "loading dividend." [35] *Id.* at 593. The court's discussion of policyholder dividends separated legitimate policyholder dividends from the "loading dividends" by the taxpayer. The court noted the taxpayer argued that the loading dividends were part of a real, not a sham, transaction because the loading dividends were " 'policyholder dividends' as defined in I.R.C. § 808, which defines 'policyholder dividend' as 'any dividend or similar distribution to policyholders in their capacity as such.' " *Id.* at 617 (quoting 26 U.S.C. § 808(a)) (footnote omitted). The court concluded that "[t]his argument fails because the § 808 definition of policyholder dividends rests on the assumption that the dividends are real transactions, and not factual shams. The definition of 'policyholder dividend' as 'dividend or similar distribution' implicitly assumes that the dividends would actually be real transactions." *In re CM Holdings, Inc.,* 254 B.R. at 617. Noting that the loading dividends were factually shams, the court dismissed the argument that 26 U.S.C. § 808 could be used to determine if the loading dividends were real, dismissing the bootstrapping argument of the taxpayer, and stating, "if the loading dividend falls within the definition of § 808, it must be real, even though § 808 requires the policyholder dividends be real in the first place." *In re*

---

**35.** The Third Circuit in its affirmance of the District Court's decision described the procedure of loading dividends to fund the premiums for the COLI plan:

> The payment mechanism for the following four years used a "loading dividend" to fund the premiums. For those years, in a simultaneous netting transaction occurring on the first day of the policy year:
> (i) Camelot paid the annual premium plus accrued interest;
> (ii) approximately 95% of the annual premium was taken by MBL as an expense charge, while approximately 5% was credited to the policy value;

> (iii) approximately 5–8% of the expense charge was set aside to cover MBL's actual expenses;
> (iv) approximately 92–95% of the expense charge was immediately returned to Camelot in the form of a "loading dividend;"
> (v) Camelot received a partial withdrawal of policy value in an amount equal to approximately 99% of the accrued loan interest;
> (vi) the loading dividend and partial withdrawal were used to offset payment of the annual premium and accrued loan interest; and
> (vii) Camelot paid the balance due in cash.
> *In re CM Holdings, Inc.,* 301 F.3d at 99–100.

*CM Holdings, Inc.,* 254 B.R. at 617–18. The court concluded that 26 U.S.C. § 808 did not make the COLI plan transaction any less of a sham. *Id.* On appeal, the United States Court of Appeals for the Third Circuit agreed with the District Court and stated, "The District Court's holding that the COLI transaction as a whole lacked economic substance, and thus was an economic sham, is undoubtedly correct. Thus, we do not reach the issue of whether the separate components of the transaction were factual or economic shams." *In re CM Holdings, Inc.,* 301 F.3d at 108. The Third Circuit continued, "[h]owever, we must clarify that we do not find the loading dividends to be factual shams. Factual shams are "transactions" that never actually occurred...." *Id.* The Third Circuit's explanation, although challenging the District Court's conclusions about the loading dividends being factual shams, nevertheless demonstrates how different the loading dividends in *CM Holdings* were from the policyholder dividends distributed by the plaintiff, and even further removed from the Dividend Guarantees. The Third Circuit explained that "[a] circular netting transaction, where different loans and payments are deemed to occur simultaneously (and thereby offset each other), is not by definition a factual sham. As the District Court pointed out, the simultaneous netting of the payment and the loan with the policy value as collateral that occurred in years 1–3 is common in the industry, and is a transaction with economic substance. The loading dividends of years 4–7 were similar simultaneous netting transactions that 'actually occurred,' and are therefore not factual shams." *Id.* By contrast, plaintiff paid eligible policyholder dividends from participating policies from the divisible surplus, and in the specific case of the Dividend Guarantees, guaranteed a certain amount of policyholder dividends.

In addition to challenging the defendant's characterizations of economic substance as it applies to the instant case, plaintiff also argued "the government cannot point to a single tax accounting case that denies a taxpayer a deduction that more nearly matches income with related expenses or that prevents a taxpayer from conforming its tax accounting of its liabilities to its true economic position." In response, defendant cited to *Clement v. United States,* 217 Ct.Cl. 495, 580 F.2d 422 (1978), *cert. denied,* 440 U.S. 907, 99 S.Ct. 1214, 59 L.Ed.2d 455 (1979), as evidence of the economic substance doctrine in a tax accounting case in which the timing of a recognized deduction was at issue. The defendant argued, "[t]he Court upheld the Commissioner's decision [to disallow the acceleration] because the acceleration resulted in a material distortion of income, but the Court also applied the business-purpose requirement to a deduction resulting from the use of tax-accounting rules." (citing *Clement v. United States,* 217 Ct.Cl. at 503–04, 580 F.2d at 427). *Clement v. United States* should be afforded little weight however, as the Revenue Ruling relied upon by the Court of Claims, Revenue Ruling 75–152, 1975–1 C.B. 144 (1975), Farmer's Deduction for Advance Payment for Livestock Feed, has since been superseded by Revenue Ruling 79–229, 1979–2 C.B. 210 (1979), Advance Payment for Livestock Feed, and applied to farmers electing the cash basis method of accounting. *See Clement v. United States,* 580 F.2d at 426. The business purpose language, on which the defendant relies, comes from the Revenue Ruling, which states in part, "[t]he second test is that the prepayment must be made for a valid business purpose and not merely for tax avoidance." Rev. Rul. 75–152, 1975–1 C.B. 144. As the Revenue Rule has been superseded and applied, when issued, specifically to farmers electing the cash basis method of accounting, the *Clement* does not offer defendant support for its argument that plaintiff needed a non-tax business purpose to adopt the Dividend Guarantees.

The nature of Dividend Guarantees is unique from the typical economic substance transaction analysis which is not applicable to the facts of this case. Plaintiff should not be precluded from accounting for the Dividend Guarantees in the years in which they were enacted.

## CONCLUSION

For the reasons discussed above, the deductions plaintiff claimed in its amended complaint related to the Dividend Guarantees for tax years 1995, 1996 and 1997 for Mass-

Mutual, and the Dividend Guarantee for tax year 1995 for ConnMutual, are allowable. As noted above, per the parties' stipulation for partial dismissal, plaintiff's claims regarding tax years 1988 through 1994, are confirmed as **DISMISSED.** Further proceedings to resolve the remaining issues in the case will be scheduled by separate Order.

**IT IS SO ORDERED.**